*410 Attachment 1*

**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**[Amended 9-26-1996 by Ch. No. 2425; 10-23-1997 by Ch. No. 2470; 6-23-1999 by Ch. No. 2531; 3-22-2001 by Ch. No. 2592; 8-25-2004 by Ch. No. 2739]**

| | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1. Residential uses.** | | | | | | | | | | | | | | | |
| A One-family detached dwelling. | Y | Y | Y | Y | Y | N | N | Y | -- | -- | -- | -- | -- | -- | -- |
| B. Two-family detached dwelling. | -- | -- | Y | Y | Y | N | N | Y | Y | Y | -- | -- | -- | -- | -- |
| C. Three- or four-family detached dwelling. | -- | -- | -- | Y | Y | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| D. Multifamily (5 dwelling units and over). | -- | -- | -- | Y | Y | N | N | Y | Y | Y | S | S | -- | -- | -- |
| E. Community residence * | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | -- | -- | -- |
| F Nursing or convalescent home, orphanage. | -- | -- | -- | S | S | N | N | Y | -- | Y | Y | -- | -- | -- | -- |
| G. Convent or rectory. | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | -- | -- | -- | Y |
| H Family day-care home: | | | | | | | | | | | | | | | |
| Up to 8 children | Y | Y | Y | Y | Y | -- | -- | Y | Y | Y | Y | Y | -- | -- | -- |
| H(1) Family day-care home: | | | | | | | | | | | | | | | |
| 9 or more children | S | S | S | S | S | -- | -- | S | -- | -- | -- | -- | -- | -- | -- |
| I. Manufactured home park * | -- | -- | -- | S | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| J. Taking of boarders or leasing rooms by a person residing on the premises for not more than 2 boarders. | Y | Y | Y | Y | Y | N | N | S | Y | Y | -- | -- | -- | -- | — |
| K. Rooming house up to 6 rooming units. | -- | -- | S | S | S | N | N | N | S | S | S | -- | -- | -- | -- |
| L. Rooming house over 6 rooming units (limit 12 persons). | -- | -- | -- | -- | S | N | N | N | S | S | S | -- | -- | -- | -- |
| M. Mixed residential/commercial uses. | -- | -- | -- | S | -- | N | N | Y | -- | -- | S | -- | -- | -- | -- |
| N Independent-living facility | -- | -- | -- | S | -- | N | N | S | -- | S | S | -- | -- | -- | -- |
| O. Artist studio, display and sales. | -- | -- | -- | -- | Y | N | N | Y | - | Y | Y | Y | Y | -- | -- |
| **2. Accessory uses.** | | | | | | | | | | | | | | | |
| A. Garage, no dwelling units. | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | -- | -- | -- | -- | -- |
| B. Storage shed up to 100 square feet in area. | Y | Y | Y | Y | Y | Y | N | Y | -- | -- | -- | -- | — | — | -- |
| C Storage shed over 100 square feet in area. | S | S | S | S | S | S | Y | S | Y | Y | Y | Y | Y | -- | -- |
| D. Swimming pool (residential use). | Y | Y | Y | Y | Y | N | N | Y | — | -- | -- | -- | -- | Y | -- |
| E. Fence. | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| F. Ground-mounted antenna for amateur radio and television. | Y | Y | Y | Y | Y | N | N | S | Y | Y | -- | -- | -- | -- | -- |
| G. Home occupations. | S | S | S | S | S | N | N | A | Y | Y | Y | -- | -- | -- | -- |
| H. Satellite dish antenna up to 8 feet in diameter. | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | -- | -- | -- |
| I. Satellite dish antenna over 8 feet in diameter. | -- | -- | -- | -- | -- | N | S | S | Y | Y | Y | Y | Y | — | — |
| J. Private greenhouse. | Y | Y | Y | Y | Y | Y | N | S | — | -- | -- | -- | -- | -- | Y |
| K. Flagpole. | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| L. Sale of handicraft or homecraft products incidental to their manufacture on the premises, provided that the display of such merchandise shall not be visible from the street. | A | A | A | A | A | N | N | Y | A | A | A | A | A | A | A |
| **3. Transient residential.** | | | | | | | | | | | | | | | |
| A Bed-and-breakfast home (1 dwelling unit).* | -- | -- | S | S | Y | N | N | Y | Y | Y | -- | -- | -- | -- | -- |
| B. Motel.* | -- | -- | -- | -- | -- | N | N | Y | -- | Y | -- | -- | -- | -- | -- |
| C Motor inn * | -- | -- | -- | -- | Y | N | N | Y | -- | -- | Y | -- | -- | -- | -- |
| **4. Gardening and raising of animals.** | | | | | | | | | | | | | | | |
| A. Gardening/farming, not to include the raising of animals. | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y |

**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**(Cont'd)**

| | | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | Greenhouse/nursery not used for a private gainful business | S | S | S | S | S | S | N | Y | Y | Y | Y | Y | -- | Y | Y |
| C. | Commercial greenhouse or nursery. | -- | -- | -- | -- | -- | S | Y | Y | Y | Y | Y | Y | -- | -- | Y |
| D. | Keeping of animals as household pets | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y |
| E | Raising of animals | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| F. | Public zoo. | -- | -- | -- | -- | -- | Y | N | N | -- | -- | -- | -- | -- | Y | -- |
| G | Pigeon loft | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| **5.** | **Public, semipublic, education and recreation uses.** | | | | | | | | | | | | | | | |
| A. | Place of worship. | Y | Y | Y | Y | Y | S | S | S | Y | Y | S | Y | Y | -- | Y |
| B. | Cemetery. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | Y |
| C. | Crematory | -- | -- | -- | -- | -- | N | N | Y | -- | -- | -- | -- | -- | -- | S |
| D. | Public museum or library. | S | S | S | Y | Y | Y | Y | Y | Y | Y | Y | -- | -- | Y | -- |
| E. | Hospital | -- | -- | -- | S | -- | N | N | S | -- | -- | -- | -- | -- | -- | -- |
| F. | Incinerator | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | -- | -- | -- |
| G. | Municipal fire station | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | -- |
| H. | Municipal garage. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| I. | Refuse transfer station | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | -- | -- | -- |
| J. | Municipal structure or use not otherwise specified herein. | S | S | S | S | S | S | S | S | Y | Y | Y | Y | Y | Y | S |
| K. | Individual instruction. | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | -- |
| L | Day-care center.* | S | S | S | S | S | S | A | Y | Y | Y | Y | Y | Y | -- | -- |
| M. | Elementary or secondary school | Y | Y | Y | Y | Y | N | S | Y | Y | Y | Y | S | S | S | -- |
| N. | Trade or professional school | -- | -- | -- | -- | -- | N | S | Y | Y | Y | Y | Y | Y | -- | -- |
| O. | School conducted for teaching such subjects as singing, dance or instrumental music. | -- | -- | -- | -- | -- | N | S | Y | Y | Y | Y | Y | Y | -- | -- |
| P. | Historical museum or display, including incidental retail sales. | -- | -- | -- | -- | -- | Y | Y | Y | -- | -- | Y | -- | Y | Y | -- |
| Q. | Community center | -- | S | S | S | S | S | Y | Y | Y | Y | Y | -- | -- | -- | -- |
| R. | Municipal park. | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | -- | -- | Y | -- |
| S. | Nonprofit organizations. | -- | -- | -- | -- | -- | S | Y | Y | Y | Y | Y | Y | Y | Y | -- |
| T. | Noncommercial club or fraternal organization | -- | -- | -- | S | S | S | N | S | S | S | S | -- | -- | -- | -- |
| U. | Golf course. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | S | -- |
| V. | Nonprofit recreational facility. | -- | -- | -- | Y | -- | N | Y | Y | -- | Y | Y | Y | -- | -- | -- |
| W. | Marina. | -- | -- | -- | S | -- | Y | Y | Y | -- | -- | S | -- | -- | -- | -- |
| **6.** | **Neighborhood commercial uses.** | | | | | | | | | | | | | | | |
| A. | Retail store of less than 2,500 square feet per establishment. | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| B. | Eating places of less than 2,500 square feet of gross floor area, no dancing or live entertainment. | -- | -- | -- | -- | -- | Y | Y | Y | Y | Y | Y | Y | -- | -- | -- |
| C | Service business of less than 2,500 square feet of gross floor area per establishment, primarily serving local needs. | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| **7.** | **General commercial uses.** | | | | | | | | | | | | | | | |
| A. | Grocery store over 20,000 square feet. | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | -- | -- | -- | -- |
| B | Retail store over 2,500 square feet serving the general needs of the City. | -- | -- | -- | -- | -- | N | N | N | -- | Y | Y | -- | -- | -- | -- |
| C. | Restaurant exceeding 2,500 square feet of gross floor area or providing dancing and entertainment | -- | -- | -- | -- | -- | Y | Y | Y | S | S | S | S | S | -- | -- |
| D. | Tavern with liquor license | -- | -- | -- | -- | -- | S | N | S | Y | Y | Y | -- | -- | -- | -- |

