UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| PAWTUCKET TRANSFER OPERATIONS, LLC,<br>*Plaintiff,*<br>vs.<br>CITY OF PAWTUCKET, et al.<br>*Defendants.* | C.A. No. 05-520 S |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now come the Defendants, in the above-referenced matter, and hereby move this Court for an Order of summary judgment in their favor. As grounds, Defendants rely on their Memorandum of Law filed contemporaneously herewith.

Defendants,
By their attorneys,

*/s/ Marc DeSisto*
*/s/ Michael A. DeSisto*

Marc DeSisto, Esq. (#2757)
Michael A. DeSisto, Esq. (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com
michael@desistolaw.com

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court and is available for viewing and downloading from the ECF system.

*/s/ Michael A. DeSisto*

Michael A. DeSisto, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PAWTUCKET TRANSFER OPERATIONS, LLC,

*Plaintiff,*

vs.

C.A. No. 05-520 S

CITY OF PAWTUCKET, et al.,

*Defendants.*

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted by,

Marc DeSisto (#2757)
Michael A. DeSisto (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906
(401) 272-4442
(401) 272-9937 fax
marc@desistolaw.com
michael@desistolaw.com

# TABLE OF CONTENTS


I. PLEADINGS

II. DESCRIPTION OF MOTION

III. FACTS

IV. ISSUES

V. POINTS AND AUTHORITIES

A. Standard of Review - Motion for Summary Judgment

B. Defendants are entitled to summary judgment on Plaintiff's § 1983 procedural due process claim because Plaintiff does not have a property interest and received adequate post-deprivation remedies.

C. Defendants are entitled to summary judgment on Plaintiff's § 1983 substantive due process claim because Plaintiff does not have a property interest and Defendants' conduct was not egregiously unacceptable, outrageous or conscious-shocking.

D. Defendants are entitled to Summary Judgment on Plaintiff's Equal Protection Claim because Plaintiff was not Selectively Treated Compared with Other Similarly Situated Persons nor can Plaintiff Present Evidence of Gross Abuse of Power by Defendants.

E. Defendants are entitled to summary judgment on Plaintiff's equitable estoppel/detrimental reliance claim because the Zoning Certificates were not enforceable, were not issued by a duly authorized City official and Plaintiff could not justifiably rely on them.

F. Defendants are entitled to summary judgment on Plaintiff's intentional interference with contractual relations and interference with prospective economic advantage claims as Plaintiff cannot establish the elements of either claim.

G. Conclusion

## I. PLEADINGS

Plaintiff, Pawtucket Transfer Operations, LLC, has filed a seven (7) count Complaint against the Defendants, City of Pawtucket, by and through its Treasurer, Ronald L. Wunschel, City of Pawtucket Zoning Board of Review, by and through its Members, and Michael Cassidy, individually and in his capacity as Director of the City of Pawtucket Planning and Redevelopment Commission. Plaintiff seeks to recover under *42 U.S.C. § 1983* for alleged procedural due process, substantive due process and equal protection violations arising out of the "revocation" of two Zoning Certificates. *Plaintiff's Amended Complaint, Counts I, II and III.* The last four counts of Plaintiff's Amended Complaint allege state law claims and include equitable estoppel/detrimental reliance, *Plaintiff's Amended Complaint, Counts IV and V,* interference with contractual relations, *Plaintiff's Amended Complaint, Count VI,* and interference with prospective economic advantage, *Plaintiff's Amended Complaint, Count VII*.

Defendants deny Plaintiff's allegations and submit that they are entitled to summary judgment in their favor based on the undisputed facts of this case.

## II. DESCRIPTION OF MOTION

This case concerns what may be termed a conventional planning dispute between a developer and a city agency. Plaintiff filed an application with the City Planning Commission to operate a refuse transfer station in the City of Pawtucket. The Director of the Planning Department determined that Plaintiff needed to obtain a use variance to operate the proposed transfer station. Therefore, he instructed Plaintiff to obtain a use variance from the Zoning Board before the City Planning Commission would consider Plaintiff's application. Plaintiff disagreed with this decision and filed an appeal to the Zoning Board of Appeals. The Zoning

Board upheld the decision of the Planning Director. Once again, utilizing its appellate rights under the Pawtucket Ordinances, Plaintiff filed an appeal to the state court. Plaintiff also filed the instant lawsuit alleging constitutional and state law claims.

In the First Circuit, it is well-settled that conventional planning disputes do not implicate the Constitution unless tainted with fundamental procedural irregularity, racial animus or the like. The instant case is a conventional planning dispute without the taint of any fundamental procedural irregularity or prohibited animus. Plaintiff was dissatisfied with the decisions of the Pawtucket planning officials but successfully utilized the administrative and state law appellate process. While Plaintiff may be dissatisfied with the decisions of the City officials, and the time involved with the appeal process, this dissatisfaction does not translate into procedural and/or substantive due process and/or equal protection claims against the Defendants. Similarly, the actions taken by Defendants in this conventional planning dispute do not give rise to the state law claims asserted by Plaintiff.

## III. FACTS AND TRAVEL

Plaintiff, Pawtucket Transfer Operations, LLC, is a Rhode Island Limited Liability Company.[1] On or about August 1, 2003, Plaintiff submitted a Site Plan Review Request Form ("Site Plan Application"), pursuant to Article IIIA § 410-15.1 of the Pawtucket Zoning Ordinance, to the City Planning Commission.[2] *The July 31, 2003 Site Plan Application is attached hereto as Exhibit A*. The Site Plan Application sought permission to operate a "railroad shipping operations/transfer station for refuse" on a parcel of land located at 280 Pine Street in

[1] Pawtucket Transfer Operations, LLC changed its name to Boshad, LLC on June 20, 2005, according to the records of the Rhode Island Secretary of State.
[2] The Site Plan Application cover letter was addressed to Ronald Travers, Zoning Official for the City of Pawtucket. It should have been addressed to Michael Cassidy, Director of the Department of Planning and Redevelopment.

Pawtucket (the "Parcel"). In answer to the Site Plan Application question whether Zoning Board approval was required for the proposed change, Plaintiff circled "no" noting that "Property is currently zoned for this usage." Plaintiff also enclosed a copy of a Certificate of Zoning Compliance, dated February 27, 2003, and signed by Todd Olbrych, Building Official. According this Certificate, the proposed use – Refuse Transfer station – conformed to the Zoning Ordinance. *The February 27, 2003 Certificate of Zoning Compliance is attached hereto as Exhibit B*.[3]

The Site Plan Application was followed by an August 5, 2003 letter requesting that the City schedule a hearing for the August 2003 Planning Board meeting. The letter stated that Plaintiff was "in the process of permitting this project through the Rhode Island Department of Environmental Management (RIDEM)." According to the letter, Plaintiff was advised by RIDEM to pursue City approval of the project concurrent with RIDEM permitting.

On August 12, 2003, Michael Cassidy, the Department of Planning and Redevelopment Director, responded by requesting, among other things, a copy of the RIDEM application to allow the City Planning Commission to undertake a thorough, accurate and complete review of the site plan and project request. As a result, no hearing was held by the City Planning Commission. On February 27, 2004, RIDEM notified Plaintiff, through its duly authorized representative, that it had reviewed Plaintiff's license application for its proposed "C&D

[3] Although not included with the Site Plan Application, a Certificate of Zoning Compliance was issued for the Parcel on September 24, 2002 to Daniel J. Poggi, Jr. with a business name of Pawtucket Railway Hauling, LLC. This Certificate contains the same use as the later issued Certificate and Daniel J. Poggi, Jr. appears to have a business relationship with Plaintiff. The September 24, 2002 Zoning Certificate is attached as Exhibit C. (The September 24, 2002 and February 27, 2003 Certificates of Zoning Compliance are collectively referred to as the Zoning Certificates.)

[Construction and Demolition] Processing Facility and for a proposed Solid Waste Transfer Station." The review was not a positive one for Plaintiff. RIDEM noted that

> The submitted license application has numerous defects. All of the Department's comments shall be comprehensively addressed in the revised application submittal. The Department's final decision on the license application will be based on the next submittal. If the deficiencies described in the attached comments are not completely addressed, the license application will be denied.

*The 13 page RIDEM review is attached hereto as Exhibit D.*

On March 30, 2004, Plaintiff filed a second Site Plan Application ("Second Site Plan Application") with the Department of Planning and Redevelopment ("Planning Department"). *The Second Site Plan Application is attached hereto as Exhibit E.* This Second Site Plan Application differed from the earlier one in two ways. In the first Site Plan Application, Plaintiff was listed as the owner of the Parcel. In the Second Site Plan Application, the owner listed was Providence & Worcester Railroad Company. Secondly, the proposed use of the Parcel was now listed as "Railroad terminal and construction and demolition debris transfer station." Unfortunately, the Second Site Plan Application was incomplete requiring Plaintiff to submit additional information. Plaintiff produced the additional documents on or about April 28, 2004. Included in this information was a letter to the City, dated April 28, 2003, from Mary A. Tanona, General Counsel, Providence and Worcester Railroad Company ("P&W") stating that P&W had agreed to lease the Parcel to Plaintiff subject to execution of a mutually agreeable lease agreement, among other things.[4]

By letter dated April 29, 2004, Michael Cassidy acknowledged receipt of the Second Site Plan Application. However, he stated that it was the opinion of the Planning Department that the

[4] The letter was received by the Planning Department on April 28, 2004 leading the Defendants to believe that the correct date of the letter should be April 28, 2004. A Memorandum of Lease was subsequently recorded in the Pawtucket Land Evidence Records on May 26, 2005 indicating that a lease agreement between Plaintiff and P&W was entered into on August 31, 2004.

