UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PAWTUCKET TRANSFER OPERATIONS, LLC | ) | |
| vs. | ) | C.A. No. 05-520 S |
| | ) | |
| CITY OF PAWTUCKET, *et al.* | ) | |

**PLAINTIFF PAWTUCKET TRANSFER OPERATIONS LLC'S MOTION FOR SUMMARY JUDGMENT ON COUNTS IV TO VII AND OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Pawtucket Transfer Operations LLC, by its attorneys, moves that this Court grant summary judgment as to liability on Counts IV to VII of its Complaint on the ground that there is no genuine dispute as to any fact material to these Counts, and that plaintiff is entitled to judgment as a matter of law.

Plaintiff objects to *Defendants' Motion For Summary Judgment* on Counts I, II and III of the Complaint on the ground that there is genuine dispute concerning the facts material to those Counts. Plaintiff objects to *Defendants' Motion For Summary Judgment* on Counts IV to VII on the ground that plaintiff is entitled to judgment on those Counts as a matter of law.

In support of this motion, plaintiff submits the following, which it incorporates herein by reference:

1. *Affidavit of Daniel J. Poggi, Jr.*, plus *Exhibits A – I;*
2. *Affidavit of Todd Olbrych*, plus *Exhibits AA – BB;*
3. *Affidavit of Marlene Wheaton;*
4. *Plaintiff's Exhibits 1, 2 and 3;*
5. *Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment*, plus *Appendix I;*
6. *Plaintiff's Statement of Undisputed Facts Under Local Rule 12.1;*

7. *Plaintiff's Statement of Disputed Facts Under Local Rule 12.1.*

Respectfully submitted,
Pawtucket Transfer Operations LLC
By its Attorneys,
McKinnon & Harwood

/s/ John B. Harwood
/s/ Michael E. Sendley
John B. Harwood (#2093)
Michael E. Sendley (#5591)
1168 Newport Avenue
Pawtucket, RI 02871
(401) 723-9655
(401) 722-9106 (facsimile)

**CERTIFICATION**

I hereby certify that on Monday, May 07, 2007, a true copy of the within, was served upon the following and in the following manner(s):

Marc DeSisto, Esq., Michael A. DeSisto, Esq., DeSisto Law by electronic means to "marc@desistolaw.com" and Michael@desistolaw.com through the ECF system.

/s/ Michael E. Sendley
Michael E. Sendley

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PAWTUCKET TRANSFER OPERATIONS, LLC | ) | |
| | ) | |
| vs. | ) | C.A. No. 05-520 S |
| | ) | |
| CITY OF PAWTUCKET, *et al.* | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## Introduction

This is a case of deliberate obstruction by local public officials wielding enormous economic power, causing plaintiff millions of dollars in damage.

The land at issue is located in a "Manufacturing Open" zone in the City of Pawtucket, where plaintiff Pawtucket Transfer Operations, LLC ("PTO") planned to operate what is called a "refuse transfer station." This zone is commercial, permitting myriad kinds of business operations, including dry cleaning plants, automotive repair shops, bowling alleys, parking garages, railroads, and freight terminals, as well as a variety of industrial uses, such as food processing, textile mills, lumber and wood products, drugs, chemicals, plastics, metal industries, jewelry, stone and glass products. Pawtucket Code § 410 Attachment 1.

In late 2002 and early 2003, the City issued two separate "Certificates of Zoning Compliance" declaring that a "refuse transfer station" is an allowed use in such a zone. And it is.

Pawtucket law is so clear on this point that the Superior Court has declared it "arbitrary" and "capricious" to come to any other conclusion.

One of these Certificates was issued to plaintiff PTO. The other was given to its predecessor in interest. Relying on both, PTO entered binding contracts and made costly commitments in anticipation of doing business as a refuse transfer station on the site. City officials knew PTO was relying on these Certificates to begin developing its business. In fact, City officials required PTO to provide proof of its business commitments.

After these Certificates were issued, however, and after PTO had expended thousands of dollars in reliance on their contents, political animus intervened. Neighbors complained. The Mayor expressed outrage. The City Council entered the fray. The powers that be decided PTO had to be sacrificed.

So, when PTO filed a routine Site Plan Review application pursuant to Article IIIA §410-15.1 of the Pawtucket Zoning Ordinance, with the Certificate appended to prove zoning compliance, defendant Michael Cassidy, Director of the Pawtucket Department of Planning and Redevelopment, declared that a "private" refuse transfer station is not an allowed use in an MO zone, only a "public" refuse transfer station. Never mind that the zoning ordinance said nothing of the kind. Never mind that the City had issued two Certificates of Zoning Compliance saying as much. Never mind that Cassidy's declaration was irrational and capricious, as the Superior Court later held, mincing no words. And never mind that Cassidy was not a zoning official.

Lacking authority to do anything other than field the Site Plan application, Mr. Cassidy decided to declare PTO's site plan application "incomplete." He refused to process it, or to give PTO any hearing at all. He had no authority to do either of these things. He was the Director of

Planning and Redevelopment, not the Director of Zoning and Code Enforcement. The Pawtucket Code is clear that Cassidy has no authority over zoning matters.

Pawtucket law is also clear that "the development plan review procedure shall not be used to deny an applicant a permitted use of the property as established by the Zoning Ordinance." (*The relevant portions of the Pawtucket Code are attached hereto as Appendix 1) See Appendix 1 at Article IIIA § 410-15.1.* "The development plan review requirements are designed to assure safe, orderly and harmonious development of property…". *Id. @ 410-15.1 (A).* Mr. Cassidy, as the administrative officer of the City Planning Commission, was required to schedule a public hearing within thirty (30) days of the receipt of a completed development plan application. *Id.* As part of the development plan review process, the applicant must submit all plans and documents normally required for a building permit. *Id. @ 410-15.1 (B)*

PTO appealed Mr. Cassidy's decision to the Zoning Board of Review ("Board"), but the case had become a political football. Politicians were quoted in the newspaper "blasting" use of this land as a refuse transfer station. The City Council passed a resolution opposing PTO, opponents packed the hearing and the Board rolled over, entering a decision that was insupportable on its face.

PTO's rights were not vindicated until it took the matter to court, where the court declared the City's actions arbitrary and illegal and remanded the case to the Board with an order to issue PTO the permit it sought. In the meantime, however, two years of unnecessary delay had caused PTO severe financial loss.

This is not, as defendants would have it, a "conventional" zoning dispute, unless it is a Rhode Island convention for public agents to act egregiously, unfairly, irrationally and illegally. This is an extreme case. It should shock the conscience of anyone committed to due process of

law. "'In a democracy, power implies responsibility. The greater the power that defies the law the less tolerant can this Court be of defiance.'" *D'Ambra v. Providence,* 21 F.Supp.2d 106, 108 (D.R.I. 1998)(quoting *United States v. United Mine Workers,* 330 U.S. 258, 312 (1947)(Frankfurter, J. concurring)).

Both plaintiff and defendants have moved for summary judgment on the state causes of action (Counts IV-VII). The material facts on these counts are undisputed. Defendants intentionally interfered with PTO's contract rights and economic advantage. Plaintiff is entitled to judgment on these counts as a matter of law.

