UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PAWTUCKET TRANSFER OPERATIONS, LLC, Plaintiff, | ) | |
| v. | ) | C.A. No. 05-520 S |
| CITY OF PAWTUCKET, et al., Defendants. | ) | |

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

In this matter, Plaintiff seeks to fashion a federal case out of what amounts to a local planning dispute over the permitting of a transfer station. The effort ultimately fails, in spite of apparently less than model behavior by the local zoning officials.

Procedurally, what is now before the Court are cross-motions for summary judgment. For the reasons stated, the Court grants in part Defendants' Motion for Summary Judgment, and denies as moot Plaintiff's cross-Motion for Summary Judgment.

This action is styled as a civil rights action brought under 42 U.S.C. § 1983 for an alleged deprivation of rights under the United States Constitution. The action was commenced by Pawtucket Transfer Operations, LLC ("PTO"), a limited liability company authorized to do business in the State of Rhode Island with offices located in the City of Warwick. PTO filed a seven count Complaint

against the City of Pawtucket ("City"), the City of Pawtucket Zoning Board of Review ("Zoning Board"), and Michael Cassidy as Director of the City of Pawtucket Planning and Redevelopment Commission ("Planning Director") (collectively, "Defendants").

I. FACTUAL SUMMARY

The Court sketches the following facts relevant to this decision, drawing all inferences in favor of the nonmovant (which, for purposes of this decision, is PTO). On September 24, 2002, the Pawtucket Division of Zoning and Code Enforcement ("Zoning Division") granted a Certificate of Zoning Compliance to Daniel J. Poggi for Pawtucket Railway Hauling, LLC.[1] The zoning certificate, which was signed by Todd Olbrych, above the title "Building Official," states that the use of a parcel of property at 280 Pine Street in Pawtucket ("the Property") as a "Refuse transfer station" "conforms to the Zoning Ordinance of the City of Pawtucket, Rhode Island." At the time, the Property was apparently owned by Pawtucket and Worcester Railway Company ("P&W Railway").

On February 27, 2003, the Zoning Division granted a Certificate of Zoning Compliance to PTO (as opposed to Pawtucket Railway Hauling). This certificate was also signed by Todd Olbrych, again above the title "Building Official." As with the

---

[1] PTO alleges that Pawtucket Railway Hauling, LLC was PTO's predecessor in interest. While the assertion of this relationship has been disputed by Defendants, the Court need not resolve the question because it has no bearing on the outcome.

first certificate, the second certificate stated that a refuse transfer station was a conforming use for the Property under the Pawtucket Zoning Ordinance ("Zoning Ordinance"). At the time each zoning certificate was issued, the Director of the Zoning Division was Ronald F. Travers. However, Poggi (who was involved in the acquisition of both the certificate for Pawtucket Railway Hauling, LLC and the certificate for PTO) claims to have overheard Travers say to Olbrych that he (Travers) wanted Olbrych to sign the certificates.[2] In addition, Olbrych stated in his affidavit that, between 2000 and 2004, he signed 478 "Certificates of Zoning Compliance," and that his authority to do so was never questioned.[3]

Within days after it was issued the second zoning certificate, PTO negotiated an agreement with P&W Railway which, if executed,

---

[2] According to Travers, between 2000 and 2005 the Zoning Division issued 960 zoning certificates. Of those 960 certificates, Travers signed only 180 (39 of which he actually signed over the pre-printed name of a Pawtucket building official). The remaining certificates were signed by other officials within the Zoning Division.

[3] The issue of whether Olbrych had actual or apparent authority to sign the zoning certificates or whether such certificates in any way bound the city is, in a word, irrelevant. As explained elsewhere in this opinion, even if Olbrych had the authority to sign the certificates or if the certificates created a property right, PTO has not adumbrated a valid claim for either procedural due process or substantive due process. And, while the Court finds the City's handling of the certificates to be less than ideal, in that the procedures employed cannot be expected to increase the public's confidence in its local authorities, the dispute over Olbrych's authority does not illuminate any facts sufficiently egregious to support an equal protection claim.

would allow PTO to take control of the Property in exchange for monthly payments to P&W Railway.