**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**(Cont'd)**

| | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E. Any commercial use with a drive-in window. | -- | -- | -- | -- | -- | N | N | N | S | S | S | S | -- | -- | -- |
| F Multitenant commercial structure. | -- | -- | -- | -- | -- | N | N | S | S | S | S | -- | -- | -- | -- |
| G. Nightclub | -- | -- | -- | -- | -- | -- | -- | -- | -- | S | S | S | S | -- | -- |
| **8. Personal services.** | | | | | | | | | | | | | | | |
| A Coin-operated dry cleaner and laundering (7215) | -- | -- | -- | -- | -- | N | N | S | Y | Y | Y | Y | -- | -- | -- |
| B. Dry-cleaning plant, except rugs (7216). | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | Y | Y | -- | -- |
| C. Carpet and upholstery cleaning (7217) | -- | -- | -- | -- | -- | N | N | N | Y | Y | -- | Y | Y | -- | -- |
| D. Funeral services (726) | -- | -- | -- | -- | -- | S | N | Y | S | Y | Y | Y | -- | -- | -- |
| E. Bank, credit union and financial services. | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| F. Miscellaneous services, including health club, travel agent, weight-reduction salon, beauty salon, barbershop (729) | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | -- | -- | -- |
| G. Travel agency | -- | -- | -- | -- | -- | -- | -- | -- | Y | Y | Y | Y | -- | -- | -- |
| H. Health club/weight-reduction salon | -- | -- | -- | -- | -- | -- | -- | -- | Y | Y | Y | Y | Y | -- | -- |
| I. Tattoo parlor | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| J. Massage therapy | -- | -- | -- | -- | -- | -- | -- | -- | -- | S | S | -- | -- | -- | -- |
| **9. Business services.** | | | | | | | | | | | | | | | |
| A. Advertising agency (731) | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| B. Services to dwellings and buildings (734) | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| C. Computer and data processing services (737). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| D. Management, consulting and public relations services (7392). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| E. Equipment rental and leasing (7394) | -- | -- | -- | -- | -- | N | N | N | -- | Y | Y | Y | Y | -- | -- |
| F. Business services (other 73) | -- | -- | -- | -- | -- | N | N | Y | -- | Y | Y | Y | Y | -- | -- |
| **10. Office uses.** | | | | | | | | | | | | | | | |
| A. Medical office building. | -- | -- | -- | S | S | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| B. Veterinarian. | -- | -- | -- | -- | -- | N | N | S | S | Y | Y | -- | -- | -- | -- |
| C. Other office or office building. | -- | -- | -- | -- | -- | N | Y | Y | Y | Y | Y | A | A | -- | A |
| D. Professional office or studio for a doctor, accountant, dentist, real estate or insurance agent | -- | -- | -- | -- | -- | N | Y | Y | Y | Y | Y | Y | Y | -- | -- |
| E. Multipurpose health service office, for the offices and facilities of 1 or more entities whose primary purposes involve transportation, education, work experience, counseling, physical therapy and support services. | -- | -- | -- | -- | -- | N | Y | Y | -- | Y | Y | Y | Y | -- | -- |
| **11. Automotive repair, services and garages.** | | | | | | | | | | | | | | | |
| A. General automotive repair shops (7538) | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | Y | Y | -- | -- |
| B. Other automotive repair shops (7534) | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | Y | Y | -- | -- |
| C. Automotive services, except repair (754). | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | Y | -- | -- | -- |
| **12. Auto body repair shop.** | | | | | | | | | | | | | | | |
| A. Auto body repair shops (7531). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |

**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**(Cont'd)**

| | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **13. Miscellaneous repair services.** | | | | | | | | | | | | | | | |
| A. Electrical and electronic repair shops (762). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| B. Reupholstery and furniture repair (764). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| C. Other repair shops and related services (763). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| **14. Amusement/recreation services.** | | | | | | | | | | | | | | | |
| A. Motion picture theater (783) | -- | -- | -- | -- | -- | N | N | Y | -- | Y | Y | -- | -- | -- | -- |
| B. Orchestra and entertainers (792). | -- | -- | -- | -- | -- | N | N | Y | -- | Y | Y | Y | Y | -- | -- |
| C. Bowling alley, billiards and pool (793) | -- | -- | -- | -- | -- | N | N | Y | -- | Y | Y | Y | Y | -- | -- |
| D. Other amusement and recreation (79) | -- | -- | -- | -- | -- | N | N | Y | -- | Y | Y | Y | Y | -- | -- |
| E. Dance halls, studios and schools (791). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| F. Coin-operated amusement devices (gamerooms) (7993). | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | Y | -- | -- | -- |
| **15. Automotive uses.** | | | | | | | | | | | | | | | |
| A Parking garage or parking area | -- | -- | -- | -- | -- | N | A | Y | Y | Y | Y | Y | Y | A | A |
| B Parking garage or parking area for noncommercial vehicles | -- | -- | S | S | Y | A | A | Y | Y | Y | Y | Y | Y | A | A |
| C. Parking garage or parking area within 100 feet of any commercial or industrial zone. | -- | S | S | S | S | N | N | S | Y | Y | Y | Y | Y | A | A |
| D. Storage of 1 truck of not more than 3/4-ton capacity, owned and operated by a person residing on the premises, specifically excluding vehicles used for the transportation of liquids, gases, rubbish, trash, garbage or other noxious matter. | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y |
| E. Parking of commercial vehicles over 3/4-ton capacity | -- | -- | -- | -- | -- | N | Y | A | Y | Y | Y | Y | Y | Y | Y |
| F Storage for noncommercial registered automobiles owned and operated by a person residing on the premises. | A | A | A | A | A | N | N | A | A | A | A | A | A | A | A |
| G. Off-street parking garage or parking area as required by Article IX. | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A |
| H Car washing facility. | -- | -- | -- | -- | -- | N | N | N | S | Y | Y | -- | -- | -- | -- |
| I Gasoline service station, including repair facilities. | -- | -- | -- | -- | -- | N | N | N | S | S | -- | -- | -- | -- | -- |
| J. Automobile/truck repair garage. | -- | -- | -- | -- | -- | N | Y | N | Y | Y | -- | Y | Y | -- | -- |
| K. Automobile, truck and motorcycle sales, rental and service. | -- | -- | -- | -- | -- | N | N | N | -- | Y | Y | Y | -- | -- | -- |
| **16. Wholesale commercial uses.** | | | | | | | | | | | | | | | |
| A Wholesale commercial use, including the sale and storage of goods, supplies or equipment. | -- | -- | -- | -- | -- | N | N | N | -- | Y | Y | Y | Y | -- | -- |
| **17. Public utility uses.** | | | | | | | | | | | | | | | |
| A. Telephone or telegraphic office exchange. | -- | -- | -- | -- | -- | N | N | Y | Y | Y | Y | -- | -- | -- | -- |
| B. Electric power substation or gas pressure regulator station | S | S | S | S | S | S | S | S | S | S | S | Y | Y | -- | -- |
| C. Electric power plant and cogeneration facility. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| D. Public utility pole. | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