February 27, 2003 Certificate of Zoning Compliance ("Zoning Certificate") was issued in error. The cited Zoning Board section – 410-12.5(I) - referred to public refuse transfer stations as being an allowable use. Plaintiff was proposing a private transfer station. Therefore, the Planning Department had referred the matter over to the City's Law Department for a legal opinion on whether Plaintiff's proposed use was allowed under the Zoning Ordinance.

On July 12, 2004, Mr. Cassidy notified Plaintiff, by letter, that the Law Department had determined that a private refuse transfer station was not an allowed use under Section 410-12 (5) of the Zoning Ordinance. Further, Plaintiff's RIDEM license application listed the use as a construction and demolition debris processing facility. This use was not an allowed use in any zone in the City of Pawtucket. Therefore, Plaintiff would need to obtain a use variance from the Zoning Board before the Second Site Plan Application could be heard by the City Planning Commission. *The July 12, 2004 letter is attached hereto as Exhibit F.*

On or about July 28, 2004, Plaintiff filed an appeal of the City Planning Commission's decision to the Zoning Board of Appeals pursuant to § 410-15.1(H)(4) of the Zoning Ordinance. In addition, Plaintiff filed an application for a use variance. This use variance application was subsequently withdrawn by Plaintiff on October 6, 2004. Plaintiff's appeal was heard by the Zoning Board on November 9, 2004. After an extensive hearing, Plaintiff's appeal was denied. Plaintiff then filed a timely appeal of the Zoning Board's decision in the Providence County Superior Court. On June 22, 2006, Superior Court Judge Stephen J. Fortunato issued a bench decision in favor of Plaintiff ruling that a refuse transfer station was a permitted use for the Parcel. *The transcript of Judge Fortunato's bench Decision is attached hereto as Exhibit G.*

In conjunction with filing its zoning appeal, Plaintiff also filed the instant lawsuit alleging, among other things, denial of its procedural and substantive due process rights and

equal protection rights, all in violation of *42 U.S.C. § 1983,* as well as several state law claims. Defendants filed a motion for summary judgment, together with a memorandum, on August 9, 2006. *Documents 9 and 10.* Plaintiff, on November 15, 2006, filed an objection to Defendants' summary judgment motion as well as its own motion for partial summary judgment on Counts III and IV of the original Complaint. *Documents 19 and 20.* On December 22, 2006, Defendants filed an objection to Plaintiff's partial summary judgment motion and a response to Plaintiff's objection to Defendants' summary judgment filing. *Document 22.* These motions and objections were scheduled for a January 25, 2007 hearing.

On January 5, 2007, however, Plaintiff filed a Motion for Leave to File Amend Complaint. *Document 25*. Among other things, Plaintiff's Amended Complaint added a new count alleging an equal protection violation. The motion was granted by this Court on January 12, 2007. Thereafter, the hearing date for the summary judgment motions and objections was vacated to allow Defendants to re-file their summary judgment pleading to address the equal protection claim contained in the Amended Complaint. This consolidated summary judgment motion and memorandum incorporates Defendants' earlier filings.

**IV. ISSUES**

1. Whether Plaintiff can establish a constitutionally protected property interest in the Zoning Certificates?
2. Whether Plaintiff was provided adequate post-deprivation remedies?
3. Whether Defendants conduct was egregiously unacceptable, outrageous or conscience-shocking?
4. Whether Plaintiff, compared with others similarly situated, was selectively treated based on impermissible considerations such as race, religion, intent to inhibit or

punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person?

4. Whether the Zoning Certificates created any enforceable rights in Plaintiff?

5. Whether the Zoning Certificates were issued by a duly authorized representative of the City and Plaintiff justifiably relied on them?

## V. POINTS AND AUTHORITIES

### A. Standard of Review - Motion for Summary Judgment

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the [Civil] Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, *477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986)*. Summary judgment is lawful and proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. In addition, "[s]ummary judgment is appropriate against a party who, after a sufficient time for discovery, 'fails to make a showing sufficient to establish the existence of a single element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Torraco v. Maloney, 923 F.2d 231, 232 (1st Cir. 1991)(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986)).*

According to *Fed. R. 56(e)*:

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a

> genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. *(Emphasis added)*.

Based upon the foregoing, the United States Supreme Court observed that the above two sentences of Rule 56(e) were added "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings." *Celotex Corp, 477 U.S. at 325, 106 S.Ct. at 2554*. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505, 2514 (1986).*

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id. at 249, 106 S.Ct. at 2511 (emphasis added).* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at 249-50, 106 S.Ct. at 2511 (emphasis added)*. As the Court recognized:

> [n]or are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a scintilla of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether where is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. *Id. at 251, 106 S.Ct at 2511 (emphases in original).*

Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id. at 252, 106 S.Ct. at 2512 (emphasis added)*.

**B. Defendants Are Entitled to Summary Judgment on Plaintiff's § 1983 Procedural Due Process Claim because Plaintiff Does Not Have a Property Interest and Received Adequate Post-Deprivation Remedies.**

Count I of the Complaint contains Plaintiff's first claim against the Defendants. According to Plaintiff, Defendants "unlawfully revoked the Zoning Certificates without authority and in violation of the procedural requirements set forth in the Pawtucket Zoning Ordinance." *Plaintiff's Amended Complaint, paragraph 35*. This "revocation" argues Plaintiff, was unconstitutional because it denied Plaintiff its procedural due process rights in violation of *42 U.S.C § 1983*, as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article One, Section Two of the Rhode Island Constitution. *Id. at 36*. In order to establish a procedural due process claim against Defendants, Plaintiff must prove two elements. First, Plaintiff must show that it had a property interest as defined by state law. Second, Plaintiff must show that the Defendants, acting under color of state law, deprived it of that interest without adequate process. *SFW Arecibo, Ltd. v. Rodriguez, 415 F. 3d 135, 139 (1st Cir. 2005); PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 30 (1st Cir. 1991)*. Plaintiff can satisfy neither element.

The United States Constitution does not define was constitutes a constitutionally protected "property interest." "Rather, [property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161; 101 S.Ct. 446, 451 (1980) quoting Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 2709 (1972)*. Someone seeking to establish a property interest must clearly have more than an abstract need or desire for it. There must be more than a unilateral expectation of it. Instead, there must be a legitimate claim of entitlement to it. *Macone v. Town of Wakefield, 277 F.3d 1, 9 (1st Cir. 2002)*. The

property interest Plaintiff claims is the use contained in Zoning Certificates signed by Todd Olbrych, a former Pawtucket Building Official. However, these Zoning Certificates do not vest any rights in Plaintiff.[5]

In Pawtucket, the authority to issue a zoning certificate originates from R.I.G.L. § 45-24-54 and Section 410-93 of the Pawtucket Zoning Ordinances. R.I.G.L. § 45-24-54 states:

> A zoning ordinance adopted pursuant to this chapter must provide for the administration and enforcement of its provisions pursuant to this chapter. The zoning ordinance must designate the local official or agency and specify minimum qualifications for the person or persons charged with its administration and enforcement, including: (1) the issuing of any required permits or certificates; (2) collection of required fees; (3) keeping of records showing the compliance of uses of land; (4) authorizing commencement of uses or development under the provisions of the zoning ordinance; (5) inspection of suspected violations; (6) issuance of violation notices with required correction action; (7) collection of fines for violations; and (8) performing any other duties and taking any actions that may be assigned in the ordinance. ***In order to provide guidance or clarification,*** the zoning enforcement officer or agency shall, upon written request, issue a zoning certificate or provide information to the requesting party as to the determination by the official or agency within fifteen (15) days of the written request. In the event that no written response is provided within that time, the requesting party has the right to appeal to the zoning board of review for the determination. *(emphasis added)*.

Section 410-93 follows this language and states, in pertinent part, that ***"[i]n order to provide guidance or clarification, the Director*** shall, upon written request, issue a zoning certificate or provide information to the requesting party within fifteen (15) days of the written request." *(emphasis added)*.

"Zoning Certificate" is defined in the Ordinance as "[a] document signed by the Director, as required in this chapter, which acknowledges that a use, structure, building, or lot either complies with or is legally nonconforming to the provisions of the municipal zoning ordinance or is an authorized variance therefrom." *Section 410-132*. *See* also *R.I. G.L. § 45-24-31(65)*. The

[5] Plaintiff filed the February 27, 2003 Zoning Certificate with its application. See Exhibit B. However, throughout the Complaint, Plaintiff references the earlier September 24, 2002 Zoning Certificate as well to support its position. For purposes of this motion, and without conceding the relevancy of the earlier Zoning Certificate, Defendants will reference both as well.