As to the constitutional claims under 18 U.S.C. § 1983 -- Count I (procedural due process), Count II (substantive due process) and Count III (equal protection) -- the evidence is not undisputed. Defendants claim the situation is routine and conventional and that City agents acted in good faith consistent with local law. Plaintiff says defendants were motivated by bad faith and political animus, and that their actions were outrageous, extreme, discriminatory and lacking any legitimate objective. Defendants say they gave plaintiff a "Zoning Certificate" which was nothing but an informational slip of paper. Plaintiff says the City issued a property-right-creating "Certificate of Zoning Compliance" which enjoys constitutional protection. Defendants claim plaintiff was not selectively treated as compared to others similarly situated and that plaintiff was not the subject of a gross abuse of power. Plaintiff claims that the Defendants utilized fundamentally unfair procedures to single out and impede plaintiff's legitimate rights.

These disputes are fodder for the jury. Defendants' motion for summary judgment on the constitutional counts must therefore be denied.

**Facts**

On September 24, 2002, the Pawtucket Division of Zoning Code and Enforcement ("Zoning Division") granted a Certificate of Zoning Compliance to Daniel J. Poggi for Pawtucket Railway Hauling, LLC, authorizing the operation of a "refuse transfer station", over the signature of Todd Olbrych, Building Inspector. *Affidavit of Daniel Poggi,Jr.* ("*Poggi")* at ¶¶ 3-4, plus attached *Exhibit ("Ex.") A.*[1] The Director of the Zoning Division, Ronald F. Travers, gave Mr. Olbrych express authority to issue this Certificate. *Affidavit of Todd Olbrych, ("Olbrych")* at ¶ 6.

This Certificate states that property at 280 Pine Street, Pawtucket, Rhode Island, if used as a "Refuse transfer station" "conform[s] to the Zoning Ordinance of the City of Pawtucket, Rhode Island." *Poggi, Ex. A*. Pawtucket Railway Hauling is a predecessor in interest to the plaintiff here, PTO. *Id.* at ¶ 3.

In February, 2003, PTO applied for and received an identical Certificate of Zoning Compliance in its own name for the conduct of this business.[2] *Id.* at ¶ 5, plus attached *Ex. B; Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Defendants' 12.1")* at ¶ 4. This Certificate, too, was signed by Todd Olbrych, Building Inspector. *Id.; Defendants' 12.1* at ¶ 3. Zoning Director Travers gave Mr. Olbrych express authority to grant this Certificate as well. *Olbrych* at ¶ 6. Daniel Poggi of PTO heard Mr. Travers confirm that Mr. Olbrych had such authority. *Poggi* at ¶ 6.

---

[1] The three factual affidavits on which plaintiff PTO relies, plus exhibits attached thereto, are appended to *Plaintiff's Motion for Summary Judgment and Objection to Defendants' Motion for Summary Judgment.*

[2] This Certificate contains a typographical error. It states that the relevant section of the Zoning Ordinance is "Section 410-12.5(A)." The referenced section applies to churches, not refuse transfer stations. The Certificate should have cited the section cited in the first Certificate, *i.e.*, "Section 41-12.5(I)" which applies to "refuse transfer stations." The Board of Zoning Review termed this discrepancy a "scrivener's error." *Poggi, Ex. H* at p. 7.

As it turns out, Mr. Olbrych has wielded authority to sign Certificates of Zoning Compliance for years. *Olbrych* at ¶ 4. In fact, a review of the Pawtucket Division of Zoning and Code Enforcement records for the years 2000 through 2005 reveals that, during that time, the Division of Zoning and Code Enforcement issued 960 certificates of zoning compliance (including the two to Plaintiff herein).[3] Of those 960 certificates, the Director of Zoning, Ronald F. Travers, signed only 180 of them. *See Attached Certificates.* And of those 180 signed by Director Travers, 39 were signed by him over the pre-printed name of a Pawtucket building official. The other 767 certificates of zoning compliance issued during the period from 2000 to 2005 were signed by people other than Mr. Travers, including a. "Todd Olbrych , Building Official" (478 certificates), b. "Albertino L. Vicente, Code Compliance Officer/Alt. Building Official" (273 certificates), and c. "Richard Belham, Building Official" (15 certificates). *Id.* Each certificate was issued on the official form of the Division of Zoning and Code Enforcement. *Id.*

Ironically, after the Pawtucket Zoning Board decided against PTO on November 9, 2004, in its appeal of the Cassidy decision to revoke PTO's certificates of zoning compliance, discussed infra, with the Board citing as a basis that only the Director of Zoning, Ronald Travers, has the authority to sign such certificates, the Zoning Division issued another 233 certificates over the next 14 months over the signature of a building official and not the Zoning Director. *See Attached Certificates.* It wasn't until the year 2006, while this controversy was brewing in

[3] Attached to Plaintiff's Memorandum is the Affidavit of Ronald F. Travers, as record keeper for the City of Pawtucket Division of Zoning and Code Enforcement. The Travers Affidavit was provided to plaintiff's counsel along with all certificates of zoning compliance issued by the City from "2000 to present" in response to plaintiff's request for records from defendants. Mr. Travers also provided a copy of the Defendant Zoning Board's official record concerning PTO, which is not attached hereto as it is not being referred to herein. The certificates of zoning compliance attached to the Travers Affidavit shall be referred to herein as "Attached Certificates".

state and federal court, that Director Travers announced that "the City last year revised its policy on issuance of zoning certificates, so that only he as director now signed off on them", and not his assistants. *See Pawtucket Times newspaper article dated August 1, 2006 attached hereto as Plaintiff's Exhibit 1.*

Within days after the City reconfirmed its position and issued the second Certificate of Zoning Compliance to PTO on February 27, 2003, PTO, in good faith reliance on the Certificates, negotiated an agreement with Pawtucket and Worcester Railway Company (P&W Railway) pursuant to which PTO would take immediately control the Pine Street property in anticipation of doing business there in exchange for monthly payments to P & W Railway. PTO's arrangement with P & W Railway evolved into a formal lease of the Pine Street property for twenty (20) years in order to operate a refuse transfer station on this site in exchange for a payment of $4136 per month plus City property taxes.[4] *Poggi* at ¶ 7. PTO began making monthly lease payments as of September 2004. *Id.*

On or about July 31, 2003, PTO submitted a routine "Site Plan Request Form" to the Pawtucket City Planning Commission seeking approval for a proposed change in site operations at 280 Pine Street from a rail yard to "railroad shipping operations / transfer station for refuse." *Poggi* at ¶ 8, plus attached *Ex. C*; *Defendants' 12.1* at ¶ 1; *Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("DM")*, at attached *Ex. A*. Where the form asked "Is Zoning Board approval required?", PTO answered "no" because "the property is

[4] The term "refuse" is generic, with a broad definition. The business PTO planned to operate would involve construction and demolition debris (e.g., lumber, wood products, masonry, metals, paper), not any form of garbage. Trucks would bring this debris to the site, where it would be compacted and transferred to rail cars for transport out of state. Any non-construction debris would be placed in covered bins and transported off the site on the same day. All activities related to this business, including transfer of the debris from truck to train, would occur inside an enclosed building. See, Poggi, Ex. H at 1-2.

currently zoned for this usage." *Id.* PTO attached a copy of the February, 2003 Certificate of Zoning Compliance. *Poggi* at ¶ 9; *Defendants' 12.1* at ¶ 2. Planning Director Cassidy received the request for site plan review and, on August 12, 2003, he wrote to PTO's representatives requesting information on PTO's application to the R.I. Department of Environmental Management. Cassisdy stated that PTO must submit this information to the Pawtucket Planning Commission "in order for the City to schedule the site plan review". *See August 12, 2003 Cassidy letter attached hereto as Plaintiff's Exhibit 2.* Of significant note, despite knowing that PTO intended to develop the subject property as a refuse transfer station, in his letter Cassidy does not question or cite any concerns with this intended use, nor does he suggest that the use is not allowed in the MO zoning district in which the property is located. He simply states that he will not schedule the site plan review until PTO submits additional documentation relating to its DEM application.