On or about July 31, 2003, PTO submitted a Site Plan Review Request Form to the City Planning and Redevelopment Commission ("Planning Commission") seeking permission to operate a "railroad shipping operations/transfer station for refuse" on the Property. PTO attached a copy of the second zoning certificate to the request form.

Subsequently, on August 5, 2003, PTO sent a letter to the Planning Commission requesting that the Commission schedule a hearing that month on the subject of PTO's proposed transfer station. In its letter, PTO stated that it was "in the process of permitting this project through the Rhode Island Department of Environmental Management (RIDEM)," and that RIDEM had advised PTO to seek the City's approval of the project concurrent with RIDEM permitting.

On August 12, 2003, the Planning Director responded to PTO's letter and requested that PTO provide a copy of its RIDEM application in order to facilitate a complete review of the proposed project. As a result of the Planning Director's request, no hearing was held by the Planning Commission.

PTO had applied to RIDEM for a proposed "C&D [Construction and Demolition] Processing Facility and for a proposed Solid Waste Transfer Station" at the Property. On February 27, 2004, RIDEM

notified PTO that it reviewed PTO's application, that the application contained several deficiencies, and that the application would be denied if the deficiencies were not rectified.

On March 30, 2004, PTO filed a second Site Plan Review Request Form with the Planning Commission. Instead of the use described in the first request form, which was a "railroad shipping operations/transfer station for refuse," the use described in this second request form was a "railroad terminal and construction and demolition debris transfer station."

The Planning Director determined that the second request form was incomplete and asked for additional information, including a letter from P&W Railway confirming its agreement with PTO for specific uses at the Property. PTO provided the requested information on April 28, 2004, including a letter from the P&W Railway's General Counsel stating that "P&W has agreed to lease the Property to [PTO], subject to the execution of a mutually agreeable lease agreement, and subject to [PTO's] ability to obtain the necessary permits to develop the Property."

On April 29, 2004, the Planning Director acknowledged receipt of the additional information. However, he also informed PTO that it was the opinion of the Planning Commission that PTO's zoning certificate may have been issued in error. The Planning Director's letter claimed that Zoning Ordinance section 410-12.5(I) categorized a <u>public</u> refuse transfer station as an allowable use

for the Property, thus possibly prohibiting PTO's proposed private refuse transfer station. The Planning Director also indicated that the matter had been referred to the City's Law Department for a legal opinion as to whether PTO's proposed use was allowed under the Zoning Ordinance.

On July 12, 2004, the Planning Director informed PTO that the Law Department had concluded that a private refuse transfer station was not an allowed use for the Property under the Zoning Ordinance. The Planning Director also noted that PTO's RIDEM application described the proposed project not as a refuse transfer station but as a construction and demolition debris processing facility. According to the Planning Director, such a use was not an allowed use under any provision of the Zoning Ordinance, and PTO therefore would need to obtain a use variance from the Zoning Board before the Planning Commission could give consideration to PTO's second request form.

In response to the Planning Director's letter, PTO took two actions. First, on July 28, 2004, PTO appealed the Planning Commission's decision to the Zoning Board. Second, PTO filed for a use variance with the Zoning Board (however, it subsequently withdrew the variance application on October 6). In the meantime, on September 22, the City Council passed a resolution opposing PTO's proposed project and communicated the resolution to the

Zoning Board. PTO's appeal to the Zoning Board was heard and denied on November 9.

PTO next filed an appeal of the Zoning Board's decision in the Rhode Island Superior Court. On June 22, 2006, the Superior Court issued a bench decision in favor of PTO, ruling that a private refuse transfer station was a permitted use for the Property. However, despite this reversal, PTO apparently has not received approval from RIDEM to operate either a refuse transfer station or a construction and demolition debris transfer station on the Property. Defendants subsequently appealed the Superior Court's decision to the Rhode Island Supreme Court and, as far as is known by this Court, that appeal remains pending.