v-00520-S-LDA Document 19-2 Filed 11/15/2006



**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**(Cont'd)**

| | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E. Public utility tower not otherwise specified herein. | S | S | S | S | S | S | S | S | S | S | S | Y | Y | S | -- |
| F. Radio or television transmission tower. | -- | -- | -- | -- | -- | N | N | N | -- | Y | Y | Y | Y | -- | -- |
| G. Water tower | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| H. Any other structure which is part of a public utility system, other than a freight or trucking terminal | S | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| I. Personal communications system antenna. | -- | -- | -- | -- | S | N | S | S | -- | S | S | S | S | -- | -- |
| J. Wireless communications antenna. | -- | -- | -- | -- | -- | N | S | S | -- | -- | -- | S | S | -- | -- |
| **18. Transportation uses.** | | | | | | | | | | | | | | | |
| A. Heliport. | -- | -- | -- | -- | -- | S | S | S | -- | -- | Y | Y | Y | -- | -- |
| B. Railroad. | -- | -- | -- | S | S | N | N | S | S | S | S | Y | Y | -- | -- |
| C. Passenger transportation terminal. | S | S | S | S | S | Y | Y | Y | S | Y | Y | S | S | -- | -- |
| D. Freight or trucking terminal. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| **19. Storage uses.** | | | | | | | | | | | | | | | |
| A. Coal, lumber or wood yard, heating oil storage or distribution | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| B. Storage of equipment, products, supplies or material. | -- | -- | -- | -- | -- | N | Y | A | -- | -- | -- | Y | Y | -- | -- |
| C. Storage of junk, automotive junk, junkyard, commercial junkyard. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| D. Storage of flammable or volatile materials | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| E Storage of building materials and equipment incidental to adjacent construction | A | A | A | A | A | A | A | A | A | A | A | A | A | A | A |
| F. Hazardous substances: any substance or mixture, or substance which is toxic, corrosive, an irritant, a strong sensitizer flammable or combustible, or generates pressure through decomposition, heat or other means if such substance may cause substantial personal injury or substantial illness. | -- | -- | -- | -- | -- | N | N | N | -- | -- | - | -- | -- | -- | -- |
| G. Permanently sited trailers for storage use. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| H Rental storage space. | -- | -- | -- | -- | -- | N | N | N | -- | Y | -- | Y | Y | -- | -- |
| **20. Industrial uses.** | | | | | | | | | | | | | | | |
| A. Manufacture of handicraft or homecraft products by a person residing on the premises and having no employees. | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | -- | -- |
| B. Manufacture, processing or treatment of products, provided that they are principally sold at retail on the premises, and provided that not more than 5 persons are engaged therein | -- | -- | -- | -- | -- | N | N | Y | A | A | A | Y | Y | -- | -- |
| C. Processing of food and kindred products (20). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| D. Textile mill products (22) | -- | -- | -- | -- | -- | N | Y | Y | -- | -- | -- | Y | Y | -- | -- |
| E. Apparel and other textile products (23). | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |
| F. Lumber and wood products (24) | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |
| G. Furniture and fixtures (25). | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |
| H Paper and allied products (26). | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |

**TABLE OF USE REGULATIONS**
**City of Pawtucket**
**(Cont'd)**

| | RL | RS | RT | RM | RE | RD1 | RD2 | RD3 | CL | CG | CD | MO | MB | PO | PC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I. Printing and publishing (27). | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |
| J. Chemicals and allied products (28). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| K. Plastic materials and synthetics (282). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| L. Drugs, pharmaceutical (283) | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| M. Drugs, biological products (2831). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| N. Soaps, cleaners (284). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| O. Industrial organic chemicals (286). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| P. Miscellaneous chemical products (289). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| Q. Rubber and miscellaneous plastic products (30). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| R. Leather and leather products (31). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| S. Stone, clay and glass products (32). | -- | -- | -- | -- | -- | N | S | N | -- | -- | -- | Y | Y | -- | -- |
| T. Primary metal industries (33) | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| U. Nonferrous rolling and drawing (335) | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| V. Nonferrous wire drawing and insulating (3357). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| W. Fabricated metal products and services (347). | -- | -- | -- | -- | -- | N | Y | S | -- | -- | -- | Y | Y | -- | -- |
| X. Jewelry, silverware and plated ware (391). | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | Y | -- | -- |
| Y. Bulk storage of propane with the primary purpose being distribution and transportation to commercial and industrial users. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| Z. Concrete or cement products manufacture | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | Y | -- | -- | -- |
| AA. Quarrying or mining of sand, gravel or rocks. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| BB. Rock or stone crushing. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| CC. Manufacturing of firearms. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | -- | -- | -- | -- |
| DD. Any other manufacturing use. | -- | -- | -- | -- | -- | N | S | S | -- | -- | -- | S | S | -- | -- |
| EE. Manual assembly of jewelry products. | -- | -- | -- | -- | -- | -- | -- | -- | -- | S | S | Y | Y | -- | -- |
| FF. Multitenant industrial structure | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | S | S | -- | -- |
| **21. Signs.** | | | | | | | | | | | | | | | |
| A. Signs. See § 410-88A to F. | -- | -- | -- | -- | -- | S | S | S | Y | Y | Y | Y | Y | -- | -- |
| B. Billboard, bulletin type. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| C. Billboard, thirty-sheet poster type. | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |
| D. Billboard, eight-sheet poster type | -- | -- | -- | -- | -- | N | N | N | -- | -- | -- | S | S | -- | -- |

**§ 410-15.1. Development plan review process. [Amended 3-22-2001 by Ch. No. 2592; 11-12-2004 by Ch. No. 2750]**

A. Purpose. It is the purpose of this article to establish procedures pursuant to the permitting process which will enable the City to perform a comprehensive review of certain proposed developments. The development plan review (DPR) procedure shall not be used to deny an applicant a permitted use of the property as established by the Zoning Ordinance. The particular uses requiring development plan review are outlined. The development plan review requirements of this article are designed to assure safe, orderly and harmonious development of property in a manner that shall:

(1) Provide suitable safeguard and consideration for land use and site architectural design that is compatible with adjacent districts and uses;

(2) Permit development to an extent commensurate with the availability and capacity of public facilities and services and promote the safe circulation of traffic throughout the City;

(3) Preserve and protect natural resources and features and encourage consideration of environmental impacts and mitigative measures;

(4) Encourage the provision of open space and public access and give due consideration to the quality and design of landscaping;

(5) Encourage adequate consideration for the proper control of erosion, surface and subsurface drainage and pollution;

(6) Facilitate orderly harmonious site development including safe and convenient provision and design of egress and ingress, off-street parking, truck loading, internal circulation, emergency access, refuse disposal outdoor storage, signage and lighting;

(7) Preserve natural, historical, and cultural resources to the maximum extent feasible;

(8) Protect appropriate vistas and environmental qualities of the City;

(9) Assure consideration of the various elements of the comprehensive plan of the City.