"Director" is defined as the "Director of the Division of Zoning and Code Enforcement of the City of Pawtucket. Id. *The relevant Sections of the Pawtucket Zoning Ordinance are attached hereto as Exhibit H.*

As Section 410-93 and R.I.G.L. § 45-24-54 make clear, the purpose of the zoning certificate is to provide guidance or clarification; it does not vest any rights in a certificate holder. "[T]he purpose of the [zoning] certificate is plainly to provide no more than informational assistance alone. Such a certificate does not operate to vest any rights in the owner of the property in question or the individual making the request for the certificate. (citations omitted) Therefore, although a zoning certificate may well serve as an indication about how a zoning official views the use, structure or building or lot insofar as it complies with the Ordinance – information that no doubt would be useful to property owners and others – it does not operate to create any enforceable rights or to divest existing rights." *Tompkins v Zoning Bd. of Review of the Town of Little Compton, 2003 WL 22790829 (R.I. Super. 2003).*

The lack of enforceable rights is especially true in the instant case. Plaintiff requested a zoning certificate for a ***proposed*** use, not an ***existing*** use. The definition of a zoning certificate in the Ordinance and state law references present use, not future use. *See Section 410-132* and *R.I. G.L. § 45-24-31(65) (A zoning certificate is "[a] document signed by the Director, * * * which acknowledges that a use, structure, building, or lot either complies with or is legally nonconforming * * * .")* The definition of a zoning certificate speaks of the present use of the property not a contemplated, proposed use. The *Tompkins* court noted

> the purpose for which a zoning certificate is given is to provide information concerning the *present status* of the *existing* use, structure, building or lot but not *proposed* uses, structures, buildings or other development." *Id. at 11.* * * * "Thus, neither a zoning official nor zoning board of review may lawfully issue a zoning certificate for the purpose of making a binding or enforceable determination about whether or not a proposed use, structure, building or lot would be legal under a municipal ordinance.

> Given the language of the pertinent sections of the Enabling Act, it is clear that the practice of attorneys and landowners to request a zoning certificate as a means of gaining binding or enforceable administrative approval is wholly unavailing and is particularly so with respect to proposed uses or development. And, the endless hearings and litigation that have been spawned by the misuse of zoning certificates or misunderstanding of their significance is time poorly spent. *Id. at 12-13*.

It is clear from *Tompkins*, and the plain language of R.I.G.L. § 45-24-54 and Section 410-93, that a zoning certificate is for the limited purpose of providing non-binding, informational assistance only. A non-binding, informational certificate cannot create a constitutionally protected property interest. This fact is especially true where, as Plaintiff attempts here, the certificate is for a proposed use and not an existing use. In fact, Plaintiff is attempting to do what the *Tompkins*' court noted as an abuse: attorneys and landowners misusing the zoning certificate ordinance and statute "as a vehicle to gain administrative approval for proposed development and/or changes in use." *Id. at 9*. The proper method: "[w]here the use, structure, building or other development is proposed, as opposed to existing, it is only through the submission of proper applications for necessary permits that a party can gain an enforceable approval of proposed plans." *Id. at 13*. Further, in addition to the fact that the Zoning Certificates are non-binding and for informational purposes only, as will be discussed *infra*, Todd Olbrych was not authorized to issue them.

Plaintiff argues that it has a property interest because the zoning certificate was issued under § 410-96 rather than § 410-93 of the zoning ordinance. Second, it claims that it was entitled to a pre-deprivation hearing. In this case, it does not matter under which section of the Pawtucket Zoning Ordinance the zoning certificates were issued. These certificates, in and of themselves, do not create a constitutionally protected property interest. They are simply the opinion of a building official of what is an allowable use in the area. Whether the use is in fact allowable is not established by the certificates; instead, it is dependent on the zoning ordinance.

It is the zoning ordinance that creates the right to use a particular property for a particular use. For example, if Mr. Olbrych had presented Plaintiff with a zoning certificate which stated that the Property could be used as a nuclear waste dump, Plaintiff certainly could not argue that it had a constitutionally protected property interest in that use unless, of course, the zoning ordinance allowed nuclear waste dumps in that area. It is the ordinance that creates the use, not the zoning certificate. So, in the instant case, the zoning certificates did not create a constitutionally protected property right.

Plaintiff contends that "Pawtucket law unconditionally allows PTO to operate a refuse transfer station in a "Manufacturing Open" zone [because] [t]he Rhode Island Superior Court has definitely so held." *Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 10*. However, that statement is not only untrue; it misses the mark. The decision of the Superior Court simply states that a refuse transfer station is an allowable use for the Property under the Pawtucket Zoning Ordinance.[6] It does not allow Plaintiff to operate anything because Plaintiff must still proceed through the regulatory process. The decision, if upheld by the Supreme Court, simply allows Plaintiff to bypass one aspect of this regulatory process, i.e., Plaintiff does not need zoning board approval to proceed before the City Plan Commission.

Plaintiff must still comply with all other City and State regulations to actually gain approval to operate a refuse transfer station. The issue of use is simply one stick, in a bundle of sticks, needed to obtain a permit to operate the refuse transfer station. It is too early in the process to state that Plaintiff has acquired a constitutionally protected property interest. There are simply too many other steps and variables in the regulatory process for Plaintiff to claim that it is now entitled to operate a refuse transfer station on the Property. This is why the subject of

---

[6] The decision has been appealed by the City and others to the Rhode Island Supreme Court.

this case cannot be analogized to the issuance of a building permit; Plaintiff has not yet reached that stage of the process. Plaintiff has not established a constitutionally protected property interest to operate a refuse transfer station.

For all these reasons, Plaintiff does not have a property interest in the Zoning Certificates and, therefore, cannot establish the first element of its procedural due process claim against Defendants.

Even if Plaintiff was able to show a constitutionally protected property interest, it cannot establish the second element of the procedural due process standard. The second element requires that Defendants, acting under color of state law, deprived it of that property interest without adequate process. *See SFW Arecibo, Ltd. v. Rodriguez, 415 F. 3d at 139.* In addressing this second element, "it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry should examine the procedural safeguards built into the statutory or administrative procedure * * * effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch, 494 U.S. 113, 126 (1990)*.

In the instant case, Mr. Cassidy, the Planning and Redevelopment Director determined that Plaintiff needed a use variance for the Parcel despite the Zoning Certificate. Plaintiff disagreed with this decision and, pursuant to the Pawtucket Zoning Ordinance, filed an appeal to the Pawtucket Zoning Board of Review. When this appeal failed, Plaintiff, once again, availed itself of the appeal provisions of the Pawtucket Zoning Ordinance, and state law, and filed an appeal to the state court. This appellate scheme contained the Pawtucket Ordinances follows state law. Defendants contend that these post-deprivation remedies afforded Plaintiff

constitutionally adequate due process and, in fact, proved effective as Plaintiff was successful in the state court appeal.

Defendants can only assume that Plaintiff's procedural due process claim is based on the lack of a pre-deprivation hearing. A hearing was not held by Mr. Cassidy when he determined that, despite the existence of the Zoning Certificates, Plaintiff would need to apply to the Zoning Board for a use variance. However, it is well-settled that the lack of a pre-deprivation hearing does not, in and of itself, constitute a procedural due process violation. Instead, the Court must examine "the procedural safeguards built into the statutory or administrative procedure * * * effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." _Id_. The procedural safeguards in the instant case were the post-deprivation appellate procedures available to Plaintiff. *See also, _PFZ Properties, Inc_., 928 F2d at 31 ("When a deprivation of property results from conduct of state officials violative of the state law, the Supreme Court has held that failure to provide pre-deprivation process does not violate the Due Process Clause."); _Amsden v. Moran_, 904 F.2d 748, 755 (1st Cir. 1990) ("The availability of judicial review is an especially salient consideration in situations where permits and licenses have been denied or revoked by state or local authorities in alleged derogation of procedural due process."); _SFW Arecibo, Ltd_., 415 F.3d at 139 ("[o]ur focus is on the availability of post-deprivation, rather than pre-deprivation, process . . ."); _Licari v. Ferruzzi_, 22 F.3d 344, 348 (1st Cir. 1994) ("There is further reason why the revocation of the building permits did not violate Colonial's right to procedural due process: post-deprivation remedies were available.")*

In the instant case, the post-deprivation remedies were more than adequate to satisfy procedural due process. Plaintiff's use of these post-deprivation remedies demonstrates their fairness. As the Court stated in _Amsden_, "the proof of the pudding is in the tasting: the process

proved effective." *Amsden, 904 F.2d at 755*. Similar to the plaintiff in Amsden, Plaintiff was ultimately successful in the Superior Court. Although Plaintiff claims that it was entitled to a pre-deprivation hearing, it offers no support for this position. The so-called "local law" cited by Plaintiff, § 410-15.1(F)(2) of the Pawtucket Zoning Ordinance, does not require a pre-deprivation hearing. Plaintiff has not presented any analysis or case law that would require a pre-deprivation hearing in these circumstances. Plaintiff cannot establish, under the undisputed facts of this case, that it was entitled to a pre-deprivation hearing or that it was denied procedural process.