PTO had applied to the Rhode Island Department of Environmental Management (DEM) for a license to conduct a "Construction and Debris Processing Facility", which under DEM regulations would be considered a "Solid Waste Transfer Station." *Poggi* at ¶ 10. This application used different terminology to describe PTO's planned operations because DEM regulations use language different from Pawtucket's ordinances. *Id.* On February 27, 2004, DEM cited a number of technical deficiencies in the application and sought further information. *Id.*; *DM* at *Ex. D.*

Because of the difference between DEM's regulatory terminology and the City's, on March 30, 2004, plaintiff filed a second Site Plan Review Request Form using the DEM terminology, describing the business using the phrase "construction and debris transfer station" in lieu of "refuse transfer station." *Poggi* at ¶ 11, *Ex. D; DM* at *Ex. E.* Plaintiff did not intend by

this change in language to make any substantive change in the proposed use of the land. *Poggi* at ¶ 11.

Mr. Cassidy again determined that PTO's application was incomplete and asked for more information. *Id.* at ¶ 12. Among the items required was a letter from the attorney for P&W Railway, stating that the P&W had agreed to lease the parcel to PTO pending execution of a lease agreement. *Id.* Cassidy again gave no indication that he questioned the legality of PTO's use of the subject property. PTO provided the requested information, thereby confirming to City agents that PTO was making financial commitments in reliance on the Certificate of Zoning Compliance. *Id.*

PTO provided this information on April 28, 2004. *Poggi* at ¶ 12; *Defendants' 12.1* at ¶ 11. Having now complied with all of Cassidy's requests for additional information and documentation, PTO assumed that its site plan review application was complete to the satisfaction of the City Planning Commission and Mr. Cassidy. However, the next day, April 29, 2004, defendant Cassidy began the deliberate process of thwarting PTO's plan. He penned a letter to PTO manager Dan Poggi, stating that, in his opinion, the Certificate of Zoning Compliance was issued in error because City ordinances permit only public refuse transfer stations, not private ones. *Poggi* at ¶ 12, plus attached *Ex. E*. "Therefore your site plan review application is not complete [and] will not be heard before the City Planning Commission" without a legal opinion. *Id.*

On July 12, 2004, this decision became final. In a letter to Mr. Poggi, Mr. Cassidy stated that the City solicitor's office had confirmed that City ordinances permit only public refuse transfer stations in MO zones, not private ones. *Poggi* at ¶ 14, plus attached *Ex. F*; *DM* at attached *Ex. F*. He added that PTO had described its operations as "construction and

demolition debris transfer stations" in its DEM application, and operations bearing that description were not permitted in any City zone. *Id.* PTO's application was therefore "incomplete", so that "the Planning Commission cannot review or accept" it. *Id.* This ruling brought PTO's DEM application to a halt. *Poggi* at ¶ 15. In his capacity as the administrative officer for the Planning Commission, Cassidy had no power or authority to issue such opinions on zoning. Moreover, his opinion was clearly wrong.

PTO appealed to the Zoning Board of Review, arguing that City ordinances unambiguously permitted "refuse transfer stations" in Manufacturing Open zones, and say nothing about "public" refuse stations. *Id.* at ¶ 16. A political firestorm ensued. Opponents of PTO packed the hearing, which was held on September 28, 2004. *Id.* at ¶ 17. The City Council passed a resolution opposing PTO's proposed operations and communicated that to the Zoning Board. *Id.* at ¶ 18, plus attached *Ex. G* at p. 3.

In the wake of this pressure, the Zoning Board upheld Cassidy, claiming that it lacked authority to reverse his decision unless he acted arbitrarily or capriciously.[5] *Poggi* at ¶19, plus attached *Ex. H* at p. 6. The Board faulted PTO for failing to offer testimony concerning the meaning of the legal term "refuse transfer station" in the Pawtucket ordinances. "[Counsel's] argument alone cannot rise to the level of competent testimony on this issue." *Id.* at 8. The Board also concluded that Mr. Olbrych lacked authority to sign the Certificate of Zoning Compliance issued to PTO, although no one had offered evidence on this issue. *Id.* at 9; *Olbrych* at ¶ *9*..

---

[5] *Compare,* Pawtucket Code, attached hereto as *App. 1,* at § 410-118 (Zoning Board may make such order as ought to be made, and to that end shall have the powers of the officer appealed from.).

PTO appealed to the Superior Court, which reversed in no uncertain terms: "[T]here is nothing in the ordinance that would permit the [Board's] conclusion … [T]hey have arbitrarily and capriciously amended the ordinance and read it in a way that the common, normal usage of the language used in the ordinance does not permit, …" *Pawtucket Transfer Operations vs. Pawtucket Zoning Board*, Superior Court for Providence County, No. PC/05-0159, *Decision* dated June 22, 2006 (*Poggi* at ¶ 20, plus attached *Ex. I*) at p. 4. [6] The court found the City's claim that a "construction and demolition debris" transfer station is not a "refuse" transfer station frivolous. *Id.* at 8. The court ordered the Board to issue PTO the permit it sought. *Id.* at 10.

In the meantime, PTO sustained serious financial damage. Between the time Cassidy illegally declared PTO's site plan application "incomplete" on July 12, 2004 and the date the Superior Court reversed the Board's decision on June 22, 2006, PTO lost nearly two years. It paid rent unnecessarily, both to rent railway cars and to rent the site acreage; it paid taxes to the City as part of its rental agreement; it paid management expenses. These losses totaled almost $1 million. *Affidavit of Marlene Wheaton ("Wheaton")* at ¶¶ 2 and 3 . In addition, PTO lost profits conservatively estimated at in the millions. *Id.* at ¶ 4.

**<u>Summary Judgment Standards</u>**

"The oenologist's creed teaches that we should drink no wine before its time. Much the same principle applies to summary judgment; it is a deliciously helpful device if properly timed, but one that can leave a sour taste if brought to bear on an insufficiently fermented record." *Mandel v. Boston Phoenix*, 2006 U.S.App. LEXIX 19618, *1-2 (1st Cir.). The record is rarely

[6] Acknowledging that the Pawtucket Zoning Ordinance did not previously differentiate between public and private refuse transfer stations, the Pawtucket City Council amended the Zoning Ordinance on September 21, 2006 to add

fermented enough for summary judgment when the allegations concern constitutional violations. 10B Wright, Miller & Kane, *Federal Practice and Procedure 3d* §2732.2, p. 152 (1998). Nor is it sufficiently ripe where imprecise or thin evidence tends to support conflicting inferences. "Summary judgment cannot be predicated on [a] vacillatory record." *Mandel, supra* at *20-21.

The time is right for summary disposition under F.R.Civ.P. 56(c) only if the moving party demonstrates that there is no genuine dispute as to any material fact and that s/he is entitled to judgment as a matter of law. A genuine dispute exists when "based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party." *Napier v. Deesie*, 454 F.3d 61, 66 (1st Cir. 2006).

This Court must examine all the evidence in the light most flattering to the non-moving party and "'indulge all reasonable inferences in that party's favor.'" *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997)(quoting *Maldonado-Denis v. Castillo-Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994)). It is defendants' burden to demonstrate that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).