II. STANDARD OF REVIEW

Defendants now move for summary judgment on all seven counts of PTO's Complaint. PTO moves for summary judgment on Counts IV, V, VI, and VII of its Complaint.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational finder of fact could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the

outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citation omitted).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, 43 F.3d at 735. Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted). Cross motions for summary judgment do not change the standard, Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007), but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001). In deciding a typical cross-motion for summary judgment, courts must consider each motion separately, drawing inferences against each movant in turn. Reich, 126 F.3d at 6. For the purposes of these Motions, the Court considers Defendants' Motion first, drawing appropriate inferences in favor of PTO.

## III. DISCUSSION

### A. Count I (Procedural Due Process)

PTO's procedural due process claim alleges that Defendants unlawfully revoked PTO's zoning certificates without authority and in violation of the procedural requirements set forth in the Zoning Ordinance. PTO alleges that it thus was denied its procedural due process rights under the Fifth and Fourteenth Amendments of the United States Constitution, as implemented by 42 U.S.C. § 1983, and Article One, Section Two, of the Rhode Island Constitution.[4]

To establish a procedural due process violation, PTO must prove two things: first, PTO must show that it had a property interest as defined by state law; and second, that Defendants, acting under color of state law, deprived it of its property interest without adequate legal process. See, e.g., SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 139 (1st Cir. 2005); PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 30 (1st Cir. 1991).

Constitutionally protected property interests are delineated not by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law." Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)

---

[4] As the drafters of the Rhode Island Constitution intended that document's Due Process Clause to parallel the Due Process Clause of the Fourteenth Amendment, see Jones v. Rhode Island, 724 F. Supp. 25, 34-35 (D.R.I. 1989), the Court will consider them together.

(quotation omitted). It goes without saying that a person claiming a violation of a property right must have a legitimate claim of entitlement to that right. See, e.g., Macone v. Town of Wakefield, 277 F.3d 1, 9 (1st Cir. 2002). Here, PTO claims that its zoning certificates created a constitutionally protected property right to use the Property for the use described in the certificates.

At the outset, PTO argues that summary judgment is precluded by a factual dispute over whether PTO's zoning certificates are "zoning certificates" issued pursuant to Zoning Ordinance section 410-93, or "Certificates of Zoning Compliance" issued pursuant to Zoning Ordinance section 410-96. PTO concedes that the former are informational only, but argues that the latter "unequivocal[ly] . . . create[] a constitutionally protected property right." Defendant, on the other hand, argues that neither type of certification creates any constitutionally protected property right, and thus it is of no consequence under which Zoning Ordinance section the zoning certificates were issued.

The Court agrees with PTO that, at least on an initial pass, it appears that the certificates were issued pursuant to Zoning Ordinance section 410-96. Most obviously, the certificates bear the title "Certificate of Zoning Compliance," which is the precise term used in section 410-96. However, while there may be a question of fact as to which Zoning Ordinance section authorized the issuance of the certificates, the Court believes that the

answer ultimately is immaterial. Even if PTO could establish that its certificates gave rise to a constitutionally protected property right (as the Court will assume for purposes of this discussion), it cannot establish that it was deprived of that interest without due process of law.

That PTO was not provided with a hearing prior to the deprivation of its purported property right does not, by itself, establish a violation of due process. It is well established that when a deprivation of property results from conduct of state officials in violation of state law, failure to provide pre-deprivation process does not necessarily violate the Due Process Clause, particularly when post-deprivation due process is available. See, e.g., PFZ Props., 928 F.2d at 31 (citing Parratt v. Taylor, 451 U.S. 527, 543 (1980), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31 (1986)). In PFZ Properties, the post-deprivation process found adequate by the First Circuit Court of Appeals included the right to petition the administrative agency for reconsideration and to seek judicial review in state court. Id. at 31; see also Amsden v. Moran, 904 F.2d 748, 755 (1st Cir. 1990) ("The availability of judicial review is an especially salient consideration in situations where permits and licenses have been denied or revoked by state or local authorities in alleged derogation of procedural due process."); SFW Arecibo, 415 F.3d at 139 (citing approvingly PFZ Props. and stating

"our focus is on the availability of post-deprivation, rather than pre-deprivation, process"); Licari v. Ferruzzi, 22 F.3d 344, 348 (1st Cir. 1994) ("There is a further reason why the revocation of the building permits did not violate [plaintiff's] right to procedural due process: postdeprivation remedies were available.").