B. Applicability.

(1) No permit to build, alter or expand any of the uses requiring development plan review as outlined below shall be issued by the Building Official until a written statement of final approval in accordance with this article has been received. The applicant is responsible for obtaining a building permit through the Zoning and Code Enforcement as required by City ordinances. The applicant must submit all plans and documents normally required for a building permit. The approved final plan shall be part of this submission. The development plan review process will not preclude the need to meet other City requirements as they may apply to a particular development. No alteration to any City ordinance requirements, or any necessity to gain approval by another legal jurisdiction shall be deemed to be authorized or granted by virtue of the development plan review under this article.

(2) Where the project is subject to development plan review and constitutes a subdivision, as defined in the land Development and Subdivision Review Regulations adopted by the City Planning Commission, the two processes shall proceed concurrently. In the event that the development plan review decision is made prior to a final decision on the subdivision associated with the development, this decision shall be conditional on the subdivision approval.

(3) For any property located in the Riverfront Zoning District and therefore subject to design review by the Riverfront Commission, as defined by Article III of the Zoning Ordinance and where the project is subject to development plan review, the two processes shall proceed concurrently and Article III shall take precedence. In the event that the development plan review decision is made prior to a final decision on building design proposed in the development, this decision shall be conditional on Riverfront Commission approval.

C. Coordination with Zoning Board of Review. The development plan review process (if applicable) must take place prior to the consideration of a dimensional variance, special use permit or appeal to the Zoning Board of Review.

D. Development plan review process. The development plan review shall be conducted by either the City Planning Commission or the staff of the Department of Planning and Redevelopment.

E. Projects requiring development plan approval.

(1) Review required by the City Planning Commission:

(a) Construction of any new structure on a parcel or parcels of land containing 10,000 square feet or more.

(b) Exterior addition with a gross floor area of 200 square feet or more to an existing structure on a parcel or parcels of land containing 10,000 square feet or more.

(c) The construction of any new residential structure with three or more units.

(2) Review required by the staff of the Department of Planning and Redevelopment:

(a) Any infill development on lots of less than 10,000 square feet in established neighborhoods or commercial districts. "Infill development" is defined as any development or redevelopment on a lot in an established neighborhood or commercial district which is served by public facilities (sewer, water, utilities).

(b) Any permitted use that is specifically referred in writing to the Department of Planning and Redevelopment by the Building Official or the Director of Zoning and Code Enforcement.

(c) Any other use for which the application for a variance or special use permit is specifically referred in writing to the Department of Planning and Redevelopment by the Zoning Board.

F. Procedure.

(1) Preapplication conference.

(a) Before submitting a development plan, the applicant may meet with Department of Planning and Redevelopment staff to review the proposal and determine the information the applicant must submit for consideration by the Department of Planning and Redevelopment staff or the City Planning Commission. The purpose of the preapplication conference is:

[1] To acquaint the applicant with the Comprehensive Plan and any specific plans that apply to the parcel as well as zoning and other ordinances that affect the proposed development;

[2] Suggest improvements to the proposed design on the basis of a review of the sketch plan;

[3] Advise the applicant to consult appropriate authorities on the character, adequacy and placement of public utility services; and

[4] Assist the applicant to understand the procedures as required by this chapter.

(b) Department of Planning and Redevelopment staff may waive certain development plan review submission requirements if it finds that the information will not be necessary for the staff or the City Planning Commission to render a decision. Further supporting information may also be required when necessary to render a decision.

(2) Application filing.

(a) Applications that require review before the City Planning Commission: Within 30 days of the receipt of a complete development plan application, the City Planning Commission shall hold a public hearing upon the plan. Owners of real property in or within 200 feet of the perimeter of the proposed project shall be notified by certified mail of the hearing.

(b) Applications that require review by the Staff of the Department of Planning and Redevelopment: Within 30 days of the receipt of a complete development plan application, staff of the Department of Planning and Redevelopment will meet and comment on the application.

(3) General standards for approval. The City Planning Commission or the Department of Planning and Redevelopment staff shall review the application and supporting documentation and shall issue development plan approval (including appropriate revisions and conditions), provided that the applicant has proved to the Commission/staff that the following standards will be met:

(a) The design of the proposed development will be consistent with the goals of the City Comprehensive Plan and will implement the purposes of development plan review;

(b) Erosion will be adequately controlled during and after construction and will not adversely affect adjacent or neighboring property or public facilities and services;

(c) Provisions have been made for stormwater and drainage facilities, and that increased runoff due to development on site will not be incurious to any nearby property owners or cause hazardous conditions on any streets;

(d) The movement of vehicular and pedestrian traffic within the site and in relation to access streets will be safe and convenient and adequate provision has been made for snow removal;

(e) All necessary utility, infrastructure, street, roadway, sidewalk, walkway and parking area improvements will be provided for the development by the applicant and will meet all applicable City requirements and standards;

(f) The location, arrangement, appearance, and sufficiency of off-street parking and loading comply in all respects with the Zoning Ordinance and are adequate to serve the development.

G. Development and landscaping design standards.

(1) Purpose and objectives. The purpose of this section is to promote and protect public health, safety, general welfare and amenity. Effective site planning, development design, and landscaping can accomplish the following objectives:

(a) Promote the most desirable use of land and arrangement of development in the City and thus conserve the value of land and buildings, and thereby protect the City's tax revenues;

(b) Improve the physical environment through the provision of amenities such as open space, street trees, sidewalks, and live vegetation;

(c) Preserve the character and scale of existing development and control new development in conformity of the existing character of the area;

(d) Provide a transition between and a reduction in the environmental, aesthetic and other impacts of one type of land use upon another;

(e) Provide safe and efficient pedestrian and traffic circulation patterns;

(f) Lessen the transmission of noise, dust, pollution, light, and glare from one lot to another;

(g) Improve air quality through the production of oxygen and reduction of dangerous carbon monoxide;

(h) Through shading, provide cooling of air and land to offset radiational heating;

(i) Minimize the negative impacts of stormwater runoff to enhance and protect surface and groundwater quality, and promote effective flood management;

(j) Control damaging impacts of sheet runoff and resultant surface water contamination;

(k) Stabilize groundwater tables through vegetative root systems, which play an important and effective part in soil conservation, erosion control, flood control, and absorption of pollutants.

(2) Development standards.

(a) Compatibility. Applicants shall be required to plan developments, the design of which (including proposed style and materials, the relationship between any proposed buildings and the site, and the overall physical appearance), will be consistent with the goals of the City Comprehensive Plan as listed below to the extent possible:

[1] Protect existing neighborhoods from increasing housing densities that lead to overcrowding, shortage of available off-street parking and traffic congestion.

[2] Encourage infill development on vacant parcels that reflects the built character of the neighborhood.

[3] Control strip commercial development by promoting neighborhood and regional shopping districts.

[4] Revitalize downtown with a variety of mixed uses including live-work space, offices, studios, galleries, restaurants and theaters.

[5] Promote and encourage appropriate development along Pawtucket's riverfront including

well-designed commercial uses, the reuse of existing, vacant industrial buildings, the creation of public gathering places, and the provision of river access.

[6] Ensure that residential growth does not adversely affect environmental, recreational and cultural resources.

[7] Encourage the rehabilitation of underutilized commercial and industrial structures to residential units as appropriate.

[8] Protect the City's residential neighborhoods by preventing encroachment from other nonresidential land uses.

[9] Continue efforts to attract new, compatible economic development that is sensitive to Pawtucket's historic, cultural and environmental resources.

[10] Provide the adequate infrastructure including utilities, roadways, and parking facilities, at appropriate locations for economic development activities.

[11] Continue to promote Pawtucket as an artist-friendly community and as a tourist destination.

[12] Protect and improve ground and surface water quality by alleviating and where possible eliminating point and nonpoint sources of water pollution.

[13] Preserve biological diversity through the protection and management of state and federally listed rare species habitat areas and ecologically significant natural communities.

[14] Preserve and use, or adaptively reuse structures or sites in the National Register of Historic Places, in the Local Historic District, or other structures and sites of historic significance to the City.