Plaintiff cannot establish the second element of the procedural due process standard as it received constitutionally adequate procedural due process.

Lastly, Defendants are protected by the doctrine of qualified immunity. "Qualified immunity shields government officials wielding discretionary powers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Amsden, 904 F.2d at 751 quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982).* The salient issue is not whether a plaintiff's rights were violated because qualified immunity protects even defendants who violate constitutional rights unless a plaintiff is able to demonstrate that the defendant's conduct was objectively unreasonable under the applicable standard. *Id*.

In the instant case, Plaintiff contends that it was deprived of a property interest without due process. However, based on the plain reading of R.I.G.L. § 45-24-54, § 410-93 of the Zoning Ordinance and the *Tompkins* case – which was issued before the actions of the Defendants – it can hardly be argued that it was clearly established that Plaintiff had a property interest in the Zoning Certificates. In fact, the opposite is true. Even if Plaintiff had a property

interest, it was certainly not clearly established that Plaintiff was entitled to a pre-deprivation hearing and/or that the post-deprivation remedies were inadequate. Once again, the opposite is true as these procedures constitute the norm in these instances. Therefore, Defendants are entitled to qualified immunity on Plaintiff's procedural due process claim.

For all these reasons, the inability to establish a property interest, the constitutionally adequate post-deprivation remedies afforded Plaintiff and Defendants' entitlement to qualified immunity, Defendants respectfully submit that they are entitled to summary judgment in their favor on Count I of Plaintiff's Complaint.

### C. Defendants Are Entitled to Summary Judgment on Plaintiff's § 1983 Substantive Due Process Claim because Plaintiff Does Not Have a Property Interest and Defendants' Conduct Was Not Egregiously Unacceptable, Outrageous, or Conscious-Shocking.

Plaintiff's substantive due process claim flows from the same decisions of the City Planning Director and the Zoning Board regarding the need for a use variance despite the presence of the Zoning Certificates. Once again, the first hurdle Plaintiff must overcome is the establishment of a property interest as defined by state law. *See Macone v. Town of Wakefield, 277 F.3d 1, 9 (1st Cir. 2002) ("To establish a due process claim, substantive or procedural, appellants must first establish a property interest.")* Defendants contend, for the reasons set forth *supra*, that Plaintiff cannot establish a property interest thereby condemning its substantive due process claim. Even if Plaintiff could overcome this hurdle, its substantive due process claim would still fail as the second hurdle is even higher than the first one.

"A viable substantive due process claim requires proof that the state action was 'in and of itself . . . egregiously unacceptable, outrageous, or conscious-shocking.'" *Licari v. Ferruzzi, 22*

*F.3d 344, 347 (1st Cir. 1994) quoting Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990).*

Further, as the First Circuit has on many occasions stated

> [R]ejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. The doctrine of substantive due process does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of some law. Rather, substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational in that it is not sufficiently keyed to any legitimate state interest.

PFZ Properties, Inc., *928 F.2d at 31-32. (internal citations and quotations marks omitted).*

The standard necessary to establish abuse of government power is a high one. *Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F. 2d 32, 45 (1st Cir. 1992).* The reason for this high standard is the difficulty in deciding what abuses constitute abuses of substantive due process. *Id*. Therefore, the First Circuit has consistently held that, ordinarily, substantive due process claims may not be used to involve the federal court in local planning disputes. *Id*. Although not alleged by Plaintiff, even "even bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations." *Amsden, 904 F.2d at 757. See also, PFZ Properties, 927 F.2d at 32 ("Even assuming that ARPE engaged in delaying tactics and refused to issue permits for the Vacia Talega project based on considerations outside the scope of its jurisdiction under Puerto Rico law, such practices, without more, do not rise to the level of violations of the federal constitution under a substantive due process label.")* The Court has, however, "left the door slightly ajar for federal relief in truly horrendous situations. *Id.*

There was nothing egregiously unacceptable, outrageous, or conscious-shocking about Defendants' actions in the instant case. Plaintiff can only show, at best, that the decisions made by Defendants were incorrect and in excess of their authority. In fact, these are the allegations

made by Plaintiff. *See Plaintiff's Complaint, paragraph 23 and Plaintiff's Amended Complaint, paragraph 24. ("The July 12, 2004 determination of the Defendant Planning Director that the Division of Zoning and Code Enforcement was in error and his refusal to accept the Zoning Certificates was a usurpation of the legal authority of the Division of Zoning and Code Enforcement and was beyond his authority and ultra vires.")* However, decisions made for erroneous reasons, or made beyond authority, do not rise to the level of a constitutional violation. *See Amsden, 904 F.2d at 757 ("Our cases make clear that a regulatory board does not transgress constitutional due process requirements merely by making decisions for erroneous reasons or by making demands which arguably exceed its authority under the relevant state statutes.") (internal quotations and citation omitted).*

In *Creative Environments, Inc. v. Estabrook, 680 F2d 822 (1st Cir. 1982)*, the defendant town disapproved a housing development plan proposed by the plaintiff developer. A lawsuit followed wherein Plaintiff alleged, among other things, *§ 1983* due process violations. The court stated that it would assume that the plaintiff developer could have established at trial that the town used adversarial and even arbitrary tactics to deny the development plan. However, the court noted that plaintiff's claim was too typical of the run of the mill dispute between a developer and a town planning agency to rise to the level of a due process violation. *Id. at 833*. As the court stated, a "conventional planning dispute – at least when not tainted with fundamental procedural irregularity, racial animus, or the like – which takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true even where planning officials clearly violate, much less "distort" the state scheme under which they operate." *Id*.

The allegations in the instant case involve a typical run of the mill dispute between a developer and a town planning agency. The Defendants actions were not egregiously unacceptable, outrageous, or conscious-shocking. In fact, they do not even rise to the level of the allegations in the *Creative Environment* case. In support of its substantive due process claim, Plaintiff contends, among other things, that Defendants' actions were arbitrary, egregious and irrational and amount to illegal spot zoning. *Plaintiff's Amended Complaint at 38*. First, even these allegations do not rise to the egregiously unacceptable, outrageous and conscience-shocking level. Second, even at that, it is not enough for Plaintiff to simply rest upon mere allegations or denials, it must present affirmative evidence to defeat a properly supported summary judgment motion. *Fed.R.C.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2502, 2514 (1986).* Moreover, it is not enough to rely on a single reference in the Superior Court bench decision that Zoning Board decision was arbitrary and capricious and then conclude that such a statement transforms Defendants' actions into a constitutional deprivation. This statement by the Superior Court does not mandate a finding of a constitutional deprivation because the standard applied in administrative procedures appeals is different and less stringent that the "truly horrendous situations" protected by the substantive due process clause. *Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992).*

The arbitrary and capricious comment by the Superior Court in the zoning appeal relates to the appellate review standard employed in administrative appeals. *Romanik v. Meinertz, 2006 R.I. Super. LEXIS 126, at 5-6.* The standard applied to determine whether a governmental action amounts to a deprivation of substantive due process rights, however, is much more stringent. Without repeating the arguments in Defendants' Memorandum, the First Circuit standard is clear: "[i]n the substantive due process context, the requisite arbitrariness and caprice must be

stunning, evidencing more than humdrum legal error." *Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990).* "Where a license or permit denial [or revocation] is involved, the class of cases which meets the constitutional threshold is narrowly limited." *Collins v. Nuzzo, 244 F.3d 246, 250 & 251 (1st Cir. 2001).* In fact, such a violation has been found to occur only in a "truly horrendous situation." *Nestor Colon Medina, 964 F.2d at 45.* The standard is "unforgiving" and "guards against insinuating the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals." *Id. (internal quotations omitted).*

Substantive due process protection is not triggered by merely unsound or erroneous government decisions. *Rivera v. Fagundo, 310 F. Supp. 2d 428, 435 (D.P.R. 2004).* Rather, "[i]ts use is limited to those specific instances involving egregious abuse of governmental power which the courts find shocking." *Id. citing Collins v. City of Harker Heights, 503 U.S. 115 (1992).*[7] In *Co. of Sacramento v. Lewis, 523 U.S. 833 (1998)*, the United States Supreme Court "clarified the law of substantive due process and made pellucid that conscience-shocking conduct is an indispensable element of a substantive due process challenge to executive action." *DePoutot v. Raffaelly, 424 F.3d 112, 118 n.4 (1st Cir. 2005) (emphasis added) citing Lewis, 523 U.S. at 846-47 and Hawkins v. Freeman, 195 F.3d 732, 738-39 (4th Cir. 1999) (en banc) (underscoring the "shock the conscience" prerequisite in executive action cases*). The First Circuit has also "repeatedly held that rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. The doctrine of substantive due process does not protect individuals