**<u>Substantive and Procedural Due Process (Counts I and II)</u>**

The relevant evidence on these claims is in dispute. Plaintiff is entitled to relief upon proof that City agents, acting under color of state or local law, deprived it of a protected property interest in violation of substantive and/or procedural due process as guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution and Article One, Section Two of the Rhode Island Constitution. 14. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). No one

---

the word "municipal" before "refuse transfer station" in §410-12.5(I) of the Table of Use Regulations. *See certified copy of September 21, 2006 Amendment to Zoning Ordinance attached hereto as Plaintiff's Exhibit 3.*

disputes that defendants acted under color of law. Factual issues remain, however, as to: (a) whether PTO was deprived of a property interest; and (b) if so, whether the deprivation occurred without either substantive or procedural due process.

1. Property Interest

The measure of PTO's property right is taken in accordance with local, not federal, law. *Board of Regents v. Roth*, 408 U.S. 564 (1955). A cognizable property interest "'is what is securely and durably yours under [local] law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain.'" *Barrington Cover Limited Partnership v. Rhode Island Housing and Mortgage Finance Corporation,* 246 F.3d 1, 5 (1st Cir. 2001)(quoting *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir. 1983)).

As Defendants cite in their Memorandum, someone seeking to establish a property interest must clearly have more than an abstract need or desire for it. There must be more than a unilateral expectation of it. Instead, there must be a legitimate claim of entitlement to it. *Macone v. Town of Wakefield, 277 F.3d 1,9 (1st Cir. 2002); D.M.* @ 9. Pawtucket law unconditionally entitles PTO to operate a refuse transfer station in a "Manufacturing Open" zone. The Rhode Island Superior Court has definitively so held. *Poggi, Ex. I* (concluding that the ordinance language was so clear that it could not reasonably be interpreted any other way). This legal entitlement alone creates a property right under Rhode Island law. *Pitocco v. Harrington,* 707 A.2d 692, 695-696 (R.I. 1998)(entitlement to permit approval under local law is property right); *L.A. Ray Realty v. Cumberland*, 698 A.2d 202 (R.I. 1997)(same). The constitutional interest is created by the existence of the ordinance itself. "The *entitlement to the permit* [is] the

protected property interest." *D'Ambra v. Providence, supra* at 109 (emphasis original)(citing *Pitocco, supra*). *Accord, Johnson & Wales College v. DiPrete,* 448 A.2d 1271 (R.I. 1982).

In this case, PTO has additional evidence of a right entitled to protection. PTO secured a "Certificate of Zoning Compliance" from an agent of the City, confirming its entitlement to operate a refuse transfer station in an MO zone. *Poggi, Ex. B.* It is here that a controversy of fact intervenes. Defendants claim that PTO's "Certificate of Zoning Compliance" was no more than a "zoning certificate" issued for informational purposes under R.I.G.L. 1956 § 45-24-53 and Pawtucket Code § 410-93 (both authorizing the zoning enforcement director to provide "guidance or clarification" by issuing "zoning certificates" on request). *DM* at 11-14. (A copy of the relevant portions of the portions of Pawtucket Code is attached hereto as *App. 1*). They assert that such a certificate gains PTO no enforceable property interest at all. *DM* at 11-14.

Plaintiff, on the other hand, has introduced evidence that defendants issued, not a "zoning certificate" under § 410-93, but a "Certificate of Zoning Compliance" under § 410-96. The two are not fungible. They have different titles ("zoning certificate" vs. "certificate of zoning compliance"). The former is informational, the kind of notice an official might afford a mortgage lender, for example, or a prospective buyer. A "zoning certificate" is defined as a document acknowledging that a current use is lawful under local zoning ordinances. § 410-132. It is issued for "guidance" or "information" and, under lower-level Rhode Island precedents, creates no rights in the holder. *DM* at 11.

PTO did not receive a "zoning certificate", as suggested by Defendants in their Memorandum. *DM* @ 11. It received a document entitled "Certificate of Zoning Compliance." *Poggi, Ex. B.* The only zoning provision using this terminology is § 410-96, which makes it unlawful to alter the use of a property without a "Certificate of Zoning Compliance". Section

410-96 is not "informational". It is part of the City's zoning enforcement apparatus applicable to any proposed change in use. It is issued, not to members of the general public who may be curious about the current use of a property, but to property owners who propose to put their land to new or altered uses. § 410-96(A). Failure to obtain a Certificate of Zoning Compliance prior to a change in use is a violation of law subject to monetary penalties. § 410-96(E). Certificates of Zoning Compliance are recorded in the land evidence records of the City of Pawtucket upon their issuance by the Zoning Director's office. PTO's certificates were so recorded . Rhode Island law is unequivocal that a certification of this nature creates a constitutionally protected property right. *E.g., Pitocco, supra; L.A. Ray Realty, supra.*

PTO had a property interest by virtue of the zoning ordinance itself, and this position was supported by the City when it twice issued Certificates of Zoning Compliance confirming that refuse transfer stations were permitted at the subject property.

PTO understood that it had secured a "Certificate of Zoning Compliance" for a change in use under § 410-96, not a statement of current use under § 410-93. *Poggi* at ¶¶ 3,5. Defendants claim that it did not – that it secured nothing more than a "zoning certificate" under § 410-93, which enjoyed no constitutional protection. Although the circumstantial evidence is all in PTO's favor, this factual dispute precludes the summary disposition that defendants seek here.

2. <u>Substantive Due Process</u>

When a public agent violates controlling law in order to thwart one of its citizens, the violation implicates substantive due process if the abuse of governmental power "'shocks the conscience'" *or* if the action "'is legally irrational in that it is not sufficiently keyed to any legitimate state interest." *PFZ Properties Inc. v. Rodriguez,* 928 F.2d 28, 30 (1st Cir. 1991),

cited in *DM* at 18. Defendants argue that their treatment of PTO was not conscience shocking. *Id.* They ignore the additional, independent ground cited in *PFZ* for § 1983 relief, *i.e.,* where their actions are "legally irrational" and insufficiently grounded in any legitimate public interest. *Id.*

PTO maintains that defendants' actions are both conscience-shocking and lacking any legitimate objective. The factual assertions on which each side relies in making these assertions are material and disputed.

Defendants state as a matter of fact that Cassidy's action was lawful; that it was based on a City ordinance that "referred to public refuse transfer stations as being an allowable use"; and that is was warranted as well because "construction and demolition debris transfer stations" are "not an allowed use in any zone in the City of Pawtucket." *Defendants' 12.1* at ¶¶ 12, 13. Implicit in these allegations is an assertion of good faith, of lawfulness and of a rational effort to carry out a legitimate public objective.

PTO has adduced evidence to the contrary, *i.e.*, that defendants' actions had no rational foundation in local law; they were arbitrary and capricious; that they were made in bad faith, based on political animus, with the deliberate intention of thwarting PTO; and that they were untethered to any legitimate public objective. *Poggi* at ¶ 21.

Defendants argue that illegality and bad faith are not enough to make out a § 1983 claim. *DM* at 18, 20. But PTO does not rely on bad faith and illegality alone, although the evidence that defendants acted egregiously is overwhelming. PTO has also presented evidence that defendants' actions were irrational in that they were not "keyed to any legitimate [local] interest." *PFZ Properties Inc.*, *supra* at 30. This is a classical ground for finding a substantive due process violation. *E.g.*, *Lawrence v. Texas,* 539 U.S. 558 (2003)(finding substantive due

process violation where no legitimate state interest in making private consensual sexual activity a crime). It constitutes an independent ground for § 1983 relief in zoning cases in particular, as defendants concede. *DM* at 18, quoting *PFZ Properties, Inc., supra* at 31-32.