Thus, in order to determine whether a procedural due process violation has occurred, this Court must focus on "what process the State provided, and whether it was constitutionally adequate." Zinermon v. Burch, 494 U.S. 113, 126 (1990). The inquiry must "examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law." Id. Here, the procedural safeguards afforded to PTO are analogous to those found adequate in PFZ Props., SFW Arecibo, and similar decisions.

The Planning Director determined that PTO was required to obtain a use variance for its proposed use, despite having acquired its zoning certificates. PTO registered its objection to the Planning Director's decision by filing an appeal to the Zoning Board. See Zoning Ordinance § 410-15.1(H)(4). After receiving an adverse decision from the Zoning Board, PTO invoked the jurisdiction of the Rhode Island Superior Court, availing itself of its further right to appeal under Rhode Island law. See R.I. Gen.

Laws § 45-24-69 (providing for appeals of decisions issued by zoning boards of review). These post-deprivation procedural safeguards were more than adequate to satisfy the requirements of procedural due process. See, e.g., SFW Arecibo, 415 F.3d at 140 (procedural due process satisfied by "the right to petition the administrative agency for reconsideration and to seek judicial review"). PTO's citation to Zoning Ordinance section 410-15.1(F)(2) misses the mark. That section provides that the Planning Commission shall hold a public hearing within 30 days of the receipt of a "complete development plan application." It in no way mandates a pre-deprivation hearing under the circumstances presented here, where PTO's application was (rightly or wrongly) determined to be incomplete. To the extent that PTO believes that the Planning Director failed to perform an act he had no legal discretion to refuse, i.e. that the Planning Director improperly failed to declare PTO's application to be complete, PTO could also seek relief by way of a writ of mandamus. See, e.g., P.J.C. Realty, Inc. v. Barry, 811 A.2d 1202 (R.I. 2002) (writ of mandamus is appropriate when duty to be enforced demands no special discretion, judgment, or skill). In sum, PTO simply has not established that it has been deprived of a property interest without adequate due process of law.[5]

---

[5] Defendants additionally claim the protection of the doctrine of qualified immunity. (MSJ at 16.) Qualified immunity operates

B. Count II (Substantive Due Process)

PTO's substantive due process claim alleges that Defendants engaged in "arbitrary, egregious and irrational abuses of their governmental powers in a manner which bears no rational relationship to any legitimate governmental interest and amounts to illegal spot zoning and an effort to delay, hinder and prevent [PTO] from making use of the Subject Property in a manner permitted by state and local law," all in violation of the Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Article One, Section Two, of the Rhode Island Constitution.

It is settled that the Due Process Clause of the Fourteenth Amendment "not only accords procedural safeguards to protected interests, but likewise protects substantive aspects of liberty against impermissible governmental restrictions." Harrah Indep. Sch. Dist. v. Martin, 440 U.S. 194, 197 (1979). Thus, questions of due process may implicate both procedural and substantive rights. The substantive component of due process "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the

---

as a shield against liability for civil damages for government officials who wield discretionary powers, provided that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Amsden v. Moran, 904 F.2d 748, 751 (1st Cir. 1990) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In light of the conclusion that PTO was provided with adequate due process, the Court need not decide the qualified immunity issue.

procedures used to implement them.'" Zinermon, 494 U.S. at 125 (quoting Daniels, 474 U.S. at 331).