[15] Preserve the integrity of historic neighborhoods where most of the residential structures are more than 70 years old.

[16] Manage stormwater runoff to prevent flooding, loss of life, and property damage, to protect ground and surface water quality and to preserve the integrity of natural watercourses and wetlands.

[17] Provide safe pedestrian and bicycle access along the City's streets and at intersections, recognizing the inherent value of these forms of movement to the preservation of neighborhoods.

[18] Maintain and improve the image of the City of Pawtucket by enhancing the visual character of the City's streets, roads and highways through carefully designed landscaping and street tree planting.

[19] Promote and encourage appropriate commercial development, re-use of vacant industrial buildings. the creation of public gathering places, and the provision of access to Pawtucket's riverfront.

[20] Provide linkages and means of access to existing and developing trails and walkways, either in conjunction with or separate from bikeways in Pawtucket, the Blackstone Valley and elsewhere in Rhode Island.

[21] Recognize pedestrian movement as a necessary and viable means of movement and provide residents with safe, secure, and pleasant pedestrian access to neighborhood activities such as schools, parks, playgrounds, libraries, commercial activities, employment and places of worship.

(b) General residential apartment building design. A "residential apartment building" is defined as a multiple-unit building with apartments vertically arranged and with parking located below or adjacent to the building. Units may be for rental or for sale as condominium units. The design residential apartment buildings should focus on a high quality of design and be compatible with the surrounding neighborhood by incorporating like materials, design details, and architectural features. Secondary hipped or gabled roofs covering the entire mass of the building are preferable to mansard roofs or segments of a pitch roof applied at the structures edge. Where

possible, the provision of a courtyard or communal open space area should be incorporated into site design.

(c) Townhouse building design. A "townhouse building" is a building with two or more residential units that are located side by side with private entrances. Units may be for rental or for sale as condominium units. Townhouses should be oriented to the street to ensure pedestrian scale development. The design of the townhouses should focus on a high quality of design and be compatible with the surrounding neighborhood. Long, unbroken facades will be unacceptable. Building facades should be broken up to give the appearance of a collection of smaller structures. To the extent possible, each of the units should be individually recognizable. This can be accomplished with the use of balconies, setbacks, projections and by the pattern and rhythm of windows and doors. Secondary hipped or gabled roofs covering the entire mass of the building are preferable to mansard roofs or segments of a pitch roof applied at the structures edge. Where possible, the provision of a courtyard or communal open space area should be incorporated into site design.

(d) General commercial building design. Particularly in the Downtown, Arts and Entertainment District and riverfront districts, building design shall consider the compatibility of building design with the surrounding land uses, buildings and the physical environment. Rooflines, height, building mass, form, architectural character, exterior finish materials and outdoor spaces should complement adjacent commercial and other buildings. In the above-referenced districts, franchise architecture (a generic design that is repeated throughout different locations by a particular corporation, without consideration of a specific site or climate) will not be allowed. All new commercial construction must create buildings that blend in with the existing environment and are sensitive to their surroundings.

(e) Infill development design. Any development on a lot in an established residential neighborhood or commercial district that is served by public facilities (sewer. water, utilities) shall be considered infill development. The design of such developments shall take into consideration the prevailing street setbacks and reasonably reflect the facade height, massing, scale and style of abutting developments. "Building massing" is defined as the overall bulk of a building, as in its height, width and scale. Building scale is defined as the size of the building in relation to other buildings in close proximity.

(3) Landscaping standards; general requirements.

(a) Landscaping shall be provided as part of development plan design. It shall be conceived in a total pattern throughout the site, integrating the various elements of site design, preserving and enhancing the particular identity of the site where appropriate.

(b) Landscaping may include plant materials such as trees, shrubs, ground covers, perennials, and annuals, and other materials such as rocks, water, sculpture, art, walls, fences, and street furniture.

(c) Maximum effort should be made to save trees or other plant specimens that are large for their species, rare to the area, or of special horticultural or landscape value. In the event that any such tree or plant specimens are to be removed, they are to be replaced elsewhere on the project site with specimens of a comparable size and type. Such requirements may be waived by Department of Planning and Redevelopment staff or the City Planning Commission where the applicant demonstrates to the satisfaction of staff/Commission that special site and design conditions so warrant.

(d) Landscaping of all cuts and fills and/or terraces shall be sufficient to prevent erosion, and all roadway slopes steeper than one foot vertically to three feet horizontally shall be planted with vegetative ground cover appropriate for the purpose and for soil conditions and environment.

(e) For residential developments, planting or landscaping elements may be required throughout the development to mitigate climatic extremes, to promote effective drainage control, to mitigate water and air quality impacts, provide privacy and enhance the property appearance.

(f) For nonresidential developments in CG, CL, CD Zones, all areas of the site not occupied by buildings and required improvements shall be landscaped by the planting of grass or other vegetative ground cover, shrubs, and trees.

(g) Every development shall provide sufficient buffering when topographical or other barriers do not provide reasonable screening and when Department of Planning and Redevelopment staff or City Planning Commission determines there is a need to shield neighboring properties from any adverse external effects of a development, shield the development from negative impacts of adjacent uses, or to minimize stormwater impacts on flood management and water quality.

(4) Parking standards.

(a) Refer to § 410-78F. Parking area landscaping requirements.

(b) Parking area design standards.

[1] All parking areas shall provide the minimum required widths for traffic aisles and driveways as described in § 410-78A.

[2] Pedestrian and vehicular circulation areas shall be designed so as to provide safe and efficient traffic flow patterns. Conflicts between pedestrians and vehicular traffic shall be minimized by providing physical and visual separation between pedestrianways and traffic lanes or at crossing of the two.

[3] The placement of all directional and street level signage shall be subject to review and approval by the City Traffic Engineer.

H. Final action.

(1) Department of Planning and Redevelopment staff or the City Planning Commission shall take final action within 60 days of the receipt of a complete application.

(a) Such final action shall be one of the following:

[1] A written statement of approval indicating that the staff or the Commission has determined that the applicant has demonstrated or proved to the satisfaction of staff or the Commission that each of the applicable standards of development plan review have been met.

[2] A written statement of conditional approval, subject to such conditions, modifications and restrictions as staff or the Commission may deem necessary so that the proposed activities meet each of the applicable standards of development plan review.

[3] A written statement of a denial of an application.

(b) In the event of a denial of an application or an approval where conditions, modifications or restrictions have been imposed, staff or the Commission shall issue written findings of fact, and, where applicable, conclusions of law, explaining the reason why any standard or standards have not been met and setting forth the basis for either the denial of the application or the imposition of any condition, modification, or restriction.

(2) Revisions to the plan.

(a) All construction, alteration or expansion shall be carried out only in conformity with any conditions, modifications and restrictions set by staff or the Commission, and only in conformity with the application and development plan on which the decision was based. Minor changes to the development plan must be approved by the Building Official in consultation with Department of Planning and Redevelopment staff. Minor changes are defined as changes that do not substantially alter the basic design and layout of the project, conditions required by the reviewing authority for development plan approval and that do not substantially impact neighboring properties. Minor changes must also meet the following criteria:

[1] There is no increase in the number of lots or dwelling units.

[2] There is no change to any dimension of the previously approved plan, including building envelopes, exceeding 20%.

[3] There is no change to any street or driveway.

[4] There is no change required to any public infrastructure.

(b) Changes that do not meet the above criteria will be considered major and shall be resubmitted for the review process. Any work carried out in violation of this provision shall be ordered halted

and fully removed. The Building Official shall enforce the fulfillment of any conditions or revisions which staff or the Commission may impose.