---

[7] The First Circuit has actually rejected substantive due process claims premised on malicious official action as well as local licensing authority's outright violation of state law. *Amsden, 904 F.2d at 757; Roy v. City of Augusta, 712 F.2d 1517, 1523 (1st Cir. 1983); Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1981). See also Collins, 244 F.3d at 246.*

from all governmental actions that infringe liberty or injure property in violation of some law." *Torromeo v. Town of Fremont, 438 F.3d 113, 118 (1st Cir. 2006) quoting SFW Arecibo Ltd. v. Rodriguez, 415 F.3d 135, 141 (1st Cir. 2005) (internal citations omitted).* Defendants submit that even taking the allegations in the Complaint in the light most favorable to Plaintiff, the allegations fail to rise to the level of a "truly horrendous situation" that shocks the conscience in manner that violates substantive due process guarantees. *See i.e. Blain v. Twp. of Radnor, 167 Fed. Appx. 330 (3d Cir. 2006) (frivolous or non-meritorious appeal, condemnation threat, conflict of interest, and improper denial of a subdivision plan did not rise to the level of impropriety needed to "shock the conscience."); Thornbury Nobel, Ltd. v. Thornbury Township, 2003 U.S. Dist. LEXIS 25985, (October 22, 2004)(holding that in the land use environment, favoring one development over another for the purpose of preserving open space in the township does not shock the conscience or give rise to substantive due process claim).*

For all these reasons, including the lack of a property interest and qualified immunity, Defendants respectfully request that this Court enter summary judgment in their behalf on the substantive due process claim contained in Count II of Plaintiff's Complaint.

**D. Defendants Are Entitled to Summary Judgment on Plaintiff's Equal Protection Claim Because Plaintiff Was Not Selectively Treated Compared with Other Similarly Situated Persons Nor Can Plaintiff Present Evidence of Gross Abuse of Power by Defendants.**

Count III of Plaintiff's recently amended Complaint contends that Defendants have violated the Equal Protection Clause under both the Federal and State Constitutions. "The *Equal Protection Clause* contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004).* In order to establish its claim, Plaintiff must present evidence that—

(1) "compared with others similarly situated, [it] was selectively treated" and

(2) the selective treatment was " based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Id. *(citations omitted.)*

In this case, plaintiff cannot meet the elements necessary to prove its equal protection claim. A plaintiff "claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." *Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995)(citation and internal quotations omitted.)* "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. * * * Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples. *Tapalian, 377 F.3d at 6 (citations omitted.)*

In the instant case, Plaintiff is silent on what other similarly situated individuals or entities were treated differently by Defendants. Plaintiff does not identify others who were similarly situated or provide instances of different treatment. The equal protection claim - recently added Count III of the Amended Complaint – simply alleges discrimination against Plaintiff and the Property. In paragraph 17 of the Amended Complaint, Plaintiff alleges that Todd Olbrych issued certificates of zoning compliance for other properties without challenge by any agent or official of the City of Pawtucket. Even if true, this allegation falls well short of establishing the similarly situated standard. This allegation is too general to be of any use because it does not "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently" *Rubinovitz, 60 F.3d at 910.*

For example, Plaintiff does not identify these other zoning certificate recipients. There is no mention of the uses specified in these certificates and whether they were issued for so-called refuse transfer stations. Plaintiff produces no evidence concerning whether the holders of these certificates filed Site Plan Applications with the City Plan Commission and whether they were required to seek zoning board approval for a use variance. Defendants submit that the reason Plaintiff did not provide this evidence is that it does not exist and because Plaintiff has not experienced any dissimilar treatment. However, whatever the reason, the failure to present evidence of specific instances of similarly situated persons or entities receiving different and more favorable treatment than Plaintiff dooms its equal protection claim.

Even if Plaintiff had been able to establish the first prong of the analysis, it cannot meet the second prong. As stated *supra*, the second prong requires evidence of selective treatment based on impermissible grounds. These impermissible grounds are "race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* Race, religion and/or intent to inhibit or punish the exercise of constitutional rights are not the grounds alleged or claimed by Plaintiff. The only ground left is malicious or bad faith intent to injure a person. To prove this ground, it is not enough that the City's actions were simply arbitrary or erroneous. *Tapalian, 377 F.3d at 6*. Instead, Plaintiff must establish that the actions constituted a "gross abuse of power." *Id*. Gross abuse of power, bad-faith or malicious-intent-to-injure cases are infrequent. *Rubinovitz, 60 F.3d at 911*. Therefore, "the malice/bad faith standard should be scrupulously met." *Id. (citations and internal quotations omitted.)*

"In the field of local permits, the nature of the government conduct (or misconduct) required to establish either a substantive due process or an equal protection claim is so similar as to the compress the inquiries into one. * * * In equal protection cases, we have articulated the

need to establish a gross abuse of power, invidious discrimination or fundamentally unfair procedures" Baker v. Coxe, *230 F.3d 470, 474 (1st Cir. 2000). (citations and internal quotations omitted.)* Therefore, an arbitrary denial of a permit does not meet the constitutional threshold for equal protection and substantive due process claims, even if the denial was in violation of state law and in bad faith. *Baker, 230 F.3d at 474. (emphasis added.)* As the *Baker* court stated, there is a "marked difference between the inevitable misjudgments, wrongheadedness, and mistakes of local government bureaucracies and the utterly unjustified, malignant, and extreme actions of those who would be parochial potentates." *Id. See also, Barrrington Cove Limited Partnership v. Rhode Island Housing and Mortgage Finance Corp., 246 F.3d 1, 11 (1st Cir. 2001) ("[T]he mere fact that appellees may have violated or abused federal or state regulatory regimes by imposing the charitable contribution requirement upon Barrington, in effect wrongfully imposing an application "fee" in excess of regulatory limits, has no direct bearing on whether appellees violated Barrington's equal protection rights.")*

*Rubinovitz* illustrates the level of extreme conduct necessary for the gross abuse of power/malice/bad faith standard. In that case, a city official allegedly engaged in a vendetta against plaintiffs because they evicted her friend from their rental apartment. The official enlisted other city officials to cut off plaintiffs' utility services, charge plaintiffs with building code violations and interfere with their hiring of a building contractor. The *Rubinovitz* court determined that there was enough of an indication of a malicious orchestrated campaign causing substantial harm – "though only barely enough evidence" – for plaintiffs to survive summary judgment. *Rubinovitz, 60 F.3d at 912.* In *Baker*, the court observed that *Rubinovitz* "illustrates the extreme malicious orchestrated campaign need to surmount the constitutional threshold." *Baker, 230 F.3d 474.*

In the instant case, Plaintiff presents no evidence of the extreme malicious orchestrated campaign necessary to establish gross abuse of power. On April 29, 2004, the day after receiving Plaintiff's completed Site Plan Application, Defendant Cassidy, the Director of the Department of Planning and Redevelopment, notified Plaintiff that:

(1) the Planning Department believed the zoning certificate was issued in error; and

(2) the Planning Department had referred the issue to the City Law Department for a legal opinion.

On July 12, 2004, Defendant Cassidy notified Plaintiff that the Law Department had determined that a private refuse transfer station was not an allowed use for the property. Therefore, Plaintiff would need to obtain a use variance from the Zoning Board. Plaintiff appealed the decision to the Zoning Board and filed a variance request. This conduct, even taken in the light most favorable to Plaintiff, certainly does not rise anywhere near the level necessary to meet the gross abuse of power standard.

This fact is evident when Defendants' conduct is contrasted with that of the defendant in _Tapalian_. In that case, the First Circuit noted that the trial record was "laden with the language of personal malice and 'bad faith' retaliation, aimed at punishing Tapalian immediately following his rejection of Tusino's (the DPW Director) request that Tapalian supply him with 'two women.'" _Tapalian_, *377 F.3d at 7*. The malice/retaliation included Tusino imposing onerous and costly conditions on Tapalian's development project. Many of these conditions violated a previous court agreement and served no legitimate purpose. _Id_. Further, Tusino's assistant told Tapalian's contractor that "Tusino was intent on deliberately busting [Tapalian's] balls." _Id_. These activities were sufficient to find that Tusino had engaged in a malicious orchestrated campaign causing substantial harm constituting a gross abuse of power. *See also* _Esmail v._

Macrane, *53 F.3d 176, 178, 180 (7th Cir. 1995) (viable equal protection violation where "a powerful public official picked on a person out of sheer vindictiveness" in "a spiteful effort to get him for reasons wholly unrelated to any legitimate state objective.")* In the instant case, Defendants' conduct does not come close to constituting a gross abuse of power.

Plaintiff cannot establish the elements necessary for its equal protection claim and Defendants respectfully request that this Court enter judgment in their favor on Count III of Plaintiff's Amended Complaint.