The First Circuit has "never announced a rule precluding district courts from finding substantive due process violations by land use planning officials in every conceivable case." *Licari v. Ferruzzi*, 22 F.3d 344, 349-350 (1st Cir. 1994), cited in *DM* at 17, 18. If PTO persuades a jury that defendants' actions lacked rational relation to any legitimate local interest, § 1983 relief is available and appropriate. *See, L.A. Ray Realty, supra* (finding § 1983 violation based on egregious and irrational zoning decisions). Because the material evidence on that question is in dispute, summary disposition is premature.

3. Procedural Due Process

Defendants claim that PTO was entitled to nothing more than the post-deprivation right to sue in state court in order to compel City agents to follow the law. *DM* at 15-16. This Court may or may not ultimately agree. But the question as to what process is due – and, in particular, whether an after-the-fact hearing is constitutionally adequate here – requires inquiry into factual circumstances which remain subject to dispute.

PTO did not get a hearing before City agents rescinded its Certificate of Zoning Compliance. The only hearing defendants provided was long after the fact. Local law says that PTO should have been heard *before* any deprivation. *App. 1,* § 410-15.1(F)(2)("Within 30 days of a complete development plan application, the city Planning Commission shall hold a public hearing upon the plan.") This protection, however, contains a gaping hole: if Mr. Cassidy

declares PTO's application "incomplete", PTO is entitled to no hearing at all. Mr. Cassidy did so, and, presto, PTO's right to a pre-deprivation hearing disappeared.

Defendants do not deny this. Instead they argue that PTO has been afforded its full measure of procedural protections because of various post-deprivation remedies, *i.e.*, appeal to the Superior Court and pursuit of tort remedies. *DM* at 14-15. Post-termination remedies, however, do not suffice simply because they exist. A pre-deprivation remedy remains the gold standard.

Procedural due process is a flexible concept. It requires weighing and balancing of a number of factors, *i.e.*, the private interest that will be affected; the risk of erroneous deprivation; the probable value of additional safeguards; and the government's interest, including fiscal and administrative burdens. *Matthews v. Eldridge*, 4242 U.S. 319, 335 (1976). When assessing these factors, the Supreme Court of the United States "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)(emphasis original); *accord, Cleveland Board of Election v. Loudermill*, 470 U.S. 532, 542 (1985).

Defendants have shown no reason for an exception to the usual rule. They adduce no evidence that a pre-termination hearing would have been unreasonable, or too burdensome, or lacked value; or nor has it shown that the risk of error was minimal. *Zinermon, supra.* These are issues that cannot be decided in a vacuum. The circumstantial evidence is against defendants' position. The Pawtucket ordinance is itself proof that a pre-deprivation hearing would not have been too burdensome. Under § 410-15.1(F)(2), a pre-deprivation hearing is the rule.

Nor is this a case, like the cases cited by the defendants (*SFW Arecibo, Ltd. v. Rodriguez*, 415 F.3d 135 (1st Cir. 2005); *PFZ Properties v. Rodriguez*, 928 F.2d 28 (1st Cir. 1991), cited in

*DM* at 15-16), where a local official has violated an otherwise procedurally adequate local law. In such cases, the public agency has done all it can by passing the appropriate law. It would be unreasonable to expect the agency to provide a pre-deprivation hearing, since the agency cannot foresee when one of its agents will act *ultra vires* in a way that deprives an individual of a constitutionally protected interest. *Id.*

The problem here lies with the law itself, not with a failure to follow the law. The law permits Cassidy to decide when and whether to grant a pre-deprivation hearing. It does so by permitting him to declare, without limit or standards, when and whether an application is "complete." § 410-15.1(F)(2). He used this authority to thwart PTO, illegally and capriciously, here.

The City can prevent him from depriving citizens like PTO of a pre-deprivation hearing simply by limiting the breadth of this discretion. Absent evidence that it would have been too burdensome or otherwise unreasonable, the City's failure to limit his discretion constitutes a violation of procedural due process. *Zinermon, supra* (post-deprivation hearing was not adequate where state could have limited discretion given to state agents and thereby insured pre-deprivation hearing).

The evidence as to whether the post-deprivation hearing given to PTO was constitutionally adequate at best supports "conflicting inferences." *Mandel, supra* at *20-21. This case is therefore unripe for summary disposition. *Id.*

**Equal Protection (Count III)**

PTO contends that Defendants have violated the Equal Protection Clauses of the United States and Rhode Island Constitutions. Facts material to these claims are in dispute and, therefore, summary disposition is not appropriate.

"The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004). In order to establish its claim, a plaintiff must "adduce sufficient evidence from which a rational jury reasonably could conclude that compared with others similarly situated, [it] was selectively treated …based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person" *Id. (citations omitted)*.

PTO submits that it was selectively treated by the Defendants when they revoked the Certificate of Zoning Compliance and declared that PTO could not exercise its right to develop the subject property consistent with the Pawtucket Zoning Ordinance without first obtaining approval for a "use" variance, which is a near impossible hurdle as it requires, inter alia, a showing of loss of all beneficial use of one's property.

Defendants attempted to justify their position by declaring a) that the Certificate of Zoning Compliance issued to PTO by building official Todd Olbrych was incorrect because the Zoning Ordinance only allows publicly owned refuse transfer stations in the MO zoning district where the subject property is located and, b) that the Certificate was invalid because Mr. Olbrych did not have the authority to issue certificates of zoning compliance.

In the first instance, the Pawtucket Zoning Ordinance clearly and unambiguously allows refuse transfer stations in the MO zoning district where the subject property is located, and it did

not distinguish between public and private refuse transfer stations. *See Appendix 1 at §410-12.5(I).* It wasn't until September 2006 that the City amended its zoning ordinance to add the qualifier "municipal" before refuse transfer station in the table of uses section. *See Plaintiff's Exhibit 3.*

However, there is a genuine issue on the material fact of whether Mr. Olbrych had authority to issue the Certificate of Zoning Compliance to PTO. PTO submits that there can be no doubt that he had such authority. It was the regular practice of the Pawtucket Division of Zoning and Code Enforcement office to issue certificates of zoning compliance signed by officials and agents other than the Director of Zoning. *See Attached Certificates.* It wasn't until 2006 that Zoning Director Travers declared that the office had "changed its policy" of allowing the certificates to be issued by someone other than himself. *See Plaintiff's Exhibit 1.*

"The determination as to whether individuals are similarly situated for equal protection purposes is an amorphous one. The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Tapalian*, 377 F.3d at 6.

PTO submits that it is similarly situated with all of the other recipients of certificates of zoning compliance issued by the Division of Zoning and Code Enforcement and signed by agents of the City other than the Director of Zoning. Of the hundreds of certificates of zoning compliance signed by the Building Official Todd Olbrych over the years, PTO appears to by the only recipient that had its certificate revoked on the basis that he lacked authority to sign it. *Olbrych at* ¶¶*4, 12.*

The Defendants selective enforcement of its Zoning Ordinance and selective treatment of PTO was based on: 1) an intent to inhibit or punish PTO's exercise of its constitutional right to

use and develop its property consistent with the Zoning Ordinance and, 2) a malicious or bad faith intent to injure PTO and thwart its development plans.