The First Circuit, however, has repeatedly held that local planning disputes "do not ordinarily implicate substantive due process." Licari, 22 F.3d at 349 (quoting PFZ Props., 928 F.2d at 31). A regulatory board does not transgress constitutional due process requirements "merely by making decisions 'for erroneous reasons' or by making 'demands which arguably exceed its authority under the relevant state statutes.'" Licari, 22 F.3d at 350 (quoting Amsden, 904 F.2d at 757); see also Chiplin Enters., Inc. v. City of Lebanon, 712 F.2d 1524, 1528 (1st Cir. 1983); Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 832 n.9 (1st Cir. 1982). In sum, while the First Circuit has "left the door slightly ajar for federal relief [based on substantive due process] in truly horrendous situations," Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992), "the threshold for establishing the requisite 'abuse of government power' is a high one indeed." Id.

Here, the most that PTO can establish is that Defendants acted erroneously or in excess of their authority and, indeed, that is essentially what PTO alleged in its Amended Complaint: "The July 12, 2004 determination of the Defendant Planning Director that the Division of Zoning and Code Enforcement was in error and his refusal to accept the Zoning Certificates was a usurpation of the

legal authority of the Division of Zoning and Code Enforcement and was beyond his authority and ultra vires." Am. Compl. ¶ 24. Assuming the truth of these and PTO's other allegations, they do not come near the threshold for a denial of substantive due process. See Licari, 22 F.3d at 350; Amsden, 904 F.2d at 757.

Creative Env'ts is illustrative of the care with which courts must approach questions of substantive due process in the context of local planning disputes. In that case, the Planning Board of the Town of Bolton, Massachusetts denied approval to a proposed housing development. The plaintiff developer alleged, inter alia, that it was deprived of its due process rights. The First Circuit assumed that the developer "could have established at trial that the town engaged in adversarial and even arbitrary tactics." Creative Env'ts, 680 F.2d at 829. Even so, the Court held that "[s]uch a claim is too typical of the run of the mill dispute between a developer and a town planning agency, regardless of [the plaintiff's] characterizations of it and of defendants' alleged mental states, to rise to the level of a due process violation." Id. at 833. The Court elaborated:

> The authority cited by [plaintiff], as well as other cases, all suggest that the conventional planning dispute-at least when not tainted with fundamental procedural irregularity, racial animus, or the like-which takes place within the framework of an admittedly valid state subdivision scheme is a matter primarily of concern to the state and does not implicate the Constitution. This would be true even were planning officials to clearly violate, much less "distort" the state scheme

> under which they operate. A federal court, after all, "should not . . . sit as a zoning board of appeals." . . . *Every* appeal by a disappointed developer from an adverse ruling by a local Massachusetts planning board necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as "due process" or "equal protection" in order to raise a substantial federal question under section 1983. As has been often stated, "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution." . . . In short, we see nothing in the present case to distinguish it sufficiently from the usual land developer's claim under state law to warrant recognition of a federal constitutional question. [Plaintiff] may quite possibly have state law claims on the facts alleged. If so, there appear to be adequate state law remedies to vindicate these claims without resort to a federal court.

Creative Env'ts, 680 F.2d at 833. Similarly, PTO's evidence points to a local planning dispute of no particular exception. As already described, here the Planning Director determined that PTO was required to obtain a use variance for its proposed use, despite having acquired its zoning certificates.[6] PTO registered its objection to the Planning Director's decision by filing an appeal to the Zoning Board, and later the Superior Court, after receiving

---

[6] As explained in note 3, supra, PTO's acquisition of the zoning certificates is irrelevant to the outcome of this decision. However, even if given the construction urged by PTO, the circumstances surrounding the Planning Director's issuance of the certificates simply do not satisfy the high standard applied to substantive due process claims. See, e.g., Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (substantive due process is appropriate only in "truly horrendous situations").

an adverse decision from the Zoning Board. Certainly, in light of the First Circuit's rejection of substantive due process claims even where premised on outright maliciousness, see, e.g., Amsden, 904 F.2d at 904; Roy v. City of Augusta, Maine, 712 F.2d 1517, 1523 (1st Cir. 1983), PTO's evidence falls dramatically short of establishing any viable substantive due process claim.