(3) Time limit on approval. The approval of a development plan or modification or amendment thereof shall remain effective for a period of one year only from the date of such approval, unless, prior to the expiration of such one-year period, the applicant makes substantial efforts to build in accordance with the approved development plan, or unless staff or the Commission approves an extension for a period not to exceed one additional year. The initial period of one year shall not begin to run until the applicant has received all approvals from local, state, and federal agencies for the construction of the project envisioned by the approved site plan, provided the applicant demonstrates, to staff or the Commission that due diligence is being exercised in obtaining such approvals. The applicant shall provide letters of status to staff or the Commission at intervals of no more than six months, commencing at the date of development plan review. In the event of any appeal from development plan approval, the applicable time limit on approval shall commence only after all appellate rights are exhausted and a final determination is made to grant approval.

(4) Appeals.

(a) Appeals to the Zoning Board of Review may be taken by a person aggrieved by any final action of staff or the Commission pursuant to the provisions of this section. Such appeal shall be taken within 20 days of such final action by filing with the Zoning Board of Review a written notice of appeal specifying the grounds for appeal and the specific finding or findings of staff or the Commission in its final actions which are challenged, if any. The lack of particularity of specific grounds for appeal shall constitute cause for dismissal of any appeal. Only the grounds for appeal so specified will be reviewed by the Zoning Board of Review on appeal. Such appeal shall be accompanied by copies of the original development plan submission and the written findings of staff or the Commission with respect to the final action appealed from. Copies of the development plan and the findings shall be made available by the Department of Planning and Redevelopment for review by any party.

(b) On such review, the Zoning Board of Review shall not substitute its judgment for that of staff or the Commission but must consider the findings and record of staff or the Commission. The Zoning Board of Review shall not reverse a decision of the Commission or staff except on a finding of prejudicial procedural error, clear error, or lack of support by the weight of the evidence in the record.

I. Interpretation, conflict, and severability.

(1) In their interpretation and application, the provisions of this article shall be held to be the minimum requirements. More stringent requirements may be required if it is demonstrated that different standards are necessary to promote the public health, safety and welfare.

(2) Where staff or the Commission recognizes the design standards of this article cannot be fully met, staff or the Commission has the authority to approve development plans incorporating a balance of the design standards in a manner which maximizes the achievement of the stated objectives of this article. Compensating amenities and features exceeding standards and objectives must be identified within such a development plan. Staff or the Commission shall address these offsetting features in writing as part of its statement of final decision.

(3) Where the conditions imposed by any provisions of this article are either more restrictive or less restrictive than comparable conditions imposed by any other provisions of this article or of any other applicable law, ordinance resolution, rule or regulation of any kind, the regulations which are more restrictive and impose higher standards or requirements shall govern.

(4) The provisions of this article are severable. If a section, sentence, clause, or phrase of this article is adjudged by a court of competent jurisdiction to be invalid, the decision shall not affect the remaining portions of this article.

**§ 410-93. Enforcement duties of Director.**

It shall be the duty of the Director to interpret and enforce the provisions of this chapter in the manner and form and with the powers provided in the laws of the state and in the Charter and ordinances of the City. The Director shall refer all applications for variances, special use permits and other appeals to the Zoning Board of Review. The Director shall make a determination in writing, within 15 days, to any written complaint received, regarding a violation of this chapter. In order to provide guidance or clarification, the Director shall, upon written request, issue a zoning certificate or provide information to the requesting party within 15 days of the written request. Any determination of the Director may be appealed to the Zoning Board of Review in accordance with Article XII of this chapter.

-00520-S-LDA Document 19-2 Filed 11/15/2006 P

**§ 410-96. Certificate of zoning compliance for new, altered or nonconforming uses.**

A. It shall be unlawful to use or occupy or permit the use or occupancy of any structure or premises, or both, or part thereof hereafter created, erected, changed, converted or wholly or partly altered or enlarged in its use or structure until a certificate of zoning compliance shall have been issued therefor by the Director, stating that the proposed use of the structure or land conforms to the requirements of this chapter.

B. No nonconforming structure or use shall be renewed, changed or extended until a certificate of zoning compliance shall have been issued therefor by the Director. The certificate of zoning compliance shall state specifically wherein the nonconforming use differs from the provisions of this chapter.

C. A temporary certificate of zoning compliance may be issued by the Director for periods not exceeding six months during alterations or partial occupancy of a structure pending its completion, provided that such temporary certificate may require such conditions and safeguards as will protect the safety of the occupants and the public.

D. The Director shall maintain a record of all certificates of zoning compliance issued, and copies shall be furnished to any person upon request and upon receipt of a reasonable fee.

E. Failure to obtain a certificate of zoning compliance shall be a violation of this chapter and punishable under § 410-101.

**§ 410-118. Decisions and records of Board.**

In exercising its powers in ruling, the Board may, in conformity with the provisions of this chapter, reverse or affirm wholly or partly and may modify the order, requirement, decision or determination appealed from and may make such order, requirement, decision or determination as ought to be made, and to that end shall have the powers of the officer or agency from whom the appeal was taken. All decisions and records of the Board respecting appeals shall conform to the provisions of §§ 410-107 and 410-110 of this chapter.

**§ 410-132. Definitions.**

As used in this chapter, the following terms shall have the meanings indicated:

ABUTTER — One whose property abuts, that is, adjoins at a border, boundary or point with no intervening land.

ACCESSORY FAMILY DWELLING UNIT — An accessory dwelling unit for the sole use of one or more members of the family of the occupant or occupants of the principal residence, but not needing to have a separate means of ingress and egress.

ACCESSORY USE — A use of land or of a building, or portion thereof, customarily incidental and subordinate to the principal use of the land or building. An "accessory use" may be restricted to the same lot as the principal use. An "accessory use" shall not be permitted without the principal use to which it is related.

AGGRIEVED PARTY — An "aggrieved party," for purposes of this chapter, shall be:

A. Any person or persons or entity or entities who can demonstrate that their property will be injured by a decision of the Director; or

B. Anyone requiring notice pursuant to this chapter.

ALTERATION — An act that changes one or more of the exterior architectural features of a structure or its appurtenances, including but not limited to the erection, construction, reconstruction or removal of any structure or appurtenance.

ANIMAL — A living organism other than a plant or bacterium and excluding human beings. Included are fish, amphibians, reptiles, birds and mammals.

APPLICANT — An owner or authorized agent of the owner submitting an application or appealing an action of the Director.

APPLICATION — The completed form or forms and all accompanying documents, exhibits and fees required of an applicant by an approving authority for development review, approval or permitting purposes.

APPURTENANCES — Features other than primary or secondary structures which contribute to the exterior historic appearance of a property, including but not limited to paving, doors, windows, signs, materials, decorative accessories, fences and historic landscape features.

BOARD — The Zoning Board of Review of the City of Pawtucket.

BUFFER — Land which is maintained in either a natural or landscaped state and is used to screen and/or mitigate the impacts of development on surrounding areas, properties or rights-of-way.

BUILDING — Any structure used or intended for supporting or sheltering any use or occupancy.

BUILDING ENVELOPE — The three-dimensional space within which a structure is permitted to be built on a lot and which is defined by regulations governing building setbacks, maximum height and bulk; by other regulations; and/or any combination thereof.

BUILDING HEIGHT — The vertical distance from grade, as determined by the municipality, to the top of the highest point of the roof or structure. The distance may exclude spires, chimneys, flagpoles and the like.

CERTIFICATE OF APPROPRIATENESS — A certificate issued by an Historic District Commission established under this chapter indicating approval of plans for alteration, construction, repair, removal or demolition of a structure or appurtenances of a structure within an Historic District. Appropriate for the purposes of passing upon an application for a "certificate of appropriateness" means not incongruous with those aspects of the structure, appurtenances or the district which the Commission has determined to be historically or architecturally significant.