**E. Defendants Are Entitled to Summary Judgment on Plaintiff's Equitable Estoppel/Detrimental Reliance Claim because the Zoning Certificates Were Not Enforceable, Were Not Issued by a Duly Authorized City Official and Plaintiff Could Not Justifiably Rely on Them.**

Counts IV and V of Plaintiff's Amended Complaint allege equitable estoppel/detrimental reliance claims against the Defendants. The claims are based on the Zoning Certificates issued by Todd Olbrych, a Pawtucket Building Official. Plaintiff seeks injunctive and declaratory relief as well as monetary damages. One aspect of the injunctive relief sought by Plaintiff is a restraining order enjoining Defendants from interfering with Plaintiff's lawful use of the Parcel "and from interfering with the rights assured to Plaintiff by the Defendant Zoning ***Director***[8]." Plaintiff's Complaint, *paragraph 37(1). (emphasis added).*

"[E]quitable estoppel is 'extraordinary' relief, which 'will not be applied unless the equities clearly [are] balanced in favor of the party seeking relief.'" Southex Exhibitions, Inc. v. R.I. Builders Ass'n, *279 F.3d 94, 104 (1st Cir. 2002) quoting* Greenwich Bay Yacht Basin Assocs. v. Brown, *537 A.2d 988, 991 (R.I. 1988).* The elements necessary to prove equitable estoppel are (1) an affirmative representation or equivalent conduct on the part of the person against whom

---

[8] In Plaintiff's Amended Complaint, Defendant Zoning Director has now become Defendant Zoning Director's office. *Plaintiff's Amended Complaint,* ¶ *45(1*).

the estoppel is claimed (in this case, Defendants) which is directed to another (here, Plaintiff) for the purpose of inducing the other to act or fail to act in reliance thereon, and (2) that such representation and conduct in fact did induce the other to act or fail to act to his injury. *Id. quoting Providence Teachers Union v. Providence Sch. Bd., 689 A.2d 388, 391-92 (R.I. 1997).* The burden for proving equitable estoppel is on Plaintiff. *Id.* "[T]he key element of an estoppel is intentionally induced prejudicial reliance." *El Marocco Club, Inc. v. Richardson, 746 A.2d 1228, 1234 (R.I. 2000) quoting East Greenwich Yacht Club v. Coastal Resources Management Council, 376 A.2d 682, 686 (R.I. 1977)*. As the *El Marcocco* court stated, "to establish that it was entitled to the benefits of the equitable estoppel doctrine, plaintiff had to show that one or more ***duly authorized representatives*** of the town affirmatively represented to it by word or deed that -- notwithstanding the town's future enactment of ordinances outlawing such conduct – it still would be allowed to offer nude dancing at its liquor-serving establishment; that such representations were designed to induce plaintiffs reliance thereon; and that plaintiff actually and ***justifiably*** relied thereon to its detriment. *Id. (emphasis added)*.

In the instant case, the affirmative representation Plaintiff relies on is the issuance of the Zoning Certificates by Todd Olbrych, a former building official for the City of Pawtucket. Plaintiff alleges that "Todd Olbrych had actual and apparent authority to issue the Zoning Certificates for the City of Pawtucket." *Plaintiff's Amended Complaint, paragraph 16.* However, the plain language of the Pawtucket Zoning Ordinance clearly indicates that Mr. Olbrych had no such authority and Rhode Island case law clearly states that apparent authority is not enough to bind the City.

Section 410-93 of the Pawtucket Zoning Ordinance entitled "Enforcement duties of Director" states, in pertinent part, that "[i]n order to provide guidance or clarification, ***the***

***Director*** shall, upon written request, issue a zoning certificate or provide information to the requesting party within fifteen (15) days of the written request." "Zoning Certificate" is defined in the Ordinance as "[a] document ***signed by the Director***, as required in this chapter, which acknowledges that a use, structure, building, or lot either complies with or is legally nonconforming to the provisions of the municipal zoning ordinance or is an authorized variance or modification therefrom." *Section 410-132*. The "Director" is defined as the "Director of the Division of Zoning and Code Enforcement of the City of Pawtucket." *Id*.

Ronald F. Travers was Director of the Division of Zoning and Code Enforcement, not Todd Olbrych. Mr. Olbrych was a Building Official and he signed the Certificates as Building Official. *See Exhibits B and C attached hereto*. Under the plain language of the Ordinance, he was not duly authorized to issue the Certificates. It is well-settled that "the authority of a public agent to bind a municipality must be actual * * *. Consequently, any representations made by such an agent lacking actual authority are not binding on the municipality * * *." *Casa DiMario, Inc. v. Richardson, 763 A.2d 607, 610 (R.I. 2000) (citations and internal quotations omitted).*

In *Casa DiMario*, plaintiff filed a lawsuit against the Town of Johnston over the validity of an anti-nudity ordinance. During the course of that lawsuit, the Johnston town solicitor entered into a consent order with plaintiffs that purported to settle the case. However, the town council never authorized him to settle the lawsuit according to the terms of the consent order. The court ruled that it was clear that the solicitor lacked actual or apparent authority to settle the case. *Id. at 610*. Plaintiff, however, argued that the town should still be bound because of the town's alleged past practice of allowing the solicitor to settle certain cases without a formal prior vote of the town council. This argument was rejected by the court as misplaced and unjustified. *Id. at 611*. The court noted that courts were reluctant to order estoppel against the government

based on the action of one of its officers. *Id. at 612*. For this reason, any party dealing with a municipality is bound, at his or her own peril, to know the extent of the officer's capacity. *Id*. As the court stated, any putative detrimental reliance by plaintiff based on the town's alleged past practice of settling lawsuits without council approval would not have been justified. *Id*.

In the instant case, any putative detrimental reliance by Plaintiff on the Zoning Certificates was not justified. The Ordinance is clear that the Zoning Certificates must be signed by the Director of the Department of Zoning and Code Enforcement. It is also clear that Todd Olbrych was not the Director and did not sign the Zoning Certificates in that capacity. Plaintiff's alleged reliance on Mr. Olbrych's apparent authority to issue the Zoning Certificates is no different than the *Casa DiMario* plaintiff's alleged reliance on the apparent authority of the town solicitor to settle lawsuits.

Similarly, in *Caron v. Town of North Smithfield, 885 A.2d 1163, 1164 (R.I. 2005)*, the Town of North Smithfield sold a parcel of land to a non-profit group. The purpose of the sale was to allow this non-profit group to build low and moderate income housing on the parcel. Plaintiffs owned property adjacent to this town property and became concerned when they saw wells being sited next to their boundary line. They were concerned that they would not be able to improve or enlarge their own septic system because of its proximity to these proposed new wells. Plaintiffs alleged that they were told by various town officials, including the town administrator, that the town would cancel the contract with the non-profit group if plaintiffs' concerns could not be rectified. Plaintiffs' concerns were not rectified and the wells were drilled anyway. Plaintiffs filed suit requesting, among other things, estoppel against the town because they detrimentally relied on the town's assurances that the wells would not be located in an area that would have an adverse impact on their property.

The court began its analysis by citing the well-settled rule that the authority of a public agent to bind a municipality must be actual and any representations made by a public agent lacking actual authority were not binding on a municipality. *Id at 1164*. The town administrator, upon whom plaintiffs relied for their detrimental reliance claim, had no actual authority to bind the town or cancel the contract with the non-profit group. Therefore, "[a]lthough the Carons may have believed that Bianchi had this power or influence, their failure to discover the true scope of his authority does not provide grounds for relief on the basis of detrimental reliance." *Id. at 1165*. In *Potter v. Crawford, 797 A.2d 489 (R.I. 2002)*, the court rejected the plaintiff's assertion that a municipality may be bound by the actions of a public agent who only possesses apparent authority. The court found that "the fact that the plaintiff merely assumed that Armington [the municipal official] possessed such authority will not provide him with any grounds for relief under an estoppel theory against the town." *Id at 493*.

The detrimental reliance espoused by the plaintiffs in the above cases is no different than the alleged detrimental reliance claimed by Plaintiff in the instant case. Mr. Olbrych had no actual and/or apparent authority to issue the Zoning Certificates and Plaintiff could not justifiably rely on them. Plaintiff cannot establish this element of equitable estoppel/detrimental reliance. Even assuming Plaintiff could overcome this hurdle, i.e., that Olbyrch was a duly authorized representative, Plaintiff could not *justifiably* rely on the Zoning Certificates in expending "substantial sums of money" as a matter of law. First, as Defendants have argued *supra*, the Zoning Certificates were not enforceable against the City. At best, they provided informational assistance only. Second, the Zoning Certificates did not guarantee that Plaintiff would gain acceptance of its project. Even if the Zoning Certificates were enforceable, Plaintiff was still required to file its Site Plan Application and proceed through the city planning process.

Even approval from the City Planning Commission did not guarantee approval of the project because Plaintiff needed the approval of non-municipal agencies, such as RIDEM. As *Exhibit D* shows, RIDEM approval was far from guaranteed. So, for Plaintiff to expend substantial sums of money on the Zoning Certificates was not justifiable as a matter of law.