In equal protection cases based on bad faith intent to injure, a plaintiff must establish a "gross abuse of power, invidious discrimination or fundamentally unfair procedures." *Baker v. Coxe*, 230 F.3d 470, 474 (1st Cir. 2000). The Defendants selective enforcement of the Pawtucket Zoning Ordinance as it relates to the Certificates of Zoning Compliance issued to PTO is fundamentally unfair. They sat silent for years while individuals other than the Director of Zoning signed certificates of zoning compliance. When PTO sought technical review of its proposed development, the City chose to impede PTO's plan and, apparently for the first time, came up with the argument that Mr. Olbrych didn't have actual authority to issue the Certificate to PTO .

On November 9, 2004, the Defendant Zoning Board rendered its Decision affirming Mr. Cassidy's action to revoke PTO's Certificate of Zoning Compliance. In the Decision, the Board stated that a building official does not have authority to sign Certificates of Zoning Compliance. *Poggi, Ex. H at p. 9.* However, after that Decision, apparently nobody told the City's building officials that they couldn't issue such certificates. From the date of the Zoning Board's Decision, November 9, 2004, to December 31, 2005, Pawtucket building officials signed another two hundred thirty-three (233) Certificates of Zoning Compliance. *See Attached Certificates.*

The City wants it both ways. It authorizes it building officials to sign Certificates of Zoning Compliance and then, when a development project that it disfavors comes along for technical site plan review, it can choose to impede it based on the building official's lack of authority to sign the Certificate. That practice is fundamentally unfair and there is no rational basis to support it.

In the First Circuit, "It is not necessary that [the plaintiff's] evidence compel a jury finding of selective treatment, but simply that it permit such a rational inference." *Tapalian, 377 F.3d at p. 7.*

Zoning ordinances should be enforced in a reasonable and nondiscriminatory manner in order to satisfy equal protection requirements, and whether they are so uniformly enforced is a question of fact. *Matthews v. Fayette County*, 210 S.E. 2d 758 (GA 1974) (*cited in Tarantelli v. Jannitto*, 1981 *R.I. Super. LEXIS 34).*

As there are many issues of material fact as it relates to PTO's Equal Protection claims under the U.S. and State Constitutions, Defendants Motion for Summary Judgment must be denied.

Finally, Defendants claim that are protected from PTO's §1983 claims based on the doctrine of qualified immunity.

"Qualified immunity shields government officials wielding discretionary powers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Amsden v. Moran, 904 F.2d 748, 751 (1st Cir. 1990) quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). DM at 16.* A plaintiff must show that the defendants' conduct was "objectively unreasonable under the applicable standard" in a specific case. *Id.*

As discussed supra, Plaintiff claims it was deprived of a property interest without due process and that it was selectively treated as compared to others similarly situated. The property interest is rooted in the Pawtucket Zoning Ordinance and clearly established by the two (2) Certificates of Zoning Compliance issued to it by the Division of Zoning and Code Enforcement. Defendant Cassidy not only should have known of PTO's right to use the subject property as a

refuse transfer station, as the Zoning Ordinance was clear on that point, but he was actually informed of this fact by Zoning Director Travers. *Olbrych at ¶ 11.*

For nine (9) months, Mr. Cassidy held the determination that PTO's site plan review application was "incomplete", and he repeatedly sought additional technical information from PTO. Once all of the additional information was supplied in April 2004, he finally unveiled his ace in the hole and claimed that PTO's application was still incomplete because the use was not allowed under the pertinent section of the Zoning Ordinance, and the building official had no authority to sign the Certificates of Zoning Compliance.

Mr. Cassidy's actions transgressed PTO's clearly established rights. His conduct amounted to a gross abuse of power and were not only unreasonable, but were in fact deemed arbitrary and capricious by the Rhode Island Superior Court. Therefore, this Court should reject Defendants' claim of qualified immunity.

**Equitable Estoppel / Detrimental Reliance (Counts IV and V)**

PTO has cross-moved for summary judgment on its equitable state claims (Counts IV and V). The evidence on these claims is undisputed and PTO is entitled to judgment as a matter of law.

The applicable legal standard is nearly a half century old. "[T]he doctrine of estoppel should be applied against public agencies to prevent injustice and fraud where the agency or officers thereof, acting within their authority, made representations to cause the party seeking to invoke the doctrine either to act or to refrain from acting in a particular manner to his detriment." *Ferrilli v. Department of Employment Security*, 106 R.I. 588, 594, 261 A.2d 906, 910 (1970). In the context of building or zoning-related permits, "a permitted use should be immune to

impairment or revocation … when the holders thereof, acting in reliance in good faith, initiate construction in some reasonably substantial measure or incur some reasonably substantial obligation promoting such construction." *Shalvey v. Zoning Board of Review of Warwick*, 99 R.I. 692, 699, 210 A.2d 589, 593-594 (1965). *Accord, Jones v. Rommell*, 521 A.2d 543 (R.I. 1987); *Matunuck Beach Hotel v. Sheldon*, 121 R.I. 386, 399 A.2d 489 (1979); *Tantimonaco v. Zoning Board of Review of Johnston*, 102 R.I. 594, 232 A.2d 385 (1967). This doctrine requires proof that defendants' conduct induced plaintiff's good faith reliance. *Greenwich Bay Yacht Basin v. Brown*, 537 A.2d 988 (R.I. 1988). The issuance of a building-related permit is the kind of conduct capable of inducing such reliance. *Shalvey, supra; Tantimonaco, supra; Jones, supra.*

Defendants do not deny this law. Instead, they assert that the signatory on PTO's Certificate of Zoning Compliance, Todd Olbrych, lacked authority to issue the Certificate. *DM* at 29-30. They cite Rhode Island law holding that public agents must have actual, not apparent, authority for equitable estoppel to apply. *Id.*

Plaintiff does not disagree with this point as a legal proposition. But defendants offer no evidence that Mr. Olbrych acted without authorization. They do no more than cite the title Mr. Olbrych lists under his name on the Certificate ("Building Official"), and assert that these words prove that Mr. Olbrych lacked the requisite authority, since the Pawtucket Code defines a "zoning certificate" as a document "signed by the Director" under § 410-132, who in this case is

Ronald Travers, Director of Zoning Code and Enforcement, and not Todd Olbrych, Building Official.[7] *Id.*

PTO, however, *has* produced evidence on this issue. That evidence is both straight from the horse's mouth and undisputed. Todd Olbrych states that he had actual authority to sign the Certificate of Zoning Compliance issued to PTO, and that that authority was given to him by Zoning Director Travers: "When I signed [PTO's Certificate of Zoning Compliance], I was acting *under express authority given to me by Ronald Travers, Director of Zoning and Code Enforcement*. I had actual authority to sign [this Certificate]." *Olbrych* at ¶ 8 (emphasis supplied). Daniel Poggi confirms this in his affidavit: "When I arrived at the office to pick up the Certificate of Zoning Compliance, both the Director of Zoning Ronald Travers and Building Official Todd Olbrych were present. I heard Mr. Olbrych ask Mr. Travers whom he wanted to sign the Certificate, and Mr. Travers replied: 'You do it.'" *Poggi Affidavit* at ¶ 6. Conspicuously missing from Defendants' submissions is an affidavit from Mr. Travers denying that Mr. Olbrych was given express authority to sign certificates of zoning compliance. The reason for the omission is obvious – Mr. Travers delegated this authority for years and hundreds of certificates of zoning compliance were issued out of the zoning office, on Division of Zoning and Code Enforcement letterhead, over the pre-printed names of building officials, and signed by building officials. *See Attached Certificates.*

Mr. Olbrych states that he had actual authority to sign the Certificate of Zoning Compliance given to PTO's predecessor in September of 2002 as well. *Olbrych* at ¶ 8. Indeed, Mr. Olbrych states that he routinely signed such Certificates, using express actual authority given

[7] Since PTO was given a "Certificate of Zoning Compliance" under § 410-96, and not a "zoning certificate" under §410-93 (*see*, p. 11 supra), the Pawtucket Code states that it must be "issued", not "signed", by the Director.

to him by Director Travers. *See, Olbrych* at ¶¶ 4 and 5. And, finally, he states that PTO followed Pawtucket's prescribed procedure in applying for the Certificate of Zoning Compliance. *Olbrych* at ¶ 10.