C. Count III (Equal Protection)

PTO's equal protection claim alleges that Defendants "discriminated against Plaintiff in a manner that bears no reasonable relationship to any legitimate governmental or public interest, and arbitrarily impose[d] restrictions on a discriminatory basis specific to the Subject Property." PTO alleges that it was denied its equal protection rights under the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1983, and Article One, Section Two, of the Rhode Island Constitution.[7]

The Equal Protection Clause of the Fourteenth Amendment provides that similarly situated persons are to receive substantially similar treatment from governmental authorities.

---

[7] The Court observes that the drafters of the Rhode Island Constitution intended the Equal Protection Clause of the Rhode Island Constitution to provide protection similar to the Equal Protection Clause of the Fourteenth Amendment. See Kleczek v. R.I. Interscholastic League, Inc., 612 A.2d 734, 740 (R.I. 1992). Therefore, as on the matter of due process, the Court will consider the two claims together.

See, e.g., Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004); see also U.S. Const. amend. XIV, § 1 ("No state shall ... deny to any person within its jurisdiction the equal protection of the laws."). In order to establish an equal protection violation, a plaintiff must

> adduce sufficient evidence from which a rational jury reasonably could conclude that, "compared with others similarly situated, [he] was selectively treated ... based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Tapalian, 377 F.3d at 5 (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortgage Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001)) (emphasis in original).

PTO has not satisfied the elements of an equal protection claim. The primary factual allegation on which PTO relies -- Olbrych's declaration that he signed hundreds of zoning certificates without challenge to his authority -- is too thin a reed to support an equal protection claim. Even if Olbrych's testimony is accurate (and, indeed, the Court has no reason to doubt it), it fails to inform the relevant legal standard because it does not "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently." Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989)) (emphasis added). Olbrych's testimony, while

perhaps troubling in what it appears to reveal about Defendants' lackadaisical approach to important governmental procedures, lacks any detail about the other recipients of zoning certificates, such as their identities, proposed uses, or subsequent interactions with the City and its various departments. Without such information, PTO is left with nothing more than unsupported allegations, which cannot form the basis of a successful opposition to summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Furthermore, even assuming that PTO was treated selectively, it has not put forward any evidence that such treatment was unconstitutional, i.e. that "that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz, 60 F.3d at 910 (quoting Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. Of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989)).

Because it did not allege any other basis, the Court must assume that PTO's equal protection claim is based on a theory that Defendants had a malicious or bad faith intent in denying or revoking PTO's development application. Ordinarily, "such a plaintiff must establish more than that the government official's actions were simply arbitrary or erroneous; instead, the plaintiff must establish that the defendant's actions constituted a 'gross

abuse of power.'" Tapalian, 377 F.3d at 6 (quoting Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000)); see also Rubinovitz, 60 F.3d at 912 ("gross abuse of power" where official harbors personal hostility toward plaintiff, and undertakes a "malicious orchestrated campaign causing substantial harm"); Esmail v. Macrane, 53 F.3d 176, 179, 180 (7th Cir. 1995) (viable equal protection claim based upon mayor's "orchestrated campaign of official harassment directed against [plaintiff] out of sheer malice" and "spiteful effort to 'get' [plaintiff] for reasons wholly unrelated to any legitimate state objective"). Bad faith or malicious intent cases "are infrequent." Rubinovitz, 60 F.3d at 911. "Every appeal by a disappointed developer from an adverse ruling by a local . . . planning board necessarily involves some claim that the board exceeded, abused or 'distorted' its legal authority in some manner, often for some allegedly perverse (from the developer's point of view) reason. It is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983." PFZ Props., 928 F.2d at 32-33 (quoting Creative Env'ts, 680 F.2d at 833). The First Circuit has held that an arbitrary and unlawful denial of a permit -- even a denial in bad faith -- "does not rise above the constitutional threshold for equal protection and substantive due process claims." Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000); see also Nestor,