CERTIFICATE OF OCCUPANCY

A. A "certificate of occupancy" is a mandatory certificate issued by the Director following the requirements of the Rhode Island Building Code for the following actions:

(1) Occupancy and use of a building hereafter erected and enlarged;

(2) Change in use of an existing building to a difference in use;

(3) Intensification of an existing use of either a building or land;

(4) Occupancy and use of vacant land except for raising of crops;

(5) Change in the use of land to different use except for the raising of crops; or

(6) Any change in use of a nonconforming use.

B. The occupancy use or change of use shall not take place until a "certificate of occupancy" has been issued by the Director.

CITY — The City of Pawtucket, Rhode Island.

COMMISSION — The Historic District Commission of the City.

COMMON OWNERSHIP — Either:

A. Ownership by one or more individuals or entities in any form of ownership of two or more contiguous lots; or

B. Ownership by any association (such ownership may also include a municipality) of one or more lots under specific development techniques.

COMMUNITY RESIDENCE — A home or residential facility where children and/or adults reside in a family setting and may or may not receive supervised care. This shall not include halfway houses or substance abuse treatment facilities. This shall include, but not be limited to, the following:

A. Whenever six or fewer retarded children or adults reside in any type of residence in the community, as licensed by the state pursuant to R.I.G.L. Chapter 24 of Title 40.1. All requirements pertaining to this chapter are waived for these "community residences."

B. A group home providing care or supervision, or both, to not more than eight mentally disabled or mentally handicapped or physically handicapped persons and licensed by the state pursuant to R.I.G.L. chapter 24 of title 40.1.

C. A residence for children providing care or supervision, or both, to not more than eight children, including those of the caregiver, and licensed by the state pursuant to R.I.G.L. chapter 72.1 of title 42.

D. A community transitional residence providing care or assistance, or both, to no more than six unrelated persons or no more than three families, not to exceed a total of eight persons, requiring temporary financial assistance, and/or to persons who are victims of crimes, abuse or neglect and who are expected to reside in that residence not less than 60 days nor more than two years. Residents will have access to and use of all common areas, including eating areas and living rooms, and will receive appropriate social services for the purpose of fostering independence, self-sufficiency and eventual transition to a permanent living situation.

COMPREHENSIVE PLAN — The Comprehensive Plan of the City of Pawtucket adopted and approved pursuant to R.I.G.L. chapter 22.2 and to which this chapter shall be in compliance.

CONSTRUCTION — The act of adding to an existing structure or erecting a new principal or accessory structure or appurtenances to a structure, including but not limited to buildings, extensions, outbuildings, fire escapes and retaining walls.

DAY CARE - DAY-CARE CENTER — Any other day-care center which is not a family day-care home.

DAY CARE - FAMILY DAY-CARE HOME — Any home other than the individual's home in which day care in lieu of parental care or supervision is offered at the same time to six or less individuals who are not relatives of the caregiver, but may not contain more than a total of eight individuals receiving day care.

DAYS — Calendar days.

DEMOLITION — An act or process that destroys a structure or its appurtenances in part or in whole.

DENSITY, RESIDENTIAL — The number of dwelling units per unit of land.

DEVELOPMENT — The construction, reconstruction, conversion, structural alteration, relocation or enlargement of any structure; any mining, excavation, landfill or land disturbance; any change in use or alteration or extension of the use of land.

DEVELOPMENT PLAN REVIEW — The process whereby authorized local officials review the site plans, maps and other documentation of a development to determine the compliance with the stated purposes and

standards of this chapter.

DIRECTOR — Director of the Division of Zoning and Code Enforcement of the City of Pawtucket.

DISTRICT — See "zoning use district."

DRAINAGE SYSTEM — A system for the removal of water from land by drains, grading or other appropriate means. These techniques may include runoff controls to minimize erosion and sedimentation during and after construction or development, the means for preserving surface and groundwaters and the prevention and/or alleviation of flooding.

D.U. — Abbreviation for dwelling unit.

DWELLING UNIT — A structure or portion thereof providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking and sanitation and containing a separate means of ingress and egress.

EXTRACTIVE INDUSTRY — The extraction of minerals, including: solids, such as coal and ores; liquids, such as crude petroleum; and gases, such as natural gases. The term also includes quarrying; well operation; milling, such as crushing, screening, washing and flotation; and other preparation customarily done at the extraction site or as a part of the extractive activity.

FAMILY — A person or persons related by blood, marriage or other legal means. See also "household."

FEDERALLY INSURED OR ASSISTED HOUSING — "Federally insured or assisted housing" means:

A. Low-income housing units insured or assisted under Sections 221(d)(3) and 236 of the National Housing Act (12 U.S.C. § 1701 et seq.).

B. Low-income housing units produced with assistance under Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1401 et seq.).

C. Rural low-income housing financed under Section 515 of the Housing Act of 1949 (12 U.S.C. § 1715Z).

FENCE — A barrier constructed of posts and wire or boards erected for the purposes of protection, confinement, enclosure or privacy. Also included are solid hedges exceeding 30 inches in height adjacent to or on the front yard property line where a clear vision field is necessary for personal safety.

FENCE, NATURAL — A barrier of ornamental shrubbery that exceeds 30 inches in height.

FENCE, OPEN — A fence in which 75% or more of the side area is open. An example is a chain link fence.

FENCE, SOLID — A fence in which more than 50% of the side area is closed or opaque. An example is a wooden stockade fence.

FENCE, WALL — A barrier constructed of masonry materials erected at or near property lines for the purpose of enclosure.

FLOATING ZONE — An unmapped zoning district adopted within the ordinance which is established on the Zoning Map only when an application for development, meeting the zone requirements, is approved.

FLOOR AREA, GROSS — See Rhode Island State Building Code.

HALFWAY HOUSES — A residential facility for adults or children who have been institutionalized for criminal conduct and who require a group setting to facilitate the transition to a functional member of society.

HISTORIC DISTRICT or HISTORIC SITE — As defined in R.I.G.L. § 45-22.2-4. "Historic district" means one or more historic sites and intervening or surrounding property significantly affecting or affected by the quality and character of the historic site or sites, and has been registered or is deemed eligible to be included on the state register of historical places pursuant to R.I.G.L. § 42-45-5. "Historic site" means any real property, man-made structure, natural object or configuration or any portion or group of the foregoing which has been registered or is deemed eligible to be included on the state register of historic places pursuant to R.I.G.L. § 42-45-5.

HOME OCCUPATION — Any activity customarily carried out for gain by a resident, conducted as an accessory use in the resident's dwelling unit.

HOUSEHOLD — One or more persons living together in a single dwelling unit with common access to, and common use of, all living and eating areas and all areas and facilities for the preparation and storage of food within the dwelling unit. The term "household unit" shall be synonymous with the term "dwelling unit" for

determining the number of such units allowed within any structure on any lot in a zoning district. An individual household shall consist of any one of the following:

A. A family, which may also include servants and employees living with the family; or

B. A person or not more than five unrelated persons occupying a single household or dwelling unit.

INCENTIVE ZONING — The process whereby the Zoning Board may grant additional development capaCity in exchange for the developer's provision of a public benefit or amenity as specified in this chapter.

INDEPENDENT LIVING FACILITY — A residential facility where adults reside in a family setting and receive limited supervised care. **[Added 6-23-1999 by Ch. No. 2531]**

INFRASTRUCTURE — Facilities and services needed to sustain residential, commercial, industrial, institutional and other activities.

LAND DEVELOPMENT PROJECT — A project in which one or more lots, tracts or parcels of land are to be developed or redeveloped as a coordinated site for a complex of uses, units or structures, including but not limited to planned development and/or cluster development for residential, commercial, institutional, recreational, open space and/or mixed uses as may be provided for in this chapter.

LOT — Either:

A. The basic development unit for determination of lot area, depth and other dimensional regulations; or

B. A parcel of land whose boundaries have been established by some legal instrument such as a recorded deed or recorded map and which is recognized as a separate legal entity for purposes of transfer of title.