The key issue of this claim and the source of dispute between Plaintiff and Defendants, is whether Todd Olbrych, the former Pawtucket building official, had actual authority to issue the zoning certificate which serves as the affirmative representation relied upon by Plaintiff. The issue of who possesses actual authority is a question of law for the Court. In its memorandum filed in response to Defendants' initial summary judgment motion, Plaintiff concedes that the authority of a public agent to bind a municipality must be actual and any representations made by an agent lacking actual authority are not binding on the municipality. *Casa DiMario, Inc. v. Richardson, 763 A.2d 607, 610 (R.I. 2000).* Plaintiff argues that Mr. Olbrych had actual authority to bind the City because Ronald Travers, Director of Zoning and Code Enforcement for the City of Pawtucket, told him he could sign the zoning certificates. *Plaintiff's Memorandum, at 17*. Plaintiff also maintains that "defendants offer no evidence that Mr. Olbrych acted without authorization." *Id*. These arguments, however, demonstrate that Plaintiff misunderstands the meaning of the term "actual authority".

It is clear that Ronald Travers, as Director of Zoning and Code Enforcement, is the only individual who has actual authority to sign the zoning certificates because **the Pawtucket Zoning Ordinance duly authorizes the Director of Zoning and Code Enforcement to sign these certificates**. *See §§ 410-93, 96 and 132 of the Pawtucket Zoning Ordinance.* Conversely, Defendants' evidence that Mr. Olbrych acted without authorization is this same governing document of the City of Pawtucket. The Pawtucket Zoning Ordinance does not

authorize anyone to sign these zoning certificates other than Director of Zoning and Code Enforcement. Mr. Olbrych was not the Director of Zoning and Code Enforcement. Therefore, he was not duly authorized to sign the zoning certificates.

Plaintiff argues that Mr. Olbrych had actual authority to sign the zoning certificates because he was acting under the express authority of the Director, Mr. Travers. According to Mr. Olbrych, he asked Mr. Travers who he wanted to sign the certificate and Mr. Travers responded "You do it." *Plaintiff's Memorandum, at 17*. Assuming this is true, the pertinent question becomes whether this response conferred actual authority on Mr. Olbrych. In other words, was Mr. Travers duly authorized to delegate this authority to Mr. Olbrych? Plaintiff does not address this fundamental question because the answer is clear: there is nothing in the Pawtucket Zoning Ordinance that allows Mr. Travers to delegate this authority to Mr. Olbrych. The Pawtucket Ordinances do not allow Mr. Travers to delegate his authority and do not grant actual authority to Mr. Olbrych to bind the City. A party dealing with a municipality is bound, at his or her own peril, to know the extent of the officer's capacity. *Casa DiMario, Inc., 763 A.2d at 612.* It is clear that Mr. Olbrych did not have actual authority to issue the zoning certificates and bind the City.

Although the failure to prove that Mr. Olbrych had actual authority to bind the City dooms Plaintiff's equitable estoppel/detrimental reliance claim, Defendants must address one other aspect of Plaintiff's argument. Defendants contend one of the elements of equitable estoppel/detrimental reliance is actual and justifiable reliance by Plaintiff, on the representation, to its detriment. *See El Marocco Club, Inc. v. Richardson, 746 A.2d 1228, 1234 (R.I. 2000)*. Plaintiff contends, however, that it need not show actual and justifiable reliance but must only show proof of substantial prejudice incurred in good faith. *Plaintiff's Memorandum, at 18*. The

reason for this argument is clear: Plaintiff could not justifiably rely on the certificates for anything. Plaintiff was only at the first step in the long process to gain acceptance of its proposed refuse transfer station. For Plaintiff to expend "millions of dollars" based on these certificates was not justifiable as a matter of law.

In support of its argument that it must only show proof of substantial prejudice incurred in good faith, Plaintiff cites a string of Rhode Island zoning cases, most notably, *Shalvey v. Zoning Bd. of Review of the City of Warwick, 210 A.2d 589 (R.I. 1965), Jones v. Rommell, 521 A.2d 543 (R.I. 1987) and Tantimonaco v. Zoning Bd. of Review of the Town of Johnston, 218 A.2d 480 (R.I. 1967).* However, these zoning cases are not germane to the issue in the instant case.[9] Those cases stand for the proposition that "building permits lawfully issued for a permitted use should be immune to impairment or revocation by reason of a subsequent amendment to the zoning ordinance when the holders thereof, acting in reliance thereon in good faith, initiate construction in some reasonably substantial measure or incur some reasonably substantial obligation promoting such construction." *Shalvey, 210 A.2d at 593-594*. First, a building permit was not issued in the instant case. Once again, Plaintiff was only at the beginning stage of seeking approval for a building permit. Second, there was no amendment of the zoning ordinance and, lastly, Plaintiff had not initiated any *construction* in any reasonably substantial measure. These cases are simply not applicable to the issues in the instant case. Defendants maintain that the case law is clear: for Plaintiff to prove equitable

[9] Even if these cases were somehow relevant, it is far from an undisputed fact that Plaintiff acted in good faith and/or expended substantial sums of money. For example, the mere fact that Plaintiff entered into lease agreements does not, in and of itself, prove that it was done in good faith especially when Plaintiff entered into these arrangements and expended money after it received notice questioning whether a private refuse transfer station was a permitted use of the Property. See *supra*.

estoppel/detrimental reliance, justifiable reliance is an essential element. On the undisputed facts of this case, Plaintiff cannot prove justifiable reliance as a matter of law.

Defendants submit that summary judgment should enter in their favor on Counts IV and V of Plaintiff's Complaint because Todd Olbrych did not have actual or apparent authority to issue the Zoning Certificates. Furthermore, Plaintiff was not justified in relying on the Zoning Certificates as they were for informational purposes only and the Zoning Certificates did not guarantee Plaintiff approval of its project.

### F. Defendants Are Entitled to Summary Judgment on Plaintiff's Intentional Interference with Contractual Relations and Interference with Prospective Economic Advantage Claims as Plaintiff Cannot Establish the Elements of Either Claim.

Plaintiff contends, in Count VI of its Amended Complaint, that the Defendants intentionally interfered with its contractual relations. Count VII contains the analogous claim of interference with prospective economic advantage. To establish a prima facie case of intentional interference with contract, under Rhode Island law, Plaintiff must prove (1) the existence of a contract, (2) Defendants knowledge of that contract, (3) Defendants intentional interference with that contract, and (4) damages resulting from the intentional interference. Further, as Plaintiff has alleged intentional interference, it must show legal malice, i.e., an intent to do harm without justification. _Belliveau Building Corporation v. O'Coin_, *763 A2d. 622, 627 (R.I. 2000)*. The elements Plaintiff must prove to establish interference with prospective contractual relations are (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained and (5) damages to the plaintiff. _Mesolella v. City of Providence_, *508*

*A.2d 661, 669 (R.I. 1986).* Plaintiff cannot satisfy any of the elements necessary to prove either claim.

Initially, it is easy to doubt Plaintiff's interference claims. The elements require Plaintiff to prove the existence of a contract or business relationship, knowledge of either by Defendants, and Defendants intentional interference with malice. These allegations are easier to make than to prove, and it is Plaintiff's burden to prove them. *Belliveau Building Corporation, 763 A2d. at 627*. Plaintiff does not identify the contracts or business relationships allegedly interfered with by Defendants, how Defendants became aware of them and/or how Defendants intentionally interfered with them with malice. Without proof of these elements, Plaintiff's intentional interference claims must fail.

It would be highly unusual and unreasonable for Plaintiff to have entered into any contracts (or, for that matter, for any of the Defendants to be aware of them) because Plaintiff had simply filed its initial application, the first step in the process to gain approval for its project. As noted *supra*, the approval process went beyond City of Pawtucket approval. Plaintiff also needed approval from the RIDEM and Plaintiff had filed only the initial pre-application. The response from RIDEM was less than positive as Plaintiff was notified of numerous deficiencies and that the failure to address them would result in denial of its license application. *See Exhibit D attached hereto*. To the best of Defendants' knowledge, Plaintiff has not addressed these deficiencies with RIDEM. Therefore, unless and until Plaintiff can identify the contracts or business relationships allegedly interfered with, and Defendants knowledge of them, Plaintiff's intentional interference claims must fail.

Further, the comments from RIDEM to Plaintiff's pre-application resulted in Plaintiff changing its Site Plan Application. The March 30, 2004 Site Plan Application changed the

proposed use from "Railroad Shipping Operations/Transfer Station For Refuse" to "Railroad Terminal and Construction & Demolition Debris Transfer Station." See *Exhibits A and E attached hereto*. This change in use is not insubstantial because it *differs* from the use contained in the Zoning Certificate upon which Plaintiff relies for its claim. *See attached Exhibit A*. Evidently, Plaintiff's business plans changed as it proceeded through the RIDEM application process. Left unsaid is how Defendants were aware of these changed business plans and/or contracts related to the change.

Plaintiff must realize the difficulty of relying on the Zoning Certificate because, in paragraph 53 of its Amended Complaint, it states that

> Plaintiff intended to develop the Subject Property consistent with the plans and specifications submitted to the Defendant Planning Director and had taken substantial steps toward development.

To repeat what has been stated earlier, on its face, it is not conceivable that Plaintiff would take substantial steps toward development when it had filed only the first document in the development process. Furthermore, this statement indicates that the interference occurred *after* the plans were submitted to Mr. Cassidy. While Plaintiff first filed its Site Plan Application on or about August 1, 2003, it was incomplete and required more information for proper review by the City Planning Commission. Plaintiff took almost six (6) months to provide most of this necessary information and provided the last piece of information on April 28, 2004. The following day, Defendant Cassidy notified Plaintiff that the Department questioned whether a refuse transfer station was a permitted use, believed the Zoning Certificate was issued in error and had requested a legal opinion from the Law Department. It is unlikely that Plaintiff would have entered into any contracts with third parties during this 24-hour period and that Mr. Cassidy would have been aware of them. It is also highly unlikely that Plaintiff would have entered into

any contracts with third parties after receiving the April 29, 2004 letter because it was then on notice of potential difficulties with its application. Furthermore, an administrative officer or board should not be subject to a potential lawsuit, no matter how frivolous, simply because an applicant elects to enter into contracts while an application is being considered for approval.

In assessing Plaintiff's contractual interference claims, it is important to revisit the facts of this case, specifically the dates of various filings and notices by the parties. The initial Site Plan Application filed by Plaintiff in this case was incomplete, requiring Plaintiff to file a second one. The second Site Plan Application was filed on March 30, 2004. Unfortunately for Plaintiff, this second one also contained missing information. Plaintiff produced this information and filed a completed second Site Plan Application on or about April 28, 2004. The following day, on April 29, 2004, Michael Cassidy notified Plaintiff, by letter, that he believed the zoning certificate – which stated that a private refuse transfer station was an allowable use for the Property – was issued in error. Therefore, he had referred the matter to the Law Department for a legal opinion on whether Plaintiff's proposed use was allowable under the Zoning Ordinance. If it was not an allowable use, Plaintiff would need Zoning Board approval. *See Defendants' Memorandum at 4-8 for a more complete statement of the facts.* The date of the claimed interference, therefore, is April 29, 2004.

The initial elements that Plaintiff must prove for its contract interference claims are a contract or business relationship and Defendants knowledge of that contract or relationship. The contract and business relationship that Plaintiff relies on are the lease agreements with P&W Railroad and Infinity Rail. *Plaintiff's Memorandum, at 21*. According to Plaintiff, "[t]he City's knowledge [of these contracts] is plain on the face of the Certificate of Zoning Compliance, which states that PTO plans to use the site as a 'refuse transfer station'. . . . The City therefore

knew that plaintiff expected to develop the site for that purpose." *Id*. However, in asserting a claim for contract or business interference, the issue is not Defendants' knowledge of the intended use of the property. The issue is Defendants' knowledge of the P&W Railroad and Infinity leases. Proving that Defendants knew that Plaintiff intended to use the property as a private refuse transfer station, does not prove that Defendants had knowledge of these two leases.

Plaintiff produces no evidence that Defendants had any knowledge of the Infinity Rail lease or business relationship. In fact, Plaintiff has not produced the lease. The only "evidence" of the lease is contained in the affidavits of Daniel Poggi and Marlene Wheaton.[10] *Plaintiff's Exhibits 1 and 3, respectively*. Both affidavits state that Plaintiff entered into a long-term lease with Infinity Rail but both leave out an important fact, namely, the date the lease was entered into by the parties. The only date Plaintiff does offer is the date it began paying rent to Infiniti. Even at that, Plaintiff offers only an approximate date – February, 2005. This date is well after April 29, 2004, the date on which the City notified Plaintiff that the City Planning Commission had questions about whether a transfer station was a permitted use for the property. So, on April 29, 2004, the date of the alleged interference, the lease that Plaintiff claims Defendants interfered with was not in existence. With respect to Infiniti Rail lease, or the Infiniti Rail business relationship or expectancy, Plaintiff has not only not proven that Defendants had knowledge of it; Defendants could not have known about it because it was not in existence.

The P&W Railroad lease was also entered into after April 29, 2004. According to Ms. Wheaton, Plaintiff entered into the P&W Railroad lease on August 31, 2004. Obviously, Defendants could not have known about this lease on the date of the alleged interference because

---

[10] Mr. Poggi identifies himself as the manager of Plaintiff corporation while Ms. Wheaton identifies herself as the Corporate Controller for a corporation that is a majority owner of Plaintiff.

it was not in existence. In its memorandum, Plaintiff states that Defendants "acknowledge receiving in April, 2004 a copy of a letter from P&W Railroad's general counsel describing the lease P&W had agreed to enter with PTO. PTO manager Daniel Poggi also described the entire anticipated operation to the Zoning Board of Review." *Plaintiff's Memorandum, at 22*. While this statement contains some elements of truth, close examination of this statement reveals that it is not helpful to Plaintiff. When Plaintiff filed its second Site Plan Application on March 30, 2004, it was incomplete. On April 6, 2004, Mr. Cassidy wrote to Plaintiff requesting additional information to complete the application. Among the documents requested was a letter from P&W identifying the agreement for specific uses at the site listed according to RIDEM definitions. *A copy of the April 6, 2004 letter is attached hereto as Exhibit I.*[11] On April 28, 2004, when Plaintiff filed the other items to complete its application, it also filed the letter from Ms. Tanona. *A copy of Ms. Tanona's letter, received on April 20, 2004, is attached hereto as Exhibit J*. The Tanona letter does not indicate the existence of a lease. On the contrary, it indicates that a lease agreement had not been entered into by the parties. Ms. Tanona states that P&W had only agreed to lease the Property to PTO **subject to the execution of a mutually agreeable lease agreement and subject to PTO's ability to obtain the necessary permits to develop the Property in accordance with PTO's planned operations.** It is not a surprise that Plaintiff has not attached a copy of the Tanona letter to its memorandum because, clearly, there was no lease agreement in existence before April 29, 2004.[12] Apparently, the parties were able to agree on a lease **four months later**. But this date is well past the April 29, 2004 alleged interference date. Similar to the Infiniti Rail lease, Plaintiff cannot prove the existence of a

---

[11] Defendants have elected to follow the order of the exhibits from their initial memorandum.

[12] Furthermore, even if a lease did exist, it is evident that it would not be enforceable because it was subject to permit approval. Defendants note that Plaintiff has also neglected to provide the Court with a copy of the lease.

contract or business relationship and/or knowledge of that contract or business relationship by Defendants. The undisputed facts of this case prove that Plaintiff cannot satisfy the first two elements of its contractual interference claims.

Even if Plaintiff could establish the existence of a contract and Defendants' knowledge of it, Plaintiff has not satisfied the remaining elements necessary to prove its contractual and business interference claims. Plaintiff has the burden of proving an intentional act of interference by Defendants. This element requires that Plaintiff prove the existence of legal malice, i.e., an intent to do harm without justification. *Belliveau Building Corporation v. O'Coin, 763 A.2d 622, 627 (R.I. 2000)*. Plaintiff argues that the Superior Court decision proves legal malice. However, the Superior Court decision is not "evidence". The decision has been appealed to the Rhode Island Supreme Court and it is certainly conceivable that the Supreme Court could reverse the decision of the Superior Court. Moreover, Plaintiff has not set forth any facts whatsoever to show legal malice.

On an even more basic level, there has been no interference, by Defendants, with these two contracts or business relationships. According to Plaintiff, it entered into the leases with Infiniti Rail and P&W and has been fulfilling the terms of these contracts. The actions of the City have not interfered with these contracts or business relationships. In fact, according to the Tanona letter, the failure to obtain the necessary permits was to be factored into any subsequently agreed upon lease agreement.

Plaintiff has also failed to prove damages. It has not produced the alleged lease agreements. It has not produced any evidence of the payment of money to anyone. There is no explanation for the requested management expenses. Plaintiff has produced no evidence to support its claim for lost profits. On its face, the manner in which the damage claim has been

presented calls the entire claim into question. Even if Plaintiff had presented sufficient evidence to prove damages, it would fail for ripeness. Plaintiff has not proven that it would have received City and/or State approval for its proposed use.

There are no facts to support Plaintiff's claim that it had a contract or business plan, that Defendants knew about them, and then intentionally interfered with them with malice. Defendants respectfully request that this Court enter summary judgment in their favor on Counts VI (interference with contractual relations) and Count VII (interference with prospective economic advantage) of Plaintiff's Amended Complaint.

**G. Conclusion**

For the reasons cited herein, as well as those that may be raised at hearing, Defendants respectfully request that summary judgment enter in their favor on all Counts of Plaintiff's Complaint.

Defendants,
By their attorneys,

*/s/ Marc DeSisto*
*/s/ Michael A. DeSisto*

Marc DeSisto, Esq. (#2757)
Michael A. DeSisto, Esq. (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax: (401) 272-9937
Email: marc@desistolaw.com
michael@desistolaw.com

CERTIFICATION

I hereby certify that the within document has been electronically filed with the Court and is available for viewing and downloading from the ECF system.

*/s/ Michael A. DeSisto*

Michael A. DeSisto, Esq.