All of this evidence is uncontradicted.

The evidence is also uncontradicted that PTO relied in good faith on these Certificates. *Poggi* at ¶ 7. PTO entered an agreement to lease both land and railroad cars; it began making acquisitions for and improvements to the site; the permitting process was brought to a halt for two years, causing loss of anticipated profits. *Id.* The price tag on this reliance was very substantial, amounting several million dollars. *Wheaton* at ¶¶ 2 and 3.

In a snippet so breezy as to be little more than a throw away, defendants assert that, even if Mr. Olbrych had actual authority, PTO's reliance on the Certificate of Zoning Compliance was not justifiable because it was still awaiting action on other permit applications (site plan and DEM[8]). *DM* at 30-31. But plaintiff is entitled to equitable relief upon proof of substantial prejudice incurred in good faith, no more, no less. *E.g., Jones, supra; Tantimonico, supra; Shalvey, supra; accord, El Marocco v. Richardson,* 746 A.2d 1228, 1233 (R.I. 2000)(cited in *DM* at 28). Defendants argue that because a building permit was not issued to PTO and it was only at the beginning stages of seeking approval for same, any expenditures made in good faith reliance on the Certificates of Zoning Compliance were not reasonable or justified. *DM at 34.*

---

*Compare,* § 410-96 *with* §§ 410-93, 410-132. This is a distinction without a difference for these purposes.

[8] Defendants append to their memorandum a DEM response citing a number of deficiencies, arguing that DEM approval was "far from guaranteed." *DM* at 32. Plaintiff is not obliged, however, to demonstrate "guaranteed" approval. The standard is good faith reliance on defendants' conduct.

The cited DEM "deficiencies," in any case, are mostly technical and subject to ready amendment. *E.g.*, p. 1, ¶ 1 (requiring that a particular definition of "construction and demolition debris" be used in the application); p. 1, ¶ 2 (requiring certification that PTO will not store gypsum more than three months); p. 1, ¶ 3 (noting failure to append fire protection plan).

However, the Rhode Island Supreme Court has noted that expenses incurred before a building permit is issued, such as legal fees and expenses for work done preparing the property for a permitted use, were properly considered in the reliance analysis because the proposed use of the site was a permitted use under the zoning code as it existed at the time. *Tantimonico* at 389. The Court concluded that the landowner justifiably relied on the existing code when he incurred those expenses, **even though they were made before the building permit was issued.** *Id. (emphasis added).*

PTO incurred expenses preparing for a permitted use of the property. Although it's business plan still required technical engineering review and site plan approval from the City Planning Commission, the Pawtucket Code is clear that "the development plan review procedure shall not be used to deny an applicant a permitted use of the property as established by the Zoning Ordinance." *See Appendix 1 at §410-15.1(A).* In any event, in the expert opinion of a professional engineer familiar with the DEM regulatory process, the City's development plan review process and PTO's submissions related to both, PTO would have secured the necessary approvals to allow it to obtain a building permit. *See attached Affidavit of George Palmisciano, P.E. at ¶ 12.*

PTO's good faith is undisputed. *Poggi* at ¶ 7. And defendants admit that they knew PTO was acting in reliance on the Certificates of Zoning Compliance. They concede that PTO informed City agents of its reliance on both the September, 2002 Certificate of Zoning Compliance issued to PTO's predecessor and the February, 2003 Certificate of Zoning Compliance issued to PTO: "Included in [the] information [PTO provided in April, 2004] was a letter to the City, dated April 28, 200[4], from the general counsel to Providence and Worcester

Railroad Company (P&W), stating that P&W had agreed to lease the Parcel to Plaintiff subject to execution of a mutually agreeable lease agreement, among other things." *DM* at 4.

There is no genuine dispute as to any of the material elements of equitable estoppel / detrimental reliance: Defendants issued a Certificate of Zoning Compliance to plaintiff PTO signed by an agent with actual express authority to do so. PTO incurred substantial costs in good faith reliance on that Certificate. Defendants are therefore estopped from denying liability to PTO as a matter of law.

**Interference with Contract (Count VI) and with Prospective Economic Advantage (Count VII)**

Here, too, cross-motions for summary judgment demonstrate no factual dispute. The only evidence proffered is plaintiff's.

Defendants speculate: plaintiff's allegations are "easy to doubt;" it would be "unlikely" for plaintiff to have entered any relevant contract; is not "conceivable" that plaintiff would have taken substantial steps in reliance on the Certificates of Zoning Compliance. *DM* at 36-38. Even as to a matter of which defendants are uniquely informed – its own agents' knowledge – defendants offer no evidence. They do not deny knowledge. Instead, they point to the allegations of the pleadings and ask for judgment on that basis, a rudimentary violation of Rule 56. *Id.*

PTO, on the other hand, has submitted affidavit evidence on each of the elements of the two state torts. These elements are similar, but not identical. Tortious interference with contract (Count VI) requires proof of the existence of a contract, *Smith Development Corporation v. Bilow Enterprises,* 112 R.I. 203212, 308 A.2d 477, 482 (1973), while tortious interference with

prospective contractual relations (Count VII) requires proof of a business relationship or expectancy. *L.A. Ray Realty, supra* at 207. The other elements are the same for both:

- Defendants' knowledge of the contract or expectancy;
- An intentional act of interference;
- Proof that that act caused plaintiff damage;
- Damages to PTO.

*Smith, supra; L.A. Ray, supra.* The main difference between the two is that plaintiff must prove an "actual contract" for the former, but not for the latter. *Mesolella v. Providence,* 508 A.2d 661, 670 (R.I. 1986).

An act of interference is "intentional" if done without justification. *Smith, supra* 112 R.I. at 108-109, 308 A.2d at 480. Plaintiff need not prove ill will or actual malice. *Id.; accord, Toste Farm Corp. v. Hadbury, Inc.*, 798 A.2d 901, 907 (R.I. 2002). "The burden of proving sufficient justification is on the defendant." *Id.* at 482.

As to causation on the prospective contractual relations count, plaintiff must prove either that, but for the interference, there would have been a business relationship, or that it is reasonably probable that, but for the interference, there would have been a business relationship. *L.A. Ray Realty, supra* at 207. Loss of anticipated profits must be proved with "reasonable certainty." *Id.* at 207-208.

The evidence is all in PTO's favor. Not only have defendants offered nothing but arguments of counsel to support their summary judgment motion, they are in no position to do anything else, given that the Rhode Island Superior Court has held that their interference with PTO lacked any legal justification whatsoever. *Poggi, Ex. I.*

Contract: The evidence is undisputed that PTO entered a contract with P&W Railroad, pursuant to which PTO agreed to lease the land at issue (approximately 7.4 acres) for $4132 per

month, and to pay applicable Pawtucket property taxes, for the next twenty (20) years. *Wheaton* at ¶ 2*; Poggi* at ¶ 7. PTO and P&W Railroad thereafter signed a document acknowledging this agreement on or about August 31, 2004. *Id.*

PTO also entered an agreement with Infinity Rail to lease one hundred (100) rail cars for eleven (11) years at $249 per car per month for the first year and at $425 per car per month for the next ten (10) years. *Wheaton* at ¶ 2; *Poggi* at ¶ 7.

Defendants argue that it is not "likely" or "conceivable" that PTO entered such contracts. *DM* at 37. The evidence is undisputed, however, that PTO did.

Business relationship or expectancy: According to PTO manager Daniel Poggi, operating as a "refuse transfer station", PTO planned to field construction debris from tractor-trailer trucks, to compact it and then to transfer it to railway cars, which would transport it out of state. *Poggi* at ¶¶3, 19, *Ex. H* at 1-2. He anticipated transporting up to one thousand (1000) tons a day from as many as one hundred (100) trucks. *Id.* at ¶ 22. The leases with P&W Railroad and Infinity Rail evidence this business relationship or expectancy.

Such business expectations on the part of a land developer were deemed so obvious in *L.A. Ray Realty, supra* that the defendants conceded the point.

Knowledge: Defendants knew of PTO's contracts and plans because agents of PTO told them. The City's knowledge is plain on the face of the Certificate of Zoning Compliance, which states that PTO plans to use the site as a "refuse transfer station."[9] *Poggi, Ex. B.* The City

[9] Defendants say they could not have known that defendant was planning a "construction and demolition debris transfer station" because their initial application said "refuse transfer station." *DM* at 37. The Superior Court made short work of this kind of flim flam, calling the distinction essentially frivolous: "[T]own officials [say] that a refuse [station] cannot possibly include construction and demolition debris. That … is also an arbitrary stretch of what the ordinance allows and does not allow. … [R]efuse is, by common definition, things that are thrown away." *Poggi*, *Ex. I* at 8.

therefore knew that plaintiff expected to develop the site for that purpose. A zoning application constitutes implicit notice that the applicant expects to enter whatever business relationships are necessary to the kind of development s/he has proposed. For this reason, defendants in *L.A. Realty, supra* conceded this point as well.

Defendants also knew of the contracts PTO was entering. They admit as much in their memorandum, when they acknowledge receiving in April, 2004 a copy of a letter from P&W Railroad's general counsel describing the lease P&W had agreed to enter with PTO. *DM* at 4. PTO manager Daniel Poggi also described the entire anticipated operation to the Zoning Board of Review. *Poggi* at ¶ 19, *Ex. H* at pp. 1-2.

<u>Intentional Interference:</u> Defendants cannot reasonably maintain that they did not interfere with PTO's contracts and expectations. Any act "'which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee" constitutes interference with contract. *Smith, supra* 112 R.I. at 212, 308 A.2d at 482 (quoting 84 A.L.R. 43, 52).

The rescission of PTO's Certificate of Zoning Compliance did all of these things. Without it, PTO was paralyzed. Plaintiff was forbidden to conduct the business it planned. Its ability to earn income was eliminated. The value of its contracts was *nil.* It could not develop its business. PTO could not even continue to pursue other permits. *Poggi* at ¶ 15.

This interference was unjustified as a matter of law, given the Rhode Island Superior Court's conclusions: "[T]here is nothing in the ordinance that would permit that conclusion on the part of the zoning board, … [T]hey have arbitrarily and capriciously amended the ordinance and read it in a way that the common, normal usage of the language does not permit, the language itself does not permit, nor does the context in which the provisions are found …"

*Poggi, Ex. I* at 4. *See also, id.* at 8 (it was "arbitrary" for defendants to conclude that a "construction and demolition debris transfer station" does not fall in the category of "refuse transfer station").

These holdings are the end of the question. Defendants' actions were not justified as a matter of state law.

<u>Causation:</u> Defendants' interference has cost PTO two years of unnecessary delay: from the initial July, 2004 decision refusing to honor PTO's Certificate of Zoning Compliance (*Poggi, Ex. F*) to the June, 2006 decision of the Superior Court reversing that decision (*Poggi, Ex. I*).

During that time, PTO's application to DEM was held in abeyance. *Poggi* at ¶ 15. It could not move forward on any of its business plans. *Id.* The date on which PTO could begin operations – after securing the necessary permits and making required improvements to the site – was pushed back two years.

Framed another way, but for defendants' interference, PTO would have begun its operations two years sooner. This establishes the requisite causation. *See, L.A. Ray, supra* (finding a causal link where, but for the town's illegal denial of a permit, plaintiff would have carried out its planned development of the site).

<u>Damages:</u> PTO has suffered two types of damage.

*First*, it has suffered pecuniary loss. During this two year delay, PTO has had to pay monthly rental fees and City property taxes on the site. *Wheaton* at ¶¶ 2b and 2c. It has also been required to pay management expenses. *Id.* at ¶ 3. These costs have been substantial:

| | |
|---|---|
| Rent of railway cars from February 2005: | $ 511,300 |
| Rent of land for two years: | $ 99,264 |

| | |
|---|---|
| Payment of City taxes for two years: | $ 74,427 |
| Management and legal expenses for two years: | $ 163,340 |
| Total | $ 848,331 |

The payment of these fees gained PTO nothing at all. PTO could do nothing but tread water, and suffer unnecessary expense, for the two years it took to reverse the City's rescission of PTO's Certificate of Zoning Compliance. *Poggi* at ¶ 15.

*Second*, there are lost profits. But for this two year delay, PTO would have begun its business sooner, thereby realizing two additional years of profit. "Loss of prospective profits, if properly established, constitutes a proper basis for the award of damages" for both of these torts. *L.A. Ray Realty, supra* at 207-208.

Ordinarily, courts use the operational history of the enterprise to measure the value of lost profits. Where the business is new, the question is whether the prospective profit loss can be proven with reasonable certainty by other means.[10] *Smith, supra* 112 R.I. at 212, 308 A.2d at 482-483. "'[Where] the existence of a loss is established, absolute certainty in proving its quantum is not required.'" *Id.*, 212 R.I. at 214, 308 A.2d at483 (quoting Sedgwick, *Damages* § 170A (9th ed. 1912)).

Here, PTO has presented uncontradicted evidence of a reasonably certain profit loss amounting conservatively to $3,465,979. *Wheaton* at ¶ 4.

---

[10] Rhode Island has rejected the "new business rule", which holds that anticipated profits from a new business without a track record cannot be recovered as damages. *Smith, supra* 112 R.I. at 212, 308 A.2d at 482.

**Conclusion**

For all of these reasons, plaintiff PTO asks that this Court deny defendants' motion for summary judgment on Counts I, II and III (substantive and procedural due process and equal protection under § 1983) on the ground that there remain genuine issues of material fact.

Plaintiff PTO asks that this Court grant it summary judgment on Counts IV-VII (pendent state equitable and tort causes of action) on the ground that there are no genuine issues of material fact and plaintiff is entitled to judgment as a matter of law.

Respectfully submitted,
Pawtucket Transfer Operations LLC
By its Attorneys,
McKinnon & Harwood

/s/ John B. Harwood
/s/ Michael E. Sendley
John B. Harwood (#2093)
Michael E. Sendley (#5591)
1168 Newport Avenue
Pawtucket, RI 02871
(401) 723-9655
(401) 722-9106 (facsimile)

**CERTIFICATION**

I hereby certify that on Monday, May 07, 2007, a true copy of the within, was served upon the following and in the following manner(s):

Marc DeSisto, Esq., Michael A. DeSisto, Esq., DeSisto Law by electronic means to "marc@desistolaw.com" and Michael@desistolaw.com through the ECF system.

/s/ Michael E. Sendley
Michael E. Sendley