964 F.2d at 45 ("We have left the door slightly ajar for federal relief in truly horrendous situations.").

In Rubinovitz, after plaintiffs evicted from their property the friend of a city official, they found themselves on the receiving end of an alleged conspiracy of city officials determined to cut off the plaintiffs' utility services, charge the plaintiffs with code violations, interfere with the plaintiffs' hiring of a contractor, and otherwise frustrate the plaintiffs' use of their property. Rubinowitz, 60 F.3d at 908-09. Even with this vendetta before it, the First Circuit concluded that there was "only barely enough evidence" for the plaintiffs' equal protection claim to move beyond summary judgment. Id. at 912. As the Court later observed, Rubinovitz "illustrates the extreme 'malicious orchestrated campaign' needed to surmount the constitutional threshold." Baker, 230 F.3d at 474.

Tapalian provides another useful illustration. In that case, which was an appeal from a judgment entered on a jury verdict, the trial record was "laden with the language of personal malice and 'bad faith' retaliation." Tapalian, 377 F.3d at 7. The defendant, a city official who was alleged to have retaliated after the plaintiff developer refused his request to "supply him with 'two women,'" imposed several costly and unnecessary conditions on the plaintiff's development, some of which violated a prior, court-approved agreement. Id. at 4-5. The city official's assistant

even testified that the official was "deliberately busting [the plaintiff's] balls." Id. at 7. Based on this evidence, the First Circuit found, the jury rationally could infer that the defendant "had engaged in a 'malicious orchestrated campaign causing substantial harm,' thereby constituting a gross abuse of power." Id. at 7.

The evidence here, in contrast, even if viewed in the light most favorable to PTO, does not suggest anything rising to the level of a "gross abuse of power." Tapalian, 377 F.3d at 6. Instead, what is before the Court appears to be nothing more than a common planning dispute. PTO was issued a certificate of zoning compliance and subsequently informed that the certificate was issued in error and that PTO's proposed use would require a variance. PTO filed a variance application, later withdrawn, and simultaneously appealed the matter to the Zoning Board. When the appeal was resolved unsatisfactorily, PTO took its case to Superior Court, as was its right under the law. But, though PTO may have been dissatisfied with its experience, there is no basis in the record for any finding that PTO was "singled . . . out for unlawful oppression," Dartmouth Review, 889 F.2d at 19 (quoting Burt v. City of New York, 156 F.2d 791, 791 (2d Cir. 1946)), or that it "suffered what others have in general escaped," Burt, 156 F.2d at 791. Try as it might, PTO has not succeeded in meeting the high

standard required to make a constitutional mountain out of this planning dispute molehill.

D. Remaining State Law Claims

Both parties move for summary judgment on Count IV (Equitable Estoppel), Count V (Detrimental Reliance), Count VI (Interference with Contractual Relations), and Count VII (Interference with Prospective Economic Advantage). However, given the Court's findings with respect to Counts I, II, and III, Counts IV, V, VI, and VII will be dismissed, without prejudice, on the authority of United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). These counts are purely state law claims, and when "the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." Id. at 726; see also Gilbert v. City of Cambridge, 932 F.2d 51, 67 (1st Cir. 1991). Thus, without expressing an opinion as to their merits, the Court will dismiss, without prejudice, Counts IV through VII.

IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment as to Counts I, II, and III of PTO's Amended Complaint is GRANTED; Defendants' Motion for Summary Judgment as to Counts IV, V, VI, and VII of PTO's Amended Complaint is DENIED AS MOOT; Counts

IV, V, VI, and VII of PTO's Amended Complaint are DISMISSED WITHOUT PREJUDICE; and PTO's Motion for Summary Judgment is DENIED AS MOOT.

IT IS SO ORDERED.

WESmith

William E. Smith
U.S. District Judge
Date: 3/20/08