LOT AREA — The total area within the boundaries of a lot, excluding any street right-of-way, usually reported in acres or square feet.

LOT BUILDING COVERAGE — That portion of the lot that is or may be covered by buildings and accessory buildings.

LOT DEPTH — The distance measured from the front lot line to the rear lot line. For lots where the front and rear lot lines are not parallel, the "lot depth" is an average of the depth.

LOT FRONTAGE — That portion of a lot abutting a street.

LOT LINE**[Amended 3-22-2001 by Ch. No. 2592]** — A line of record, bounding a lot, which divides one lot from another lot or from a public or private street or any other public or private space and shall include:

A. FRONT — On an interior lot, a through lot or a flag lot, any lot line abutting a street shall be considered a front lot line. Corner lots shall be considered to have two front lot lines abutting the streets.

B. REAR — The lot line(s) opposite and most distant from the front lot line, or in the case of triangular or otherwise irregularly shaped lots an assumed line at least 10 feet in length entirely within the lot, parallel to and at a maximum distance from the front lot line.

C. SIDE — Any lot line other than a front or rear lot line.

LOT OF RECORD — A parcel of land record in the office of the Recorder of Deeds of the City of Pawtucket.

LOT, THROUGH — A lot which fronts upon two parallel streets or which fronts upon two streets which do not intersect at the boundaries of the lot.

LOT WIDTH — The horizontal distance between the side lines of a lot measured at right angles to its depth along a straight line parallel to the front lot line at the minimum front setback line.

MANUFACTURED HOME PARK — Two or more manufactured homes located on the same lot.

MIXED USE — A mixture of land uses within a single development, building or tract.

NIGHTCLUB — An establishment serving food and liquor in which music, dancing and entertainment are conducted. **[Added 6-23-1999 by Ch. No. 2531]**

NONCONFORMANCE — A building, structure or parcel of land, or use thereof, lawfully existing at the time of the adoption (or amendment) of this chapter, October 21, 1966, and not in conformity thereof. "Nonconformance" shall be of only two types:

A. Nonconforming by use: a lawfully established use of land, building or structure which is not a permitted

use in that zoning district. A building or structure containing more dwelling units than are permitted by the use regulations of a zoning ordinance shall be nonconforming by use; or

B. Nonconforming by dimension: a building, structure or parcel of land not in compliance with the dimensional regulations of this chapter. Dimensional regulations include all regulations of this chapter, other than those pertaining to the permitted uses. A building or structure containing more dwelling units than are permitted by the use regulations of a zoning ordinance shall be nonconforming by use; a building or structure containing a permitted number of dwelling units by the use regulations of this chapter, but not meeting the lot area per dwelling unit regulations, shall be nonconforming by dimension.

OVERLAY DISTRICT — A district established in this chapter that is superimposed on one or more districts or parts of districts and that imposes specified requirements in addition to but not less than those otherwise applicable for the underlying zone.

PARKING SPACE (OFF-STREET) — An "off-street parking space" shall consist of a hard-surfaced space with a minimum area of 162 square feet and access using a curb cut to a public street or private right-of-way. For residences with three dwelling units or less, the paved driveway area, excluding front yard area, may be used to calculate required parking spaces. No more than two vehicles may be parked tandem, one behind another, outside of a garage. Required off-street parking areas for five or more vehicles shall be designed in accordance with § 410-78.

PERFORMANCE STANDARDS — A set of criteria or limits relating to elements which a particular use or process either must meet or may not exceed.

PERMITTED USE — A use by right which is specifically authorized in a particular zoning district.

PERSONAL COMMUNICATIONS SYSTEM ANTENNA — A site where antenna(s) are located on an existing structure and which transmit and receive signals in the frequency of 1,850 and 2,200 MHz (Megahertz) at a power of less than 200 watts. **[Added 9-26-1996 by Ch. No. 2425]**

PLANNED DEVELOPMENT — A "land development project," as defined herein, and developed according to plan as a single entity and containing one or more structures and/or uses with appurtenant common areas.

PLANNING COMMISSION — The official planning agency of the City of Pawtucket.

PREAPPLICATION CONFERENCE — A review meeting of a proposed development held between applicants and the Planning Department before formal submission of an application for a permit or for development approval.

REHABILITATION — The process of returning a property to a state of utility, through repair or alteration, which makes possible an efficient contemporary use while preserving those portions and features of the property which are significant to its historic, architectural and cultural values.

REMOVAL — A relocation of a structure on its present site or to another site.

REPAIR — A change meant to remedy damage or deterioration of a structure or its appurtenances.

ROOMING UNIT — Either one or two rooms without cooking facilities in a rooming house.

SETBACK LINE OR LINES — A line or lines parallel to a lot line at the minimum distance of the required setback for the zoning district in which the lot is located that establishes the area within which the principal structure must be erected or placed.

SITE PLAN — The development plan for one or more lots on which is shown the existing and/or the proposed conditions of the lot.

SPECIAL USE — A regulated use which is permitted pursuant to the special use permit issued by the authorized governmental entity, pursuant to R.I.G.L. § 45-24-42. Formerly referred to as a "special exception."

STRUCTURE — Anything constructed or erected, the use of which requires permanent or temporary location on or in the ground, including but not limited to buildings, gazebos, billboards, outbuildings, decorative and retaining walls and swimming pools.

SUBSTANDARD LOT OF RECORD — Any lot lawfully existing on October 21, 1966, and not in conformance with the dimensional and/or area provisions of this chapter.

USE — The purpose or activity for which land or buildings are designed, arranged or intended or for which

land or buildings are occupied or maintained.

VARIANCE — Permission to depart from the literal requirements of this chapter. An authorization for the construction or maintenance of a building or structure or for the establishment or maintenance of a use of land which is prohibited by this chapter. There shall be only two categories of "variance," a use variance or a dimensional variance.

A. USE VARIANCE — Permission to depart from the use requirements of this chapter where the applicant for the requested variance has shown by evidence upon the record that the subject land or structure cannot yield any beneficial use if it is to conform to the provisions of this chapter.

B. DIMENSIONAL VARIANCE — Permission to depart from the dimensional requirements of this chapter where the applicant for the requested relief has shown by evidence upon the record that there is no other reasonable alternative way to enjoy a legally permitted beneficial use of the subject property unless granted the requested relief from the dimensional regulations. However, the fact that a use may be more profitable or that a structure may be more valuable after the relief is granted shall not be grounds for relief.

WIRELESS COMMUNICATIONS ANTENNA — A tower structure exceeding 50 feet in height used for transmitting and receiving signals in the 800 MHz (Megahertz) band, which may optionally have a microwave antenna(s) attached. **[Added 9-26-1996 by Ch. No. 2425]**

A. YARD **[Amended 3-22-2001 by Ch. No. 2592] – A required open space other than a court, unoccupied and unobstructed by any structure or portion of a structure; provided, however, that fences, walls, posts and customary yard accessories may be permitted subject to the limitation of this chapter.**

B. FRONT YARD — The area between a street line and a line parallel thereto, drawn through the nearest point of a structure, other than an exempted structure.

C. REAR YARD — The area between a rear lot line and a line parallel thereto, drawn through the nearest point of a main structure, other than an exempted structure.

D. SIDE YARD — The area between a side lot line and a line parallel thereto, drawn through the nearest point of a structure, other than an exempted structure.

ZONING CERTIFICATE — A document signed by the Director, as required in this chapter, which acknowledges that a use, structure, building or lot either complies with or is legally nonconforming to the provisions of this chapter or is an authorized variance or modification therefrom.

ZONING MAP — The map or maps which are a part of this chapter and which delineate the boundaries of all mapped zoning districts within